STEVEN N. BERGER, SBA #009613
PATRICK A. CLISHAM, SBA #023154
MICHAEL P. ROLLAND, SBA #030744
**ENGELMAN BERGER, P.C.**
2800 NORTH CENTRAL AVENUE, SUITE 1200
PHOENIX, ARIZONA 85004
_____
Ph: (602) 271-9090
Fax: (602) 222-4999
Email: snb@eblawyers.com
Email: pac@eblawyers.com
Email: mpr@eblawyers.com
_____
Proposed Counsel for Debtor
and Debtor-in-Possession GPMI, Co.

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| GPMI, CO., an Arizona corporation, | Case No. 2:22-bk-00150-EPB |
| EIN 86-0635770 | |
| Debtor. | |

**DEBTOR'S EMERGENCY MOTION FOR
ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
DEBTOR TO (A) OBTAIN POSTPETITION FACTORING AND FINANCING
AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS
AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) GRANTING ADEQUATE PROTECTION, (IV) SCHEDULING
A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

GPMI Co. ("**Debtor**"), debtor and debtor-in-possession in the above-captioned reorganization case (the "**Case**"), by and through counsel undersigned, moves this Court for entry of an interim and a final order under 11 U.S.C. §§ 105(a), 361, 362, 363, 364, 507(b), Rules 2002, 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 4001-4 Local Rules of Bankruptcy Procedure for the District of Arizona, authorizing Debtor to obtain

secured post-petition financing from FSW Funding ("**FSW**") as lead lender (collectively[1] the "**DIP Lender**"), and authorizing the limited use of cash collateral and grant of adequate protection as proposed hereunder.

The following information is provided in compliance with Bankruptcy Rule 4001(b)(1)(B) and Local Rule 4001-4:

- DIP Lender will provide a senior secured and junior secured (with respect to certain Prepetition Preserved Collateral as defined below) super-priority debtor-in-possession credit facility in an aggregate principal amount not to exceed $2.5 million comprised of an accounts receivable factoring facility (the "**A/R Facility**") of up to $2.0 million (the "**Factoring Commitment**"), and an inventory credit facility (the "**Inventory Facility**") of up to $500,000 (the "**Inventory Commitment**"). In addition, during the Interim Period only (defined below) DIP Lender has agreed to advance additional up to 95% of cash in Debtor's deposit accounts that may be temporarily inaccessible by Debtor during the early stages of this Case (the "**Interim Advance Facility**" and together with the A/R Facility and Inventory Facility, the "**DIP Facility**" or "**DIP Loan**").

- Debtor's accounts receivable shall be factored at an advance rate of 85% up to the approved Factoring Commitment. Interest on the Inventory Credit Facility shall accrue at a rate of eighteen and one-half percent (18.5%) per annum (the "**Interest Rate**").

- DIP Lender will be granted a first priority position lien and security interest in all of the DIP Collateral and a junior priority lien on the Prepetition Preserved Collateral.

- Pursuant to Bankruptcy Code § 364(c), DIP Lender will be granted super-priority administrative expense status, with respect to the obligations under such post-petition financing, with priority over any and all administrative expenses of the kinds

---

[1] FSW Funding is acting as the lead DIP Lender with financial participation of third party lender Lancelot Holdings, LLC.

specified in Bankruptcy Code §§ 503(b), 507(b) and 546(c), except for the carve-out for Debtor's professionals (the "**Carve-Out**") as further described in the proposed interim order attached as "<u>**Exhibit A**</u>" ("**Interim Order**").

- Interim approval of the DIP Facility is being sought for the period between the emergency hearing requested and the final hearing on this Motion (the "**Interim Period**").

- Debtor does not propose to grant liens or security interests against rights and actions arising under Code §§ 544, 545, 547, or 548.

- Debtor does not propose to use proceeds from the post-petition financing to pay pre-petition secured debt.

- Pursuant to the proposed post-petition financing, DIP Lender will be granted first priority liens and security interests (subject only to any prior, perfected, unavoidable liens securing existing liabilities having priority under applicable law) in all of the DIP Collateral, as defined below.

This Motion seeks immediate entry of an interim order granting the Motion and is brought on an emergency basis on expedited notice under Local Bankruptcy Rule 9013-1(h) to avoid immediate and irreparable harm to Debtor's estate. Debtor is in the business of manufacturing cleaning "wipes" and employs 49 employees. The relief requested is crucial to preserving Debtor's going concern and continuing its ordinary course business.

