STEVEN N. BERGER, SBA #009613
PATRICK A. CLISHAM, SBA #023154
MICHAEL P. ROLLAND, SBA #030744
**ENGELMAN BERGER, P.C.**
2800 NORTH CENTRAL AVENUE, SUITE 1200
PHOENIX, ARIZONA 85004
_____
Ph: (602) 271-9090
Fax: (602) 222-4999
Email: snb@eblawyers.com
Email: pac@eblawyers.com
Email: mpr@eblawyers.com
_____

Proposed Counsel for Debtor
and Debtor in Possession GPMI, Co.

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>GPMI, CO., an Arizona corporation,<br><br>EIN 86-0635770<br><br>          Debtor. | Chapter 11 Proceeding<br><br>Case No. 2:22-bk-00150-EPB |

### DECLARATION OF YARRON BENDOR IN SUPPORT OF DEBTOR'S CHAPTER 11 FILING AND FIRST DAY MOTIONS

YARRON BENDOR, the founder and CEO of GPMI Co., debtor and debtor-in-possession herein ("**GPMI**" or "**Debtor**"), hereby submits this declaration under oath in support of Debtor's Chapter 11 Petition for Relief and its "First Day" motions filed in this matter for expedited consideration (collectively, the "**Motions**").[1]  Yarron Bendor, under the penalty of perjury, states as follows:

---

[1] Any and all capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Motions.

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

1.     I am the founder and CEO of Debtor.  I am also the Chair of the Board of Directors and holder of 74% of the stock in Debtor.  I have worked over 45 years in the manufacturing industry.  A summary of my prior work and education is attached hereto as **Exhibit A.**

2.     I founded GPMI in 1989 as a supplier of consumer packaged goods with a focus on cleaning products, primarily two types of "wet wipes" delivery systems – those sold in "soft-packs" and those sold in "canisters".

3.     GPMI currently employs 49 workers, and is located at 190 South McQueen Road, Gilbert, Arizona, in leased premises that house both its business offices and manufacturing operations.  The leased facility is approximately 84,726 square feet, and includes executive and sales offices, warehouse space within which is located Debtor's inventory, work in process, raw materials, specialized operating and manufacturing equipment and improvements.

4.     Debtor sells its manufactured goods to wholesalers and retailers.  Most of the retailers are substantial and well-known.

5.     Over the years Debtor developed and produces private label products for its customers such as Clorox, P&G, Dial, and Rain-X, as well as proprietary products under Debtor's own tradenames and trademarks "GermaClean" and "Four Peaks Auto Care."

6.     Debtor's products enjoy a well-respected reputation in the industry as being innovative and of good quality.

7.     Since Debtor's founding in 1989, Debtor's customer base has grown steadily.  Debtor's revenues exceeded $14MM in 2021, despite the total failure by major customer Albaad, Inc. to perform on its agreements (as discussed further below).

I.     **EVENTS LEADING TO BANKRUPTCY**

       **A. The COVID Pandemic.**

8.     The COVID pandemic has had a major impact on GPMI's business.  At first, we anticipated that demand would increase for our products.   And while it did, another phenomenon worked against the Company's success.  The increased demand in the marketplace led to shortages of product necessary to fulfil the huge demand.  To capitalize on this market

condition, foreign manufacturers flooded the American market with inferior products at lower price points. Retailers overstocked the cheaper goods and were left with a glut of products that have been slow to sell except at bargain basement prices, driving demand for wipes from reputable manufacturers down throughout 2020-2021. However, that situation is resolving itself through market forces and demand for our made in the USA high quality products is once again increasing. We have an effective sales force and program in place that bodes well for future sales growth.

**B. ALBAAD Agreement and Associated Losses/Damages.**

9. In the fall of 2019, prior to the mounting overstock issues, I was approached by a company head-quartered in Israel named Albaad, Inc. ("**Albaad**"). Albaad is a publicly traded company on the Tel Aviv stock exchange with several locations in Europe and one American subsidiary located in North Carolina. Albaad is the third largest global wet wipe manufacturer, with reported revenues of approximately half a billion dollars per year. Albaad sought an arrangement where it would contract with GPMI to manufacture wipes to fulfill Albaad's substantial customer orders in the United States to supplement its existing U.S. manufacturing location in North Carolina. Albaad pitched a deal that would secure GPMI orders of over $80MM in the first year and over $100MM in the second year.

10. In order to do so, GPMI would have to substantially expand its facilities floor plan and retrofit the planned facility in Gilbert to meet manufacturing specifications and install safety and other specialized systems and equipment to meet the promised volume of business from Albaad. Albaad agreed to provide $3.75MM to assist GPMI in defraying the upfront cash burden of the expansion. These funds were to be an advance against future orders made by Albaad, and repaid by GPMI as credits against the forthcoming purchase orders made within the first year of the contract. GPMI did not agree to any other obligation with regard to the Albaad advance.

11. Induced by payment of the upfront deposit, GPMI took upon itself the much larger task of building out the additional facilities. In just over six months, GPMI was able to

3

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

fully build out a state-of-the-art facility to meet the contract. GPMI hired and trained dozens of new employees, expanding its workforce from approximately 12 employees to 110. GPMI recruited key managers to supplement the existing staff with the necessary expertise in the production of wet wipes to facilitate the projected sharp and rapid volume increase. GPMI used the Albaad deposit but in addition spent and incurred obligations of over $7.5 MM with its own capital and shareholders obligations to ensure it was ready to meet the Albaad contract.

12. In late February 2021, GPMI started production and shipments of products to Albaad and sharply increased product output in March.

13. Albaad's customer required that Albaad obtain EPA product registration for the goods being purchased. Albaad ran into problems in its efforts to obtain these approvals. Thereafter, a revised production and shipping schedule was established. The agreed, revised production and shipping schedule was established between GPMI and Albaad in late March / early April 2021.

14. In reliance on the agreed, revised schedule, GPMI manufactured product for Albaad, labeled the product, and prepared it for shipping. But Albaad did not pick up the product. Albaad continued to struggle to satisfy its customer with regard to EPA approval, and the dispute between Albaad and its customer continues to this date. It was not until August 2021 that Albaad obtained a partial EPA approval, well after its customer was willing to go forward.

15. Despite GPMI meeting its commitments under the revised production and shipping schedule agreement, Albaad failed to pay GPMI for over $800,000 in finished product, and failed to take possession of the finished merchandise. Not only was GPMI now short $800,000 in budgeted revenue, but it was also required to expend rent for storage space for the product at a cost of over $17,000/month. In addition, Albaad failed to honor any of its future contractual commitments to GPMI to order an additional $25.5MM units from April through December 2021, thereby creating a shortage of budgeted revenue for GPMI of over $37MM,

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

all of which was scheduled to be manufactured, shipped to customers, and paid for by December 2021.