As described in the accompanying *Declaration of Yarron Bendor in Support of Debtor's Chapter 11 Petitions and First Day Motions* (the "**Bendor Declaration**"),[2] Debtor seeks approval of the $2.5 million DIP Facility from DIP Lender and the limited use of Cash Collateral otherwise subject to the liens and claims of Debtor's Blanket Lien Creditors (as defined below) pursuant to the Budget.

---

[2]     Capitalized terms not defined herein shall have the meanings ascribed to them in the Bendor Declaration.

First-priority liens will be granted to the DIP Lender on substantially all of Debtor's unencumbered assets including, without limitation: (a) those additional assets with respect to which Debtor's Blanket Lien Creditors have agreed to subordinate their liens and allow the DIP Lender to prime their otherwise senior liens, and (b) certain claims asserted by Debtor in pending, prepetition litigation against Michelin North America *et. al.*, and potential causes of action held by Debtor against Albaad, Inc. (collectively, the "**DIP Collateral**"). In addition, junior priority liens will be granted to the DIP Lender on all of Debtor's other assets (primarily Debtor's leased equipment) that remain subject to Prepetition Lien Creditor (defined below) claims (the "**Prepetition Preserved Collateral**"). Debtor will also provide adequate protection to its Blanket Lien Creditors as set forth herein in the DIP Orders (defined below).

If approved, Debtor will use cash collateral and the proceeds of the DIP Loan to continue operations and meeting customer orders, honor employee wages and benefits, procure goods and services, fund general and corporate operating needs and the administration of this Case, and other ordinary course expenses all in accordance with the Budget.

For the reasons set forth hereinafter and in the Bendor Declaration, Debtor believes that approval of the DIP Loan is appropriate, is a sound exercise of business judgment, and will maximize the value of Debtor's estate for the benefit of all stakeholders. Debtor respectfully requests that the Court approve the relief requested herein, and enter the Interim Order on an emergency basis, to be followed by entry of a final order (the "**Final Order**," and together with the Interim Order, the "**DIP Orders**") at the final hearing on this Motion.

In further support of this Motion, Debtor states as follows:

## JURISDICTION

1. On January 10, 2022 (the "**Petition Date**"), Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"). Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.      An Official Committee of Unsecured Creditors has not yet been appointed.

3.      This Court has jurisdiction over this Case and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

4.      The statutory predicates for the relief requested are Bankruptcy Code §§ 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002 and 4001, and Local Rule 4001-4.

## FACTUAL BACKGROUND

1.      A full recitation of the facts and circumstances surrounding this Case is set forth in the Bendor Declaration filed contemporaneously herewith and incorporated herein by this reference.

2.      As of the Petition Date, Debtor had total assets (at book value) of approximately $15,244,393 consisting of: (i) cash of $84,989.36 (ii) accounts receivable of $1,536,556, (iii) inventory of $426,170, (iv) raw materials and work in progress of $1,497,861, (v) personal property and equipment of $9,951,321, and (vi) leasehold real property interest of $2,007,827. More detailed information concerning the assets, liabilities, and financial condition of Debtor may be found in the statement of financial affairs and schedules filed by Debtor.

3.      Although Debtor continues to operate and has excellent business prospects going forward, Debtor has suffered significant financial setbacks resulting from the breach by Albaad of certain contractual obligations that within the last nine months have severely impacted Debtor's working capital and caused mounting accounts payable.  These conditions rendered impracticable satisfying Debtor's need for additional working capital financing outside of chapter 11.  Without working capital financing, Debtor is in jeopardy of running out of cash in the short term. Debtor therefore secured the present commitment for the proposed DIP Loan in contemplation of this Case.

4.      The DIP Loan, if approved and obtained, should be sufficient to allow Debtor to continue to operate and restructure its obligations through a confirmed plan of reorganization.

## FACTS PERTINENT TO THE RELIEF REQUESTED

5.      Debtor operates a manufacturing operation in Gilbert, Arizona.  It employs 49 employees and has been in business for over 20 years.  Debtor's assets are primarily comprised of personal property in the form of cash, accounts receivable, equipment and machinery, raw materials, work in process, and inventory (the "**Collateral**").