16. Rather than take any steps to assist GPMI to shoulder the burdens of Albaad's breached purchase obligations, for over nine months, Albaad simply promised to pay for the manufactured goods (with the agreed 10% discount credited against the Albaad advance) as soon as it resolved its issues with its customer. Meetings and phone calls were held in efforts by GPMI to resolve the situation and obtain either sales revenue or other capital to address its dire financial situation. Further payment promises were made by Albaad but nothing materialized. Seeing no progress, in November 2021 GPMI confronted Albaad's management. Albaad's management informed GPMI that it made an announcement its public shareholders that it was taking a write off of $10 million in its USA operations due to issues with its customers and distributor and seeking litigation options with its partners. Albaad at that time expressly reneged on all contractual obligations to GPMI and terminated any ongoing discussions that may have resolved Albaad's breach of contract to GPMI.

17. The devastating effect of the Albaad breaches on Debtor's financial position cannot be overstated. GPMI was forced to incur storage expenses on finished private labeled goods for the Albaad purchase orders. The lack of gross profit dollars from the sale of Albaad product caused GPMI to fall behind on its regular obligations for operations. GPMI was saddled with excess in its workforce, which had to be trimmed. GPMI was and is saddled with extensive equipment lease obligations for equipment that now sits underutilized. GPMI paid for and is obligated for certain tenant improvements at its Gilbert facility and other expenses related directly to preparing its lease space for the volume of expected Albaad purchase orders. GPMI had to borrow funds not otherwise needed. Albaad's failure to perform threatened the very survival of GPMI. GPMI's causes of action against Albaad are now property of the bankruptcy estate and will be evaluated and pursued as part of this reorganization.

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

**C.  Michelin Litigation.**

18.    In February 2021, Debtor filed an action in United States District Court, District of Arizona, against Michelin Lifestyle Ltd. ("**MLL**") and Michelin North America, Inc. ("**MNA**" and together with MLL "**Michelin**"), alleging damages arising out of claims under breach of contract and tort.  The claims arise out of a 2017 contract entered into between MLL and Debtor under which the companies were to jointly develop and market consumer products under the Michelin name.  After exhaustive work over a year time period, the joint product was developed and GPMI commenced manufacturing.  GPMI entered into a contract with Walmart to sell the product.  Within weeks of fulfilling Walmart's initial order, MLL and its affiliate MNA took certain actions to stop the manufacture and sale of the joint product.  These actions are detailed in the Complaint filed in the action by Debtor's litigation counsel (Snell and Wilmer).  Debtor alleges in the action that it suffered substantial damages on account of the conduct of the Michelin entities.  The litigation is in its preliminary stages, as there is pending a motion by Michelin to dismiss for lack of jurisdiction in the United States.  Debtor intends to continue to pursue this litigation for the benefit of its estate.

**D.  Current Financial Condition.**

Secured Obligations

19.    Debtor's assets are primarily comprised of personal property in the form of cash, accounts receivable, equipment and machinery, raw materials, work in process, and finished goods (the "**Collateral**").

20.    As of the Petition Date, Debtor had outstanding obligations to the following creditors that have recorded UCC-1 Financing Statements and assert liens on certain equipment Collateral (the "**Equipment Lien Creditors**"):

a.  **NFS Leasing, Inc.** ("**NFS**") is an equipment lessor that will assert a security interest in certain equipment being leased to Debtor, which security interest is limited to the equipment described in the series of UCC-1 financing statements filed with the Arizona Secretary of State (the "**NFS Leased Collateral**").

6

b. **International Financial Services Corporation** will assert a security interest in certain equipment being leased by them to Debtor, which security interest is limited to the equipment described in in the series of UCC-1 financing statements filed with the Arizona Secretary of State (the "**IFS Collateral**").

c. **HYG Financial Services, Inc.** will assert a security interest in certain equipment being leased by them to Debtor, which security interest is limited to the equipment described in the UCC-1 financing statements filed with the Arizona Secretary of State (the "**HYG Collateral**").

21. The Collateral encumbered by the Equipment Lien Creditors shall be collectively described as the "**Equipment Collateral.**"

22. Upon information and belief, four of Debtor's creditors have filed UCC-1s asserting blanket security interests in all of GPMI's assets (the "**Blanket Lien Creditors**"), including:

a. **NFS** is an Equipment Creditor that leases certain equipment to Debtor but whose practice is to file a blanket UCC-1 lien on all assets of its lessees pending delivery and acceptance of equipment that later become subject to leases. The subsequent agreements evidencing its equipment leases only provide for a lien and security interest as to the specific equipment actually leased or financed. Accordingly, despite having filed a blanket lien form UCC-1, on information and belief, NFS does not assert a security interest beyond a first priority lien on the specific lease equipment constituting the NFS Leased Collateral.

b. **FSW Funding** ("**FSW**"), under its prepetition factoring agreements with Debtor, purchased certain accounts receivable from Debtor and separately collected the accounts directly from the account debtor. FSW's prepetition factoring agreements provided for a blanket security interest in all of Debtor's assets in order to secure repayment of factored accounts receivable. As a result FSW has filed a UCC-1 with the state of Arizona indicating that it holds a security interest in "all assets now

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

Engelman Berger, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

owned or hereafter acquired." As discussed further below, FSW has proposed providing debtor-in-possession financing to Debtor postpetition as lead lender with the financial participation of third party lender Lancelot Holdings, LLC (hereafter collectively referred to as "**DIP Lender**").

c. **Jack Gantz Irrevocable Trust No. 2** ("**Gantz Trust**") is a prepetition lender that has loaned money to and made advances on behalf of Debtor secured by all of the certain assets (primarily accounts and inventory) of Debtor. Gantz Trust is affiliated with Joe Gantz, a long time investor in and Director of the Debtor. Gantz Trust has filed a UCC-1 financing statement with the Arizona Secretary of State asserting a security interest in substantially all of Debtor's Collateral. On information and belief, Gantz Trust does not object to the grant of a priming lien by DIP Lender as proposed herein.

d. **IOU** is a prepetition cash flow lender that provided financing to Debtor. Although its loan agreements provided for security in the assets of Debtor, IOU did not perfect its lien by any means until it filed a UCC-1 financing statement with the Arizona Secretary of State on the eve of this Case.

23. The Blanket Lien Creditors and together with the Equipment Creditors, the "**Prepetition Lien Creditors**."

General Unsecured Debt

24. As a manufacturer, Debtor has numerous trade creditors that have traditionally sold goods and materials to Debtor in the ordinary course of business, whether on ordinary credit terms or invoice terms. In addition, in the ordinary course of its business, Debtor incurs general business expenses for general and administrative expenses, labor, facilities, transportation and the like. The books and records of the Debtor currently reflect approximately $13.3 million in general unsecured claims held by approximately 116 different creditors.

25. A few of the creditors holding claims filed pre-petition lawsuits against the Debtor. One of these creditors, Eastern Shipping Worldwide, Inc. ("**Eastern**") filed an action

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

in the United States District Court, Central District of California (Western Division), claiming that Debtor owes Eastern over $1.8MM for its shipping of supplies ordered by Debtor from two suppliers from China to the United States. Although the original shipping charges claimed by Eastern were in the range of $400,000, Eastern's failure to mitigate and assessment of commercially unreasonable charges/penalties has grossed up its claim to its excessive demand. Debtor asserts multiple defenses to the Eastern claim. The Eastern lawsuit and expected pre-judgment enforcement actions by Eastern put Debtor's assets at risk of seizure and were additional impetus for filing this reorganization.