6.      As of the Petition Date, Debtor had outstanding obligations to the following creditors that have recorded UCC-1 Financing Statements and assert liens on certain equipment Collateral (the "**Equipment Lien Creditors**"):

    a.  **NFS Leasing, Inc.** ("**NFS**") is an equipment lessor that will assert a security interest in certain equipment being leased to Debtor, which security interest is limited to the equipment described in the series of UCC-1 financing statements filed with the Arizona Secretary of State (the "**NFS Leased Collateral**").

    b.  **International Financial Services Corporation** will assert a security interest in certain equipment being leased by them to Debtor, which security interest is limited to the equipment described in the series of UCC-1 financing statements filed with the Arizona Secretary of State (the "**IFS Collateral**").

    c.  **HYG Financial Services, Inc.** will assert a security interest in certain equipment being leased by them to Debtor, which security interest is limited to the equipment described in the UCC-1 financing statements filed with the Arizona Secretary of State (the "**HYG Collateral**").

7.      The Collateral encumbered by the Equipment Lien Creditors shall be collectively described as the "**Equipment Collateral.**"

8.      Upon information and belief, four of Debtor's creditors have filed UCC-1s asserting blanket security interests in all of GPMI's assets (the "**Blanket Lien Creditors**"), including:

    a.  **NFS** is an Equipment Creditor that leases certain equipment to Debtor but whose practice is to file a blanket UCC-1 lien on all assets of its lessees pending delivery

and acceptance of equipment that later become subject to leases. The subsequent agreements evidencing its equipment leases only provide for a lien and security interest as to the specific equipment actually leased or financed. Accordingly, despite having filed a blanket lien form UCC-1, on information and belief, NFS does not assert a security interest beyond a first priority lien on the specific lease equipment constituting the NFS Leased Collateral.

b. **FSW Funding ("FSW")**, under its prepetition factoring agreements with Debtor, purchased certain accounts receivable from Debtor and separately collected the accounts directly from the account debtor. FSW's prepetition factoring agreements provided for a blanket security interest in all of Debtor's assets in order to secure repayment of factored accounts receivable. As a result, FSW filed a UCC-1 with the state of Arizona indicating that it holds a security interest in "all assets now owned or hereafter acquired."

c. **Jack Gantz Irrevocable Trust No. 2** ("**Gantz Trust**") is a prepetition lender that has loaned money to and made advances on behalf of Debtor secured by certain assets (primarily accounts and inventory) of Debtor. Gantz Trust is affiliated with Joe Gantz, a long time investor in and Director of the Debtor. Gantz Trust has filed a UCC-1 financing statement with the Arizona Secretary of State asserting a security interest in substantially all of Debtor's Collateral. On information and belief, Gantz Trust does not object to the grant of a priming lien to DIP Lender as proposed herein.

d. **IOU** is a prepetition cash flow lender that provided financing to Debtor. Although its loan agreements provided for security in the assets of Debtor, IOU did not perfect its lien by any means until it filed a UCC-1 financing statement with the Arizona Secretary of State on the eve of this Case.

9. The Blanket Lien Creditors and together with the Equipment Creditors, (the "**Prepetition Lien Creditors**").

10. As described in the Bendor Declaration, Debtor requires immediate access to Cash Collateral and financing under the DIP Loan to ensure it is able to continue operating during this Case and preserve the value of the estate for the benefit of all parties in interest. Without immediate postpetition financing and access to Cash Collateral, Debtor will be unable to pay wages to its employees, pay vendors for equipment and services, meet its commitments to customers, meet working capital and business operating needs, preserve and maximize the value of the estates, and administer this Case, causing immediate and irreparable harm to the value of Debtor's estate to the detriment of all stakeholders. Moreover, sufficient post-petition financing is necessary to send a strong market signal that Debtor is well-funded and capable of operating without disruption through the confirmation of its plan of reorganization.

11. As set forth in the Budget, to ensure such liquidity, Debtor seeks authorization to utilize cash collateral and draw $810,954 from the DIP Loan, on an interim basis, and an aggregate of up to $2.5 million from the DIP Loan on a final basis upon entry of the Final Order. Debtor believes the DIP Loan is essential to preserve and maximize the value of the estate, and responsibly administer this Case.