26.     Other collection litigation filed by vendors further complicated the viability of operating outside the protection of the automatic stay.

**E.     Debtor's Pre-Petition Reorganization Efforts.**

27.     Debtor engaged in extensive efforts to reorganize its business and cut costs after Albaad's failure to perform. Debtor's cost-cutting measures included laying off more than half of its employees, returning several units of leased equipment, terminating the lease of a 45,000 sq. ft. warehouse, and reduction of other general administrative expenses, thereby reducing expenses by approximately $300,000 for the returned equipment, and an additional $160,000 per month for other expenses.

28.     Debtor initially contacted financing sources and, to aid in that effort, retained experienced restructuring counsel and business restructuring consultants that have been actively working with Debtor toward restructuring options in and out of a bankruptcy filing. Debtor and its team of professionals reached out to several sources to secure bridge financing, new equity funding, refinancing of existing debt, interim relief from existing secured creditors and equipment lessors, and internal sources for new loan capital.

29.     However, as it became clear that Albaad was not going to fund any resolution of its defaults, and potential sources assessed the Debtor's situation, Debtor's focus necessarily became more focused on a restructuring in Chapter 11. In that realm, Debtor worked diligently to secure a "DIP Financing" source and ultimately did secure a DIP lending commitment from

current creditor FSW and Lancelot Holdings, L.L.C., an Arizona based private lender, or its affiliate.

30. Debtor has also had serious discussions with at least two merger candidates, a new capital buyer or investor, and existing equity with regard to an exit strategy from its Chapter 11 filing. Debtor's intent is to reorganize and emerge from its filing as a recapitalized operating company that will fund requisite payments under a bankruptcy plan.

31. MCA Advisors and its principal Morrie Aaron ("**MCA**") were retained by Debtor in the fall of 2021 to explore financing and sale options and assist as needed with the restructuring effort, and provide related necessary services. Despite MCA's best efforts, Debtor was unable to attract funding through loans or investments on time to continue operating outside of a chapter 11 reorganization.

## II. DEBTOR'S FUTURE

### A. Debtor's Increasing Business Prospects.

32. Debtor's sales efforts are led by me as CEO with the assistance of an extensive sales effort led by Leslie Bendor—a professional marketing executive with Marketing degree from ASU, Wendell Smith—a professional sales manager, Chuck Tornabene—a former President of Turtle Wax and Pylon as sales consultant, and several contracted sales reps throughout the Country. These sales rep agreements are crucial to Debtor's continued success.

33. Through our sales efforts, during the last quarter of 2021, Debtor has turned several potential leads for new business into new client relationships. These new business is estimated to generate a meaningful growth in additional revenue for Debtor over the next two years. These new projects will be identified as soon as doing so is not detrimental to the pending contract discussions.

34. There are several developing opportunities with major retailers for 2022 and 2023, and taking the highest probabilities of these opportunities as the conservative base case GPMI projects sales of $15MM to $20MM dollars for 2022, and $27MM to $35MM for 2023.

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

35.     This sales forecast takes into consideration an existing $15MM business forecast for 2021, reducing Albaad's volume commitment to 0% of what was contractually obligated by Albaad, and adding only few of the many new business opportunities.

**B.  Contemplated Reorganization**

36.     Debtor has worked closely with its reorganization professionals to conceptualize reorganization alternatives, and continues to work to identify and pursue sources of potential reorganization capital and/or transactions.  Debtor is also exploring a new value plan with its current equity holders.

**III.     FIRST DAY RELIEF REQUESTED**

**A.  DIP Financing and Use of Cash Collateral**

37.     The ability of Debtor to obtain working capital financing and liquidity through the use of cash collateral and debtor-in-possession financing on an emergency basis is critically important. As evidenced by the 13-week cash budget attached hereto as **Exhibit B** (the "**Budget**"), absent the use of cash collateral and debtor-in-possession financing, Debtor will have insufficient cash to meet payroll, fill orders, and meet other operating expenses in the short term making it impossible for Debtor to continue to operate.

38.     Prepetition, Debtor executed a *Factoring and Security Agreement*, *Addendums A and B* thereto, and a *Loan and Security Agreement* (collectively, the "**DIP Loan Documents**") with DIP Lender pursuant to which DIP Lender agreed to provide up to $2.5 million of debtor-in-possession financing to Debtor (the "**DIP Facility**" or "**DIP Loan**").

39.     Copies of the DIP Loan Documents are attached hereto as **Exhibit C**.

40.     The primary terms of the DIP Facility are as follows:

A.      Maximum DIP Loan Amount: $2.5 million available through two facilities (i) a facility in the maximum amount of $2.0 million, pursuant to which DIP Lender shall factor Debtor's accounts receivable on an ongoing basis (the "**A/R Facility**") and (ii) a credit facility pursuant to which DIP Lender will make a revolving line of credit

Case 2:22-bk-00150-EPB    Doc 9    Filed 01/10/22    Entered 01/10/22 20:38:57    Desc
Main Document    Page 11 of 27

available up to the maximum lesser amount of $500,000 or 50% of the outstanding accounts receivable factored under the A/R Facility (the "**Inventory Facility**").

B.     Use of Proceeds: Borrowers shall use the proceeds of the DIP Loan for (a) working capital; (b) for payment of (i) costs of administration of the Case, and (ii) the fees and expenses described under the DIP Loan Documents; and (c) such Pre-Petition obligations as the Bankruptcy Court shall approve.

C.     Collateral: all real and personal property of Debtor with a first position priority lien on all of Debtor's Collateral other than the Prepetition Preserved Collateral and a junior priority lien on all Prepetition Preserved Collateral.  In addition, a super-priority administrative expense claim pursuant to 11 U.S.C. § 364(c) and (d). The collateral, liens, and super-priority administrative claim are subject a carve-out for Debtor's professionals.

D.     Financing Rates:

a.     A/R Facility.  An applicable factoring advance rate of 85%.

b.     Inventory Facility.  Interest applicable at a rate of 18.5% with an increase to 20% while any event of default exists.

E.     Fees:

a.     A loan origination fee equal to one and one half percent (1.5%) of the DIP Facility.

b.     A factoring fee of 0.65% on any factored receivable outstanding for the first fifteen (15) days that a financed invoice remains outstanding based on the face amount of such invoice, and a subsequent fee in the same amount for each fifteen (15) days thereafter until paid.

c.     A $3,500 a month collateral monitoring fee.

d.     Fees applicable to advances:

i.     Wire Fee $30.00

ii.     ACH Fee $5.00

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

F.     Term: The DIP Facility shall be a month-to-month arrangement terminable by either party on 30 days' notice.

G.     Payments:

    a.  Factoring Facility: Payments on the factoring facility will be made in the ordinary course as collected or otherwise swept from Debtor's Cash Collateral Accounts upon payment by the account debtor.  All fees accrued with respect to each factored invoice will be collected and applied and the net shall be released to Debtor at least twice each month as set forth in the DIP Loan Documents.

    b.  Inventory Facility:  Interest only payments on the Inventory Facility will be made on a monthly basis by Debtor and may be paid from net receipts otherwise due to Debtor under the Factoring Facility.