12. MCA Advisors and its principal Morrie Aaron ("**MCA**") were retained by Debtor in the fall of 2021 to assist with the restructuring effort, explore financing and sale options, and provide related necessary services. To that end, during the term of its engagement, MCA contacted and solicited third parties to provide DIP Loan. Approximately 9 potential lending sources were contacted prior to the Petition Date. To date, none have expressed an interest in providing DIP Loan on better terms than those offered by DIP Lender.

13. Debtor has determined that the proposed DIP Loan is the best financing alternative available under the circumstances because it provides sufficient financing to meet Debtor's proposed liquidity needs on the best available terms through the confirmation of a plan.

14. The proposed DIP Loan is the product of good faith negotiations conducted at arm's-length. The terms of the DIP Loan are fair, reasonable and appropriate under the

circumstances and are in accordance with or below current market terms. And, further, that entry into the DIP Loan is an exercise of sound business judgment, and necessary to avoid irreparable harm during the course of this Case.

**RELIEF REQUESTED**

15. Debtor does not have sufficient available sources of working capital to operate its businesses without working DIP Loan. Based on Debtor's consolidated 13-week cash budget (the "**Budget**"), Debtor likely will run out of cash in the short term causing immediate and irreparable harm to Debtor and its estate.

16. With the assistance of MCA, Debtor has been actively seeking working capital financing for several months to assist the company through its financial struggles.

17. As discussed above, Debtor has been unable to obtain working capital financing outside of chapter 11. Thus, Debtor requests the following relief:

**USE OF CASH COLLATERAL**

18. Because of its prepetition factoring arrangements with FSW, Debtor has limited cash collateral. Nonetheless, because of the blanket liens recorded by the Blanket Lien Creditors, Debtor seeks authority to use the limited cash collateral as necessary to support the Budget.

19. To the extent any of the Blanket Lien Creditors have an interest in Debtor's cash collateral, they will have either consented to Debtor's use of cash collateral or otherwise be adequately protected by the ongoing payments proposed (as to the Equipment Creditors) and the continuation of Debtor's business operations and the preservation of the going concern value of Debtor's assets.

**APPROVAL OF DIP LOAN TERMS**

20. Prepetition Debtor and DIP Lender agreed to a *Factoring and Security Agreement*, *Addendums A* and *B* thereto, and a *Loan and Security Agreement* (collectively, the "**DIP Loan Documents**"), pursuant to which Lender has agreed to provide up to $2.5 million

of debtor-in-possession financing to Debtor.  Copies of the DIP Loan Documents are attached to the Interim Order as Exhibit 1.  The primary terms of the DIP Facility are as follows:

A.    Maximum DIP Loan Amount: $2.5 million available through two facilities (i) the A/R Facility in the maximum amount of $2.0 million, pursuant to which DIP Lender shall factor Debtor's accounts receivable on an ongoing basis and (ii) the Inventory Facility pursuant to which DIP Lender will make a revolving line of credit available up to the maximum lesser amount of $500,000 or 50% of the outstanding accounts receivable factored under the A/R Facility.

B.    Use of Proceeds: Borrowers shall use the proceeds of the DIP Loan for (a) working capital; (b) for payment of (i) costs of administration of the Case, and (ii) the fees and expenses described under the DIP Loan Documents; and (c) such Pre-Petition obligations as the Bankruptcy Court shall approve, in each case in a manner consistent with the terms and conditions of the Interim Order and Final Order.

C.    Collateral: all real and personal property of Debtor with a first position priority lien on all of Debtor's Collateral other than the Prepetition Preserved Collateral and a junior priority lien on all Prepetition Preserved Collateral.  In addition, a super-priority administrative expense claim pursuant to 11 U.S.C. § 364(c) and (d). The collateral, liens, and super-priority administrative claim are subject to the Carve-Out for Debtor's professionals as provided in the Interim Order.

D.    Financing Rates:

a.  A/R Facility.  An applicable factoring advance rate of 85%.

b.  Inventory Facility.  Interest applicable at a rate of 18.5% with an increase to 20% while any event of default exists.