41.     First-priority liens will be granted to the DIP Lender on substantially all of Debtor's unencumbered assets including, without limitation: (a) those additional assets with respect to which Debtor's Blanket Lien Creditors have agreed to subordinate their liens and allow the DIP Lender to prime their otherwise senior liens, and (b) certain prepetition pending and potential causes of action held by Debtor against Michelin and Albaad (collectively, the "**DIP Collateral**").  In addition, junior priority liens will be granted to the DIP Lender on all of Debtor's other assets (primarily Debtor's leased equipment) that remain subject to Prepetition Lien Creditor (defined below) claims (the "**Prepetition Preserved Collateral**").

42.     On information and belief, the Prepetition Lien Creditors will cooperate with Debtor to approve ongoing use of cash collateral and subordinate their liens to the DIP Lender as to the DIP Collateral.  Debtor will also provide adequate protection to its Blanket Lien Creditors in the form of postpetition payments to its Equipment Creditors and continued maintenance of Debtor and its assets as a going concern as reflected in the Budget.

43.     The final terms of the DIP Facility shall be memorialized in a proposed Credit Agreement that shall be filed with the Court prior to the Final Hearing.

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

44. During the term of its prepetition engagement, MCA contacted and solicited third parties to provide DIP Loan. Approximately 9 potential lending sources were contacted prior to the Petition Date. To date, none have expressed an interest in providing DIP Loan on better terms than those offered by DIP Lender.

45. Debtor was unable to obtain financing outside of bankruptcy; has been unable to obtain adequate unsecured credit allowable under § 503(b)(1) as an administrative expense; and has been unable to obtain debtor-in-possession financing absent Debtor's granting DIP Lender the liens described in the DIP Loan Documents.

46. The DIP Facility and DIP Loan Documents were negotiated in good faith and at arms-length by Debtor and DIP Lender. Under the circumstances, the terms of the DIP Facility are the most favorable terms available to Debtor, and are fair and reasonable.

47. Debtor has determined that the proposed DIP Facility is the best financing alternative available under the circumstances because it provides sufficient financing to meet Debtor's proposed liquidity needs on the best available terms through the confirmation of a plan. Debtor believes the DIP Facility is essential to preserve and maximize the value of the estate, and responsibly administer this Case. Moreover, sufficient post-petition financing is necessary to send a strong market signal that Debtor is well-funded and capable of operating without disruption through the confirmation of its plan of reorganization.

48. If approved, Debtor will use cash collateral and the proceeds of the DIP Loan to, among other things, continue operations and meet customer orders, honor employee wages and benefits, procure goods and services, fund general and corporate operating needs and the administration of this Case, all in accordance with the Budget.

49. As set forth in the Budget, to ensure such liquidity, Debtor seeks authorization to utilize cash collateral and draw $810,954 from the DIP Loan, on an interim basis, and an aggregate of up to $2.5 million from the DIP Loan on a final basis upon entry of the Final Order. Debtor believes the DIP Loan is essential to preserve and maximize the value of the estate, and responsibly administer this Case.

50.     Without immediate postpetition financing and access to Cash Collateral, Debtor will be unable to pay wages to its employees, pay vendors for equipment and services, meet its commitments to customers, meet working capital and business operating needs, preserve and maximize the value of the estates, and administer this Case, causing immediate and irreparable harm to the value of Debtor's estate to the detriment of all stakeholders.

**B. Ongoing Payment of Employee Wages and Benefits**

51.     Debtor employs forty-nine (49) people (collectively, the "**Employees**" and each an "**Employee**"). The Employees include both full-time and part-time employees, and salaried and hourly employees. Payroll is funded through a third-party payroll service. Debtor funds the amounts necessary to make payroll every other Thursday, and the payroll service runs payroll the following Friday. Each payroll correlates to the two week period ending the Sunday before payroll is run. Based on Debtor's ordinary operations, the next payroll is scheduled for Friday, January 14, 2022, which correlates to the pay period starting December 26, 2021 and ending January 9, 2022.

52.     As of the Petition Date, Debtor owed accrued and unpaid wages, salaries, bonuses and/or commissions, to Employees (collectively, the "**Wage Claims**"). Debtor seeks to satisfy accrued and due pre-petition obligations to individual employees for this payroll period up to the per employee statutory cap for priority claims in the amount of $13,650.

53.     Because some Employees are paid hourly, the precise amount of wages due on January 14, 2022 will depend on the hours actually worked through January 9, 2022 and therefore has not been finalized as of the date of this motion. However, Debtor anticipates that the wages due on January 14, 2022 are likely to be similar to those paid in the last payroll on December 28, 2021, which totaled approximately $91,000.

54.     In connection with the payment of wages and other compensation, Debtor is required under applicable law to withhold from Employee payroll checks certain of the Employees' obligations, including, without limitation: federal, state, and local income taxes, Social Security, Medicare, and unemployment taxes. In the ordinary course of business, Debtor

may also withhold from payroll checks: (i) Employee contributions to 401(k) or other retirement plans: (ii) Employee contributions to medical, dental, insurance, disability, or similar plans; and (iii) other contributions or obligations of the Employees as directed by the Employees or pursuant to applicable law (including Employee wage garnishments). Total withholding for the last regularly run payroll period was approximately $25,000. Debtor anticipates that the pre-petition withholdings for this period will be slightly higher due to year-end contributions, and estimates that it will be in the approximate amount of $35,000.

55.     In addition, Debtor makes payments for the employer's portion of payroll taxes and other obligations as required by applicable law. Debtor anticipates that their prepetition portion of payroll taxes is approximately $12,000.

56.     My salary is approximately $8,910.71 per pay period ($232,000 annually). Additionally, one of the employees of Debtor is Leslie Bendor. Mrs. Bendor manages sales and marketing for the Debtor.  Her role and continued employment and efforts are crucial to the ongoing success of the Debtor's sales efforts.  Mrs. Bendor is compensated with a mixture of salary in the amount of $3,461.54 per pay period ($81,000 annually) plus commissions earned on purchase orders. However, pre-petition commission payments owed to Mrs. Bendor are in arrears approximately $36,000, $19,000 of which was earned within 180 days of filing. Accordingly, in addition to payment of her regular pre-petition salary payment, Debtor seeks to pay Mrs. Bendor for pre-petition commissions, collectively up to the statutory cap of $13,650.