E.    Fees:

a.  A loan origination fee equal to one and one half percent (1.5%) of the DIP Facility.

b. A factoring fee of 0.65% on any factored receivable outstanding for the first fifteen (15) days that a financed invoice remains outstanding based on the face amount of such invoice, and a subsequent fee in the same amount for each fifteen (15) days thereafter until paid.

c. A $3,500 a month collateral monitoring fee.

d. Fees applicable to advances:

i. Wire Fee $30.00

ii. ACH Fee $5.00

F. Term: The DIP Facility shall be a month-to-month arrangement terminable by either party on 30 days' notice.

G. Payments:

a. Factoring Facility: Payments on the factoring facility will be made in the ordinary course as collected or otherwise swept from Debtor's Cash Collateral Accounts upon payment by the account debtor. All fees accrued with respect to each factored invoice will be collected and applied and the net shall be released to Debtor at least twice each month as set forth in the DIP Loan Documents.

b. Inventory Facility: Interest only payments on the Inventory Facility will be made on a monthly basis by Debtor and may be paid from net receipts otherwise due to Debtor under the Factoring Facility.

21. The ability of Debtor to obtain working capital financing and liquidity through the use of cash collateral and the proposed DIP Loan on an emergency basis is critically important. As evidenced by the Budget, absent the requested financing, Debtor will have insufficient cash to meet payroll, fill orders, and meet other operating expenses in the short term making it impossible for Debtor to continue to operate.

22. Debtor was unable to obtain financing outside of bankruptcy; has been unable to obtain adequate unsecured credit allowable under section 503(b)(1) as an administrative

expense; and has been unable to obtain debtor-in-possession financing absent Debtor's granting DIP Lender the liens described in the DIP Loan Documents.

23.     The DIP Facility and DIP Loan Documents were negotiated in good faith and at arms-length by Debtor and DIP Lender. Under the circumstances, the terms of the DIP Facility are the most favorable terms available to Debtor, and are fair and reasonable.

24.     The terms of the DIP Facility reflect Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and the liens to be granted in exchange for the financing are supported by reasonably equivalent value and fair consideration.

**BASIS FOR RELIEF REQUESTED**

**A. USE OF CASH COLLATERAL**

Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor-in-possession to use Cash Collateral with the consent of the secured party. Here, Debtor anticipates that the Blanket Lien Creditors asserting an interest in cash collateral will consent to Debtor's use of cash collateral, subject to the terms and limitations set forth in the Interim Order.

Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, § 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g.*, *In re First South Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987) (explaining that adequate protection depends on the facts and circumstances of the case); *In re Las Torres Dev., LLC*, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009) ("[I]n determining whether a secured creditor's interest is adequately protected, most courts engage in an analysis of the property's 'equity cushion'—the value of the property after deducting the claim of the creditor seeking relief from the automatic stay and all senior claims.") (internal

quotes and citations omitted); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")). The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use. *See In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral."); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180—81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value).

Debtor proposes to provide the Equipment Creditors with ongoing payments as identified in the Budget as adequate protection to avoid any postpetition diminution in value of their collateral, if any, including cash collateral, resulting from the use, sale, or lease of such collateral by Debtor and the imposition of the automatic stay (collectively, the "**Adequate Protection Obligations**").

1.      Debtor submits that the proposed Adequate Protection Obligations are sufficient to protect the Blanket Lien Creditors from any potential diminution in value to Cash Collateral. In light of the foregoing, Debtor further submits, that the proposed Adequate Protection Obligations to be provided for the benefit of the Blanket Lien Creditors are appropriate. Thus, Debtor's provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of this chapter 11 case to ensure Debtor is able to continue using Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**B.  APPROVAL OF DIP LOAN**

The Bankruptcy Code authorizes a debtor-in-possession to obtain financing postpetition pursuant to § 364. This section permits the Court, after notice and hearing, to authorize a debtor

to obtain credit or the incurring of debt with priority over all other allowed administrative claims and secured by a first priority senior lien on all property of the estate, including any property that is subject to an existing lien, if Debtor is unable to obtain such credit otherwise, and the interests of any existing secured creditors are adequately protected. In this regard § 364 provides in relevant part as follows:

> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A)    the trustee is unable to obtain such credit otherwise; and
> (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2)    In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

*See* 11 U.S.C. § 364(d).