57.     Debtor's Employees depend on timely payment of their wages and salaries to pay for their daily living expenses. Some of the Employees may stop working if they do not receive their earned compensation, and failure to pay pre-petition wages would adversely affect the morale of the Employees and the performance of the Debtor as a going concern. Debtor's ongoing business operation requires the Employees to continue to work.

58.     There are sufficient funds in the Debtor's operating account to satisfy its prepetition payroll obligations.

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

59. In the ordinary course of Debtor's business, as is customary with most companies, Debtor established various benefit plans, programs, and policies for their Employees (collectively, the "**Benefit Obligations**"). The Benefit Obligations may include, but are not necessarily limited to, obligations with respect to the following: (a) medical, dental, vision, and similar plans or benefits; (b) vacation, severance, holiday pay, sick leave, and paid time off; (c) life insurance, accidental death and dismemberment, short-term disability, and similar plans or benefits; (d) 401k; and (e) other miscellaneous benefits.

60. Based on the last regularly run payroll, Debtor anticipates that the pre-petition benefit payments due on January 14, 2022 will total approximately $25,418.39.[2]

**C. Adequate Protection for Utilities**

61. Debtor obtains or may obtain during this Chapter 11 proceeding service from utilities for, among other things, electricity, water, sewage, voice and data telecommunications and other similar utilities (collectively, the "**Utility Services**") from several utility companies (collectively, the "**Utility Companies**").

62. The uninterrupted provision of the Utility Services is necessary for Debtor's continued manufacturing and sale of its goods to wholesalers and retailers such as Sam's/Walmart, Target, Auto Zone, and Kroger. For example, electrical and water service are necessary to maintain operation of the manufacturing equipment as well as lighting, air conditioning, and ventilation at the manufacturing plant. Phone, and internet services are also necessary for Debtor to process orders and communicate effectively with its customers.

63. Debtor's primary Utility Companies include (1) SRP, which provides electricity, (2) Gilbert Spectrum Building 1 LLC, which bills Debtor directly for the use of water provided by the Town of Gilbert, (3) Friedman Recycling Company, which provides recycling services, (4) Cox Communications, which provides internet service, and (5) Momentum Telecom, which

---

[2] Additionally, premiums are due for employee medical, dental, vision, and life insurance policies totaling approximately $40,000 (some of which applies to pre-petition periods), and a portion of those premiums are contributed by Debtor as a benefit to employees. Debtor seeks to pay these premiums in the ordinary course.

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

provides phone services.

64. Debtor's primary Utility Companies include (1) SRP, which provides electricity, (2) Gilbert Spectrum Building 1 LLC, which bills Debtor directly for the use of water provided by the Town of Gilbert, (3) Friedman Recycling Company, which provides recycling services, (4) Cox Communications, which provides internet service, and (5) Momentum Telecom, which provides phone services.[3]

65. Debtor has a history of making full and timely payments to the Utility Companies, and its current and projected revenues will be sufficient to continue making payments.

66. Billing statements from each of the Utility Companies reflect charges for the last three months billed prior to the Filing Date as set forth in the chart below. The Debtor's proposed new post-petition deposits for each utility are listed in the last column of the chart.

| Utility | | | | Average | Proposed Deposits |
|---|---|---|---|---|---|
| SRP | | | | | |
| Acct # 720-328-009 | $429.00 | $539.80 | $716.56 | $561.79 | $280.00 |
| Acct # 257-218-009 | $1,150.83 | $1,568.78 | $2,666.23 | $1,795.28 | $900.00 |
| Acct # 316-567-000 | $2,469.01 | $3,100.77 | $4,534.66 | $3,368.15 | $1,700.00 |
| Gilbert Spectrum Building 1 LLC | $1,086.66 | $1,194.91 | $1,951.77 | $1,411.11 | $700.00 |
| Friedman Recycling Company | $2,546.99 | $1,371.60 | $1,774.91 | $1,897.83 | $950.00 |
| Cox Communications | $1,071.63 | $551.42 | $520.21 | $714.42 | $400.00 |
| Momentum Telecom | $2,259.09 | $2,259.60 | $2,273.20 | $2,267.30 | $1,100.00 |

---

[3] Debtor believes that this list is a full and complete list of all companies providing Utility Services. Debtor reserves the right, however, to supplement that list if it determines that any Utility Company has been inadvertently omitted. Additionally, Debtor reserves the right to assert that any of the listed Utility Companies are not utilities within the definition of 11 U.S.C. §366.

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

67. The proposed deposits set forth above, which are roughly equal to 50% of the average monthly bill for each Utility Company (the "**Utility Deposit**"), should provide adequate assurance of payment for future services to all Utility Companies.[4] Debtor is also investigating whether there were any pre-petition utility bonds or deposits which, if subsequently discovered, provide sufficient adequate protection to the respective Utility Company.

DATED this 10th day of January, 2022.

_/s/ Yarron Bendor_
Yarron Bendor

**COPY** of the foregoing transmitted via the Court's ECF system, and as indicated this 10th day of January, 2022, to the following parties:

**OFFICE OF THE U.S. TRUSTEE**
Attn: Larry L. Watson
**Via Email: Larry.Watson@usdoj.gov**

Secured Creditors and Other Interested Parties:

Factors Southwest, LLC
aka FSW Funding
Attn: Robyn Barrett
**Via Email: robyn@fswfunding.com**

Andrew Harnish
May Potenza Baran & Gillespie
_Counsel for FSW Funding_
**Via Email: aharnish@maypotenza.com**

Jack Gantz Irrevocable Trust No. 2
Dated February 16, 1988
Attn: Joseph Gantz
**Via Email: joegantz1@gmail.com**

Michael W. Carmel
_Counsel for Jack Gantz Irrevocable Trust No. 2_
**Via Email: michael@mcarmellaw.com**

---

[4] Debtor is investigating whether there were any pre-petition utility bonds or deposits that may serve as sufficient or additional adequate assurance. Debtor reserves the right to argue that such bonds or deposits, if subsequently discovered, provide sufficient adequate protection to the respective Utility Company.

Lancelot Holdings LLC
Attn: Randy Krisch
**Via Email: randy@lancelotholdings.com**

Andy Abraham
Burch & Cracchiolo, PA
*Counsel for Lancelot Holdings, LLC*
**Via Email: aabraham@bcattorneys.com**

HYG Financial Services
Attn: Shannon Mohrfeld, Vendor Financial Services
**Via Email: Shannon.c.mohrfeld@leasingmail.com**

International Financial Services Corp.
**Via Facsimile: 847.549.0119**
**and Via Email: info@ifsc.com**

IOU Central Inc.
Attn: Phil Bishop, Collections Manager
**Via Email: pbishop@ioufinancial.com**

NFS Leasing, Inc.
Attn: Mark Blaisdell, Sr. Advisor
**Via Facsimile: 866.805.3667**
**and Via Email: info@nfsleasing.com**

List of Twenty Largest Unsecured Creditors:

Eastern Shipping Worldwide
185 Hansen Court
Wood Dale, IL 60191
c/o Andrew D. Kehagiaras, Esq.
**Via Email: adk@tradeandcargo.com**