Debtor has been unable to locate financing other than financing with priority over all other allowed administrative claims and secured by a first priority senior lien on all property of the estate. As a result, Debtor accepted DIP Lender's proposal for post-petition financing secured by a senior lien on substantially all of Debtor's property and super-administrative expense priority. *In re Snowshoe Company*, 789 F.2d 1085, 1088 (4th Cir. 1986) (the trustee contacted other financial institutions in the immediate geographic areas and was unsuccessful in obtaining unsecured credit); *In re 495 Central Park Avenue Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (unsuccessful attempt to secure financing from other sources justified senior priority loan under Bankruptcy Code §364); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (that debtors had contacted four lenders satisfied the requirements of Bankruptcy Code §364 that debtors were unable to obtain comparable financing on an unsecured basis).

In these circumstances, the Bankruptcy Code imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable. *In re Snowshow Company*,

789 F.2d at 1088. There are few lenders likely to be able or willing to extend the necessary credit to Debtor, it would be unrealistic and unnecessary to require Debtor to conduct an exhaustive search for financing. *See In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).

As set forth above, and in the Bendor Declaration, in the months leading up to the Petition date, Debtor solicited proposals for financing. After appropriate investigation and analysis, including careful and time-consuming deliberations among Debtor's restructuring counsel and advisors, Debtor reasonably concluded that DIP Lender's proposal was the best, if not the only, alternative available to Debtor. Accordingly, Debtor has concluded in its business judgment that the DIP Facility is the most favorable for its estate.

Consequently, Debtor's efforts in this regard satisfy the statutory requirements of § 364(c). The proposed terms of the DIP Facility are fair, reasonable and adequate in that these terms neither tilt the conduct of this case nor prejudice the powers and rights the Bankruptcy Code confers for the benefit of all creditors. The purpose of the DIP Facility is to enable Debtor to maintain the stability of its operations during its chapter 11 case. *See In re First South Savings Assoc.*, 820 F.2d 700, 710-15 (5th Cir., 1987); *In re Tenney Village Co.*, 104 B.R. 562, 568-69 (Bankr. D.N.H. 1989).

With access to the DIP Facility, which includes immediate access of up to $810,954 pending entry of the Final Order, and subsequent access up to an additional $1,689,046 (a total of up to $2.5 million), Debtor is confident that it can maintain the stability of its operations during the remainder of its chapter 11 case. In reaching this conclusion, Debtor believes that the market generally, and vendors and customers specifically, often respond favorably to approval of a comprehensive debtor-in-possession financing package. Debtor's ability to achieve its goals depends on unimpeded operations and the continued generation at the targeted levels of cash flow requiring access to working capital.

As described above, after appropriate investigation and analysis, Debtor has concluded the DIP Facility is the best alternative available under the circumstances. Bankruptcy courts

Case 2:22-bk-00150-EPB    Doc 6    Filed 01/10/22    Entered 01/10/22 20:27:02    Desc
Main Document    Page 15 of 22

routinely defer to Debtor's business judgment on most business decisions, including the decision to borrow money. *See Group of Institutional Investors vs. Chicago Mil. St. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo., 1985) (business judgment should be left to the board room and not to the bankruptcy court); *In re Lifeguard Industries, Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio, 1983). More exacting scrutiny would slow the administration of Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provisions for private control of administration of the estates, and threaten the Court's ability to control a case impartially. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assoc.*, 14 B.R. 507, 511-13 (Bankr. D. Utah, 1981) (courts generally will not second guess a debtor's business decision when those decisions involve a business judgment made in good faith, upon a reasonable basis, and within the scope of authority granted under the Bankruptcy Code); *Curlew Valley*, 114 B.R. at 513-14. Debtor has exercised sound business judgment seeking advice from its restructuring advisors in determining that the DIP Facility is appropriate, and has satisfied the legal prerequisites to borrow under the DIP Facility. The terms of the DIP Facility are fair and reasonable and are in the best interest of its estate. And, the interests of any secured creditors being primed by the DIP Facility are being consented to or otherwise are adequately protected. Accordingly, under Bankruptcy Code §364(d), Debtor should be granted authority to enter into the DIP Facility and to borrow funds from DIP Lender on the basis described above. Absent the relief requested, Debtor and its estate will suffer immediate and irreparable harm.

## C. REQUEST FOR DIP LENDER § 364(e) PROTECTIONS

Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of Debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

As explained herein and in the Bendor Declaration, the DIP Facility as proposed is the result of: (a) Debtor's reasonable and informed determination that the DIP Lender provided the best postpetition financing alternative available under the circumstances, and (b) arm's length, good-faith negotiations between Debtor and the DIP Lender. Debtor submits that the terms and conditions of the DIP Facility are reasonable under the circumstances, and the proceeds of the DIP Loan will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.

Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of sections 363(m) and 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

### D. REQUEST FOR FINAL HEARING

Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after 35 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

### E. REQUEST FOR WAIVER OF BANKRUTPCY RULES 6004(a) AND 6004(h)

To implement the foregoing successfully, Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**NOTICE**

2
3
4
5
6
7
8

Debtor will provide notice of this motion to: (a) the U.S. Trustee for the District of Arizona; (b) the holders of the 30 largest unsecured claims against Debtor; (c) counsel to the Prepetition Lien Creditors; (d) counsel to the proposed DIP Lender; (f) the Internal Revenue Service; (g) the Arizona Department of Revenue; (h) any creditor known to have filed a UCC-1 financing statement concerning Debtor's assets as of the Petition Date; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, Debtor submits that no other or further notice is needed.

9
10

WHEREFORE, Debtor respectfully requests the entry of an interim order in the form attached hereto as **<u>Exhibit A</u>**, granting, among other things, the following relief:

11
12

A.    Authorizing Debtor to obtain on an interim basis, postpetition financing in the amount of $810,954, pending the Final Hearing;

13
14

B.    Authorizing Debtor to obtain, on a final basis, up to $2.5 million of postpetition financing under the DIP Facility;

15
16

C.    Granting to DIP Lender an allowed super-priority administrative expense claim for the DIP Facility and DIP Obligations, subject only to the Carve-Out;

17
18
19

D.    Granting to DIP Lender automatically perfected senior security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all cash collateral, subject only to the Carve-Out;

20
21

E.    Scheduling a Final Hearing to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing;

22
23

F.    Waiving the fourteen (14) day stay provisions of Federal Rule of Bankruptcy Procedure 6004(h); and

24
25

G.    Granting Debtor such other and further relief as the Court deems just and appropriate.

26    ///

27    ///

**RESPECTFULLY SUBMITTED** this 10th day of January, 2022.

**ENGELMAN BERGER, P.C.**

By  /s/ Patrick A. Clisham
        Patrick A. Clisham
        2800 North Central Avenue, Suite 1200
        Phoenix, Arizona 85004
        Proposed Attorneys for GPMI Co.

**COPY** of the foregoing transmitted via the Court's ECF system, and as indicated this 10th day of January, 2022, to the following parties:

**OFFICE OF THE U.S. TRUSTEE**
Attn:  Larry L. Watson
**Via Email:  Larry.Watson@usdoj.gov**

Secured Creditors and Other Interested Parties:

Factors Southwest, LLC
aka FSW Funding
Attn:  Robyn Barrett
**Via Email:  robyn@fswfunding.com**

Andrew Harnish
May Potenza Baran & Gillespie
*Counsel for FSW Funding*
**Via Email:  aharnish@maypotenza.com**

Jack Gantz Irrevocable Trust No. 2
  Dated February 16, 1988
Attn:  Joseph Gantz
**Via Email:  joegantz1@gmail.com**

Michael W. Carmel
*Counsel for Jack Gantz Irrevocable Trust No. 2*
**Via Email:  michael@mcarmellaw.com**

Lancelot Holdings LLC
Attn:  Randy Krisch
**Via Email:  randy@lancelotholdings.com**

Andy Abraham
Burch & Cracchiolo, PA
*Counsel for Lancelot Holdings, LLC*
**Via Email:  aabraham@bcattorneys.com**

HYG Financial Services
Attn: Shannon Mohrfeld, Vendor Financial
Services
**Via Email:**
**Shannon.c.mohrfeld@leasingmail.com**

International Financial Services Corp.
**Via Facsimile: 847.549.0119**
**and Via Email: info@ifsc.com**

IOU Central Inc.
Attn: Phil Bishop, Collections Manager
**Via Email: pbishop@ioufinancial.com**

NFS Leasing, Inc.
Attn: Mark Blaisdell, Sr. Advisor
**Via Facsimile: 866.805.3667**
**and Via Email: info@nfsleasing.com**

List of Twenty Largest Unsecured Creditors:

Eastern Shipping Worldwide
185 Hansen Court
Wood Dale, IL 60191
c/o Andrew D. Kehagiaras, Esq.
**Via Email: adk@tradeandcargo.com**