Fibertex Nonwovens Inc.
Attn: Alan Zenner
100 Iso Pkwy
Gray Court, SC 29645
**Via Email: alze@fibertex.com**

Scandia Plastics , LLC
Attn: Gary W. Lipkin
220 Laurel Road, No. 201
Attn CFO
Voorhees, NJ 08043
**Via Email: glipkin@eckertseamans.com**

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

Engelman Berger, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Web-Pro Corp.
No. 4 Uim-Kon 3rd Road Yun-An  Ste E-261
Kaohsing  Taiwan  82841
**Via Facsimile:  +84 02513683100**


West Bent Packaging dba Comar
Attn:  Tom Nelson
P.O. Box 937
West Bend, WI 53095
**Via Email:  nelsont@comar.com**


Schoeneck Containers Inc.
Attn: Lissa Ewing
2160 S. 170th St.
New Berlin, WI 53151
**Via Email:  lewing@schoeneck.com**


BOK Financial
Attn:  Brian Barry
16767 N. Perimeter Dr., No. 200
Scottsdale, AZ 85260
**Via Email:  bbarry@bokf.com**


CH Robinson Worldwide Inc.
Attn:  Eric Saxton
P.O. Box 88656
Chicago, IL 60680-1656
**Via Email:  eric.saxton@chrobinson.com**


Kleen Test Products Corp.
Attn:  Don Bauer
1611 Sunset Road, No. 209
Port Washington, WI 53074
**Via Email:  dbauer@kleentest.com**


Ameritemps AZ LLC
Attn:  Kathy Watzke
6100 Rockside Woods Blvd.
Suite 250
Independence, OH 44131-2341
**Via Email:  kathyameritemps@hotmail.com**

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Hangzhou Bonyee Daily Necessity Tech Co
No. 16 Hongda Rd., Yuhang Economic Devel
Province 311102  Hangzhou City
Zhjiang  China
**Via Email:  jiangym@nbond.cn**

Total Quality Logistics LLC
Attn:  Cheri Calvert
4289 Ivy Pointe Blvd.
Cincinnati, OH 45245
**Via Email:  ccalvert@tql.com**

Bjerk Builders Inc.
Attn:  Scott Bjerk
1383 N. Tech Blvd., No. 101
Gilbert, AZ 85233
**Via Email:  Scott@bjerkbuilders.com**

Stepan Company
Attn:  Wayne Molley
22 W. Frontage Road
Winnetka, IL 60093
**Via Email:  wmolley@stepan.com**

Fort Dearborn Co.
Attn:  Nicholas Martisek
P.O. Box 74008096
Chicago, IL 60674-8096
**Via Email:  nmartisek@fortdearborn.com**

Arizona Corrugated Container
Attn:  David Lewandowski
225 S. Dobson Avenue
Mesa, AZ 85202
**Via Email:  davidl@tucsoncontainer.com**

Changxing Kingke Import & Export Ltd
New Century Industrial Park
Lijiaxiang Town, Changxing Cnty
Huzhou, Zhejiang China
**Via Facsimile:  +86 572.6230999**

Rebel Converting
Attn:  Michael Kryshak
700 N. Progress Drive
Saukville, WI 53080
**Via Email:  mike@rebelconverting.com**

Interstate Packaging Group Inc.
Attn:  Jim Combe
8828 S. Hardy Dr., Ste. 105
Tempe, AZ 85284
**Via Email:  jcombe@intpkg.com**

Asialinx Paper Ltd. dba Softech
2591 Hunan Hwy
Bldg 1, Rm 602
Shanghai  China
**Via Facsimile:  +86 21.2098531**

<u>Utilities</u>:

Salt River Project
Attn:  Krysten Junker, Valued Energy Manager
**Via email;  SRPBIZ@srpnet.com**

Friedman Recycling
Attn:  Josephine Lyons
**Via Email:  jlyons@friedmanrecycling.com**

Momentum Telecom
Attn:  Carrie Wilkins, Account Manager
**Via Email:  carrie.wilkins@momentumtelecom.com**

Cox Communications
Attn:  Mark Tunny, Sr. Account Executive
**Via Email:  mark.tunney@cox.com**

# **Exhibit A**

## Yarron Bendor CV

Mr. Bendor is the founder of GPMI. He has over 45 years of experience in manufacturing businesses, including executive management, product development, marketing, and manufacturing.

Mr. Bendor was born and grew up in the State of Israel. He served as an officer in combat units in the Israeli Defense Force, for four years active duty and eight years reserve. He attended Haifa University in its Executive Program in Business Studies.

His prior business experience includes establishment of a farm equipment manufacturing company in Israel, which was eventually sold to a Fortune 500 company.

In 1986, Mr. Bendor relocated to the United States.

In 1989, he established GPMI for the purpose of manufacturing wet wipes in the areas of home care, auto care and personal care. As CEO of GPMI, Mr. Bendor has managed at times over 150 employees, initiated and dealt with top consumer products companies and major retailers such as: P&G, Clorox, Dial, Reckitt Benckiser, Walmart, Target, Kroger, Aldi and many others. He is actively engaged with the Company's manufacturing process and sales efforts.

On the product side, Mr. Bendor developed multiple patents including one with distinguished national recognition. He has vast experience in building, managing and maintaining a diverse and excellent team of skilled employees.