Fibertex Nonwovens Inc.
Attn: Alan Zenner
100 Iso Pkwy
Gray Court, SC 29645
**Via Email: alze@fibertex.com**

Scandia Plastics , LLC
Attn: Gary W. Lipkin
220 Laurel Road, No. 201
Attn CFO
Voorhees, NJ 08043
**Via Email: glipkin@eckertseamans.com**

Web-Pro Corp.
No. 4 Uim-Kon 3rd Road Yun-An  Ste E-
261
Kaohsing  Taiwan  82841
**Via Facsimile: +84 02513683100**

West Bent Packaging dba Comar
Attn: Tom Nelson
P.O. Box 937
West Bend, WI 53095
**Via Email: nelsont@comar.com**

| | |
|---|---|
| 1 | Schoeneck Containers Inc. |
| | Attn: Lissa Ewing |
| 2 | 2160 S. 170th St. |
| | New Berlin, WI 53151 |
| 3 | **Via Email: lewing@schoeneck.com** |
| 4 | BOK Financial |
| | Attn: Brian Barry |
| 5 | 16767 N. Perimeter Dr., No. 200 |
| | Scottsdale, AZ 85260 |
| 6 | **Via Email: bbarry@bokf.com** |
| 7 | CH Robinson Worldwide Inc. |
| | Attn: Eric Saxton |
| 8 | P.O. Box 88656 |
| | Chicago, IL 60680-1656 |
| 9 | **Via Email: eric.saxton@chrobinson.com** |
| 10 | Kleen Test Products Corp. |
| | Attn: Don Bauer |
| 11 | 1611 Sunset Road, No. 209 |
| | Port Washington, WI 53074 |
| 12 | **Via Email: dbauer@kleentest.com** |
| 13 | Ameritemps AZ LLC |
| | Attn: Kathy Watzke |
| 14 | 6100 Rockside Woods Blvd. |
| | Suite 250 |
| 15 | Independence, OH 44131-2341 |
| | **Via Email:** |
| 16 | **kathyameritemps@hotmail.com** |
| 17 | Hangzhou Bonyee Daily Necessity Tech Co |
| | No. 16 Hongda Rd., Yuhang Economic |
| 18 | Devel |
| | Province 311102  Hangzhou City |
| 19 | Zhjiang  China |
| | **Via Email: jiangym@nbond.cn** |
| 20 | |
| | Total Quality Logistics LLC |
| 21 | Attn: Cheri Calvert |
| | 4289 Ivy Pointe Blvd. |
| 22 | Cincinnati, OH 45245 |
| | **Via Email: ccalvert@tql.com** |
| 23 | |
| | Bjerk Builders Inc. |
| 24 | Attn: Scott Bjerk |
| | 1383 N. Tech Blvd., No. 101 |
| 25 | Gilbert, AZ 85233 |
| | **Via Email: Scott@bjerkbuilders.com** |
| 26 | |
| 27 | |

Stepan Company
Attn:  Wayne Molley
22 W. Frontage Road
Winnetka, IL 60093
**Via Email:  wmolley@stepan.com**

Fort Dearborn Co.
Attn:  Nicholas Martisek
P.O. Box 74008096
Chicago, IL 60674-8096
**Via Email:
nmartisek@fortdearborn.com**

Arizona Corrugated Container
Attn:  David Lewandowski
225 S. Dobson Avenue
Mesa, AZ 85202
**Via Email:  davidl@tucsoncontainer.com**

Changxing Kingke Import & Export Ltd
New Century Industrial Park
Lijiaxiang Town, Changxing Cnty
Huzhou, Zhejiang China
**Via Facsimile:  +86 572.6230999**

Rebel Converting
Attn:  Michael Kryshak
700 N. Progress Drive
Saukville, WI 53080
**Via Email:  mike@rebelconverting.com**

Interstate Packaging Group Inc.
Attn:  Jim Combe
8828 S. Hardy Dr., Ste. 105
Tempe, AZ 85284
**Via Email:  jcombe@intpkg.com**

Asialinx Paper Ltd. dba Softech
2591 Hunan Hwy
Bldg 1, Rm 602
Shanghai  China
**Via Facsimile:  +86 21.2098531**


By: */s/Cindy K. Solomon, CP*
        Cindy K. Solomon, CP