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

# EXHIBIT B

GPMI Company
13 Week Cash Flow
10-Jan

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Week of | | | | | | | |
| | 10-Jan thru 16-Jan | 17-Jan thru 23-Jan | 24-Jan thru 30-Jan | 31-Jan thru 6-Feb | 7-Feb thru 13-Feb | 14-Feb thru 20-Feb | 21-Feb thru 27-Feb | 28-Feb thru 6-Mar | 7-Mar thru 13-Mar | 14-Mar thru 20-Mar | 21-Mar thru 27-Mar | 28-Mar thru 3-Apr | 4-Apr thru 10-Apr | 13 Week Total |
| **Beginning Cash Balance** | 25,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 25,000 |
| Cash In - Collections | 417,500 | 125,534 | 311,170 | 227,864 | 331,412 | 147,315 | 280,189 | 259,921 | 326,723 | 147,833 | 277,835 | 290,801 | 378,485 | 3,522,582 |
| Cash Out - Disbursements | (342,500) | (125,534) | (311,170) | (227,864) | (331,412) | (147,315) | (280,189) | (259,921) | (326,723) | (147,833) | (277,835) | (290,801) | (378,485) | (3,447,582) |
| **Net Inflows / (Outflows)** | 75,000 | - | - | - | - | - | - | - | - | - | - | - | - | 75,000 |
| *Cumulative Net Inflows / (Outflows)* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* |
| **Ending Cash Balance** | **100,000** | **100,000** | **100,000** | **100,000** | **100,000** | **100,000** | **100,000** | **100,000** | **100,000** | **100,000** | **100,000** | **100,000** | **100,000** | **100,000** |
| DIP Line Availability | 422,442 | 631,219 | 617,134 | 655,688 | 632,694 | 753,766 | 728,693 | 721,141 | 656,941 | 757,180 | 734,594 | 687,874 | 563,658 | 563,658 |
| **Total Liquidity** | **522,442** | **731,219** | **717,134** | **755,688** | **732,694** | **853,766** | **828,693** | **821,141** | **756,941** | **857,180** | **834,594** | **787,874** | **663,658** | **663,658** |
| **Collections** | | | | | | | | | | | | | | |
| Advances | 413,500 | 87,534 | 309,920 | 223,364 | 328,912 | 144,315 | 280,189 | 259,921 | 326,723 | 147,833 | 277,835 | 290,801 | 378,485 | 3,469,332 |
| Collections on Non-Factored Invoices | 4,000 | 38,000 | 1,250 | 4,500 | 3,000 | 3,000 | | | | | | | | 53,250 |
| **Total Collections** | 417,500 | 125,534 | 311,170 | 227,864 | 331,412 | 147,315 | 280,189 | 259,921 | 326,723 | 147,833 | 277,835 | 290,801 | 378,485 | 3,522,582 |
| **Disbursements** | | | | | | | | | | | | | | |
| Purchases | 112,500 | 65,000 | 140,000 | 50,000 | 115,000 | 90,000 | 115,000 | 75,000 | 112,500 | 90,000 | 110,000 | 75,000 | 140,000 | 1,290,000 |
| Other Operations | 27,500 | 32,000 | 27,500 | 25,000 | 29,500 | 30,000 | 27,500 | 27,000 | 27,500 | 30,000 | 29,500 | 25,000 | 27,500 | 365,500 |
| Compensation | 162,500 | 16,500 | 126,000 | 10,000 | 178,500 | 16,500 | 126,000 | 10,000 | 178,500 | 16,500 | 126,000 | 42,500 | 142,000 | 1,151,500 |
| Financial | - | 4,245 | - | 42,301 | - | 4,245 | - | 42,301 | - | 4,245 | - | 42,301 | - | 139,637 |
| DIP Facility Origination Fee & Interest | 37,500 | 4,290 | 3,178 | 3,579 | 3,412 | 3,070 | 2,697 | 3,136 | 3,223 | 3,589 | 3,343 | 3,516 | 3,735 | 78,266 |
| Reorganization | - | - | - | 3,500 | - | - | - | 3,500 | - | - | - | 3,500 | 50,000 | 60,500 |
| Operating Expenses | 2,500 | 3,500 | 14,492 | 93,485 | 5,000 | 3,500 | 8,992 | 98,985 | 5,000 | 3,500 | 8,992 | 98,985 | 15,250 | 362,180 |
| **Total Disbursements** | 342,500 | 125,534 | 311,170 | 227,864 | 331,412 | 147,315 | 280,189 | 259,921 | 326,723 | 147,833 | 277,835 | 290,801 | 378,485 | 3,447,582 |
| **Net Cash Inflows / (Outflows)** | **75,000** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **75,000** |
| *Cummulative Net Cash Inflows / (Outflows)* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | *75,000* | |
| **Borrowing Base** | | | | | | | | | | | | | | |
| A/R | 1,281,185 | 1,233,627 | 1,358,352 | 1,344,539 | 1,199,147 | 1,194,642 | 1,260,304 | 1,259,199 | 1,267,699 | 1,282,171 | 1,286,208 | 1,290,246 | 1,294,283 | 1,294,283 |
| Inventory - RM | 125,572 | 112,261 | 107,322 | 95,474 | 90,928 | 84,938 | 81,973 | 76,052 | 74,207 | 70,726 | 69,467 | 65,422 | 67,508 | 67,508 |
| Inventory - FG | 221,395 | 178,624 | 157,408 | 174,738 | 205,544 | 232,125 | 267,794 | 291,889 | 323,758 | 343,864 | 367,084 | 381,923 | 400,817 | 400,817 |
| Inventory Lessor of Coll/Cap limit | 346,967 | 290,885 | 264,730 | 270,212 | 296,472 | 317,064 | 349,767 | 367,941 | 397,964 | 414,590 | 436,551 | 447,345 | 468,326 | 468,326 |
| Total | 1,628,151 | 1,524,512 | 1,623,082 | 1,614,751 | 1,495,619 | 1,511,706 | 1,610,071 | 1,627,140 | 1,665,664 | 1,696,761 | 1,722,759 | 1,737,591 | 1,762,609 | 1,762,609 |
| **DIP Loan** | | | | | | | | | | | | | | |
| Beg Balance | 969,174 | 1,205,709 | 893,293 | 1,005,948 | 959,063 | 862,925 | 757,939 | 881,378 | 905,999 | 1,008,722 | 939,581 | 988,166 | 1,049,717 | 969,174 |
| Advances | 413,500 | 87,534 | 309,920 | 223,364 | 328,912 | 144,315 | 280,189 | 259,921 | 326,723 | 147,833 | 277,835 | 290,801 | 378,485 | 3,469,332 |
| Repayments | (176,965) | (399,950) | (197,265) | (270,250) | (425,050) | (249,300) | (156,750) | (235,300) | (224,000) | (216,975) | (229,250) | (229,250) | (229,250) | (3,239,555) |
| **Ending balance** | **1,205,709** | **893,293** | **1,005,948** | **959,063** | **862,925** | **757,939** | **881,378** | **905,999** | **1,008,722** | **939,581** | **988,166** | **1,049,717** | **1,198,951** | **1,198,951** |
| **Availability** | **422,442** | **631,219** | **617,134** | **655,688** | **632,694** | **753,766** | **728,693** | **721,141** | **656,941** | **757,180** | **734,594** | **687,874** | **563,658** | **563,658** |

Case 2:22-bk-00150-EPB   Doc 9   Filed 01/10/22   Entered 01/10/22 20:38:57   Desc
Main Document   Page 27 of 27

**GPMI Company**
**13 Week Cash Flow**
**Disbursements**
**10-Jan**

| Week of | 1 · 10-Jan thru 16-Jan | 2 · 17-Jan thru 23-Jan | 3 · 24-Jan thru 30-Jan | 4 · 31-Jan thru 6-Feb | 5 · 7-Feb thru 13-Feb | 6 · 14-Feb thru 20-Feb | 7 · 21-Feb thru 27-Feb | 8 · 28-Feb thru 6-Mar | 9 · 7-Mar thru 13-Mar | 10 · 14-Mar thru 20-Mar | 11 · 21-Mar thru 27-Mar | 12 · 28-Mar thru 3-Apr | 13 · 4-Apr thru 10-Apr | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Disbursements** | | | | | | | | | | | | | | |
| **Inventory** | | | | | | | | | | | | | | |
| Non-woven | 70,000 | - | 70,000 | - | 70,000 | - | 70,000 | - | 70,000 | - | 70,000 | - | 70,000 | 490,000 |
| Chemicals | 35,000 | - | 35,000 | - | 35,000 | - | 35,000 | - | 35,000 | - | 35,000 | - | 35,000 | 245,000 |
| Film - Laminate | - | 25,000 | - | 25,000 | - | 25,000 | - | 25,000 | - | 25,000 | - | 25,000 | - | 150,000 |
| Canisters | - | 20,000 | - | 20,000 | - | 20,000 | - | 20,000 | - | 20,000 | - | 20,000 | - | 120,000 |
| Lids | 5,000 | - | 7,500 | - | 7,500 | - | 7,500 | - | 5,000 | - | 5,000 | - | 5,000 | 42,500 |
| Labels - Prisma Graphics | - | 15,000 | - | - | 15,000 | - | - | - | 15,000 | - | - | - | - | 45,000 |
| Packaging - Smurfit | - | - | 25,000 | - | - | 25,000 | - | - | - | 25,000 | - | 25,000 | 25,000 | 150,000 |
| Pallets | 2,500 | - | - | 2,500 | - | 2,500 | - | 2,500 | - | 2,500 | - | - | - | 12,500 |
| Supplies | - | 5,000 | - | 5,000 | - | 5,000 | - | 5,000 | - | 5,000 | - | 5,000 | 5,000 | 35,000 |
| Total | 112,500 | 65,000 | 140,000 | 50,000 | 115,000 | 90,000 | 115,000 | 75,000 | 112,500 | 90,000 | 110,000 | 75,000 | 140,000 | 1,290,000 |
| **Other Operations** | | | | | | | | | | | | | | |
| Energy Transport | - | | | | | | | | | | | | | |
| CH Robinson | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 325,000 |
| Repairs and Maintenance | 2,500 | - | 2,500 | - | 2,500 | - | 2,500 | - | 2,500 | - | 2,500 | - | 2,500 | 17,500 |
| Equipment | - | 2,000 | - | - | 2,000 | - | - | 2,000 | - | - | 2,000 | - | - | 8,000 |
| Lab | - | 5,000 | - | - | 5,000 | - | - | - | 5,000 | - | - | - | - | 15,000 |
| Total | 27,500 | 32,000 | 27,500 | 25,000 | 29,500 | 30,000 | 27,500 | 27,000 | 27,500 | 30,000 | 29,500 | 25,000 | 27,500 | 365,500 |
| **Compensation** | | | | | | | | | | | | | | |
| Payroll | 120,000 | - | 120,000 | - | 120,000 | - | 120,000 | - | 120,000 | - | 120,000 | - | 120,000 | 840,000 |
| 401k Contribution | - | 4,000 | - | 4,000 | - | 4,000 | - | 4,000 | - | 4,000 | - | 4,000 | - | 24,000 |
| Employee Benefits | 32,500 | - | - | - | 32,500 | - | - | - | 32,500 | - | 32,500 | - | - | 130,000 |
| Life Insurance | - | 6,500 | - | - | - | 6,500 | - | - | - | 6,500 | - | - | - | 19,500 |
| Assurant | 4,000 | - | - | - | 4,000 | - | - | - | 4,000 | - | - | - | - | 12,000 |
| Payroll Fees | - | - | - | - | 1,000 | - | - | - | 1,000 | - | - | - | 1,000 | 3,000 |
| Temp Labor | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 78,000 |
| Commission | - | - | - | - | 15,000 | - | - | - | 15,000 | - | - | - | 15,000 | 45,000 |
| Total | 162,500 | 16,500 | 126,000 | 10,000 | 178,500 | 16,500 | 126,000 | 10,000 | 178,500 | 16,500 | 126,000 | 42,500 | 142,000 | 1,151,500 |
| **Financial** | | | | | | | | | | | | | | |
| **Leases:** | | | | | | | | | | | | | | |
| NFS Leasing | - | - | - | 36,310 | - | - | - | 36,310 | - | - | - | 36,310 | - | 108,930 |
| IFSC (Compressor) | - | 1,942 | - | - | - | 1,942 | - | - | - | 1,942 | - | - | - | 5,826 |
| IFSC (Warehouse Racking) | - | - | - | 2,254 | - | - | - | 2,254 | - | - | - | 2,254 | - | 6,762 |
| IFSC (Arpac) | - | - | - | 3,737 | - | - | - | 3,737 | - | - | - | 3,737 | - | 11,211 |
| Integrity (Loma Equipment) | - | 2,303 | - | - | - | 2,303 | - | - | - | 2,303 | - | - | - | 6,908 |
| Total | - | 4,245 | - | 42,301 | - | 4,245 | - | 42,301 | - | 4,245 | - | 42,301 | - | 139,637 |
| **DIP Interest/Origination Fees  18.5%** | 37,500 | 4,290 | 3,178 | 3,579 | 3,412 | 3,070 | 2,697 | 3,136 | 3,223 | 3,589 | 3,343 | 3,516 | 3,735 | 78,266 |
| **Reorganization Fees** | | | | | | | | | | | | | | |
| Berger | - | - | - | - | - | - | - | - | - | - | - | 25,000 | - | 25,000 |
| MCA | - | - | - | - | - | - | - | - | - | - | - | 25,000 | - | 25,000 |
| DIP Legal | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Monitoring | - | - | - | 3,500 | - | - | - | 3,500 | - | - | - | 3,500 | - | 10,500 |
| US Trustee Fee | - | - | - | - | - | - | - | - | - | - | - | - | 50,000 | 50,000 |
| Total | - | - | - | 3,500 | - | - | - | 3,500 | - | - | - | 3,500 | 50,000 | 60,500 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| SRP | - | - | - | 4,500 | - | - | - | 4,500 | - | - | - | 4,500 | 4,500 | 18,000 |
| Cox | - | 1,000 | - | - | - | 1,000 | - | - | - | 1,000 | - | - | - | 3,000 |
| Bank Fees | - | - | 750 | - | - | - | 750 | - | - | - | 750 | - | - | 2,250 |
| Gilbert Spectrum (McQueen Rent) | - | - | - | 86,235 | - | - | - | 86,235 | - | - | - | 86,235 | - | 258,704 |
| Nationwide | - | - | 5,742 | - | - | - | 5,742 | - | - | - | 5,742 | - | - | 17,226 |
| AMEX | - | - | - | - | 2,500 | - | - | 2,500 | - | - | - | - | 2,500 | 7,500 |
| AT&T | - | - | - | 250 | - | - | - | 250 | - | - | - | 250 | 250 | 1,000 |
| FedEx | - | - | 500 | - | - | - | 500 | - | - | - | 500 | - | 500 | 2,000 |
| Grady Works | - | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 | 5,000 | 20,000 |
| Other | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 32,500 |
| Total | 2,500 | 3,500 | 14,492 | 93,485 | 5,000 | 3,500 | 8,992 | 98,985 | 5,000 | 3,500 | 8,992 | | | 362,180 |
| **Total Disbursements** | 305,000 | 121,245 | 307,992 | 224,286 | 328,000 | 144,245 | 277,492 | 256,786 | 323,500 | 144,245 | 274,492 | 287,286 | 374,750 | 3,369,317 |