# EXHIBIT A



# LOAN AND SECURITY AGREEMENT

This **LOAN AND SECURITY AGREEMENT** is entered into as of January 12, 2022 by and between GPMI, Co., an Arizona corporation ("Borrower"), and FACTORS SOUTHWEST, L.L.C., dba FSW FUNDING, an Arizona limited liability company whose chief executive office and principal place of business is located at 4530 E. Shea Blvd., Suite 170, Phoenix, AZ 85028 ("Lender").

## RECITALS

A.  Borrower has requested that Lender lend funds and provide financial accommodations to Borrower (collectively, the "Loan") as more fully set forth herein and in the other Loan Documents.

B.  The financial accommodations made herein are in anticipation of Borrower filing a voluntary bankruptcy petition seeking protection under Chapter 11 of the Bankruptcy Code and are intended to finance Borrow as a debtor-in-possession during the pendency of the Bankruptcy Case.

**NOW, THEREFORE**, in consideration of the premises, and intending to be legally bound hereby, the Parties hereby agree as follows:

## AGREEMENT

1.  **Certain Definitions and Index to Definitions**.

   1.1  **Accounting Terms**.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP consistently applied.

   1.2  **Definitions**.  All other capitalized terms contained in this Agreement which are not specifically defined herein shall have the meanings provided those terms in the UCC to the extent the same are used herein.  All references herein to the singular or plural shall also mean the plural or the singular, respectively, and references to any gender shall mean any other gender, including the neuter.  The term "including" shall mean "including without limitation," regardless of whether so stated.  As used herein, the following terms shall have the designated meanings:

   1.2.1.  **"Account Debtor"** – a Person to whom Borrower has sold Inventory or other Collateral, or to whom Borrower or its Affiliates have provided services for which that Person has not fully paid Borrower or that Affiliate all amounts due for those goods or services.

   1.2.2.  **"Accounts"** – all accounts receivable or other obligations owed to Borrower by an Account Debtor.

   1.2.3.  **"Accounts Receivable Factoring Facility"** – means the transaction contemplated by the Factoring Agreement.

   1.2.4.  **"ACH"** – means automated clearing house or similar payment process.

   1.2.5.  **"ACH Agreement"** – see Section 3.1.3 hereof.

   1.2.6.  **"Advances"** - see Section 2.1 hereof.

   1.2.7.  **"Affiliate"** means any entity which directly or indirectly, through one or more intermediaries, controls, or is controlled by or is under common control with Borrower, or 5% or more of the equity interest of which is held beneficially or of record by Borrower or any Account Debtor or any Affiliate of either of them.  "Control" means the power, directly or indirectly, to direct management and policies of an entity, whether through the ownership of voting securities, by contract or otherwise.

*Loan and Security Agreement*

Case 2:22-bk-00150-EPB    Doc 51-1    Filed 01/21/22    Entered 01/21/22 10:14:03    Desc
Exhibit A - Final DIP Facility Agreements    Page 2 of 62



1.2.8. "**Agreement**" - this Loan and Security Agreement, together with all exhibits and schedules hereto, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated, or replaced.

1.2.9. "**Allowable Amount**" - the lesser of (i) the Borrowing Base less Availability Reserves, if any, and (ii) the Maximum Amount.

1.2.10. "**Anniversary Date**" – the later of the date that is one year following the date of this Agreement, or the Renewal Termination Date, if applicable.

1.2.11. "**Applicable Laws**" means all applicable federal, state, local and foreign laws, rules, regulations and orders of any Governmental Authority.

1.2.12. "**Asset Report**" – a report prepared by Borrower setting forth a complete and current detailed listing of all of Borrower's inventory, the listing to include, without limitation, the part numbers, cost and location of all inventories, and the quantity of inventory in the possession of each sales representative and submitted to Lender in accordance with Section 2.4.1 hereof

1.2.13. "**Available Cash**" – means cash on deposit, if any, that may be held in any of Borrower's deposit accounts that are not otherwise Borrower's immediately accessible funds

1.2.14. "**Availability Reserves**" - as of any date of determination, an amount as Lender may from time to time establish and revise in good faith reducing the amount of the Advances which would otherwise be available to Borrower hereunder:

1.2.14.1. To reflect events, conditions, contingencies or risks which, as determined by Lender in good faith, do or may affect either (i) the Collateral or any other property which is security for the Obligations or its value, (ii) the assets, business or prospects of Borrower or any Obligor, or (iii) the security interest and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof);

1.2.14.2. To reflect Lender's good faith belief that any Collateral report or financial information furnished by or on behalf of Borrower or any Obligor to Lender is or may have been incomplete, inaccurate or misleading in any material respect; or

1.2.14.3. In respect of any state of facts that Lender determined in good faith constitutes an Event of Default or Incipient Default.

1.2.14.4. Lender may retain the Availability Reserves until Complete Termination.

1.2.15. "**Avoidance Claim**" - any claim that any payment received by Lender is avoidable under the Bankruptcy Code or any other debtor relief statute.

1.2.16. "**Bankruptcy Case**" – means the Chapter 11 case filed in the United States Bankruptcy Court for the District of Arizona by Borrower as Case No. 2:22-bk-00150-EPB, in which Borrower has remained in possession of its assets and continues to operate its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

1.2.17. "**Bankruptcy Court**" – means the court presiding over Borrower's Bankruptcy Case

1.2.18. "**Bona-fide**" - means that each party to a transaction has acted in Good Faith and in an arms' length manner with respect to the transaction.

1.2.19. "**Borrower**" - see Preamble hereof.

*Loan and Security Agreement*

Case 2:22-bk-00150-EPB   Doc 51-1   Filed 01/21/22   Entered 01/21/22 10:14:03   Desc
Exhibit A - Final DIP Facility Agreements   Page 3 of 62



1.2.20.    "**Borrowing Base**" – The lesser of a) up to twenty percent (20%) of eligible raw material limited to non-woven and unopened plastic canisters and lids less than 365 days aged plus up to sixty percent (60%) of finished goods limited to less than 30 days aged with respect to the Inventory Credit Facility; or b) up to 95% Maximum Amount with Respect to the Inventory Credit Facility.

1.2.21.    "**Borrowing Base Certificate**" - a certificate executed by an authorized officer of Borrower to support its request for an Advance, in a form acceptable to Lender.

1.2.22.    "**Borrower Account**" – any deposit or securities account of Borrower with any bank, securities firm or other financial institution.

1.2.23.    "**Business Day**" - any day which is not a Saturday, Sunday, or other day on which national banks located in Arizona are authorized or required to be closed.

1.2.24.    "**Cash Facility**" – means the financing provided pursuant to this Agreement to substitute for Available Cash

1.2.25.    "**Change of Control**" –(a) A sale, hypothecation or other disposition is made of twenty (20%) percent or more of the beneficial interest in any class of voting equity of a Person, (b) the sale of all or substantially all of at least twenty (20%) of the Person's assets, or (c) the change in the management or control of the Person, whether through the ownership or control of voting securities or otherwise.

1.2.26.    "**Clearance Days**" – the number of days for which Lender's financial institution has to declare whether the Clearance Day Payments are good funds, which period shall be no less than three (3) Business Days from the date the payments are deposited into Lender's account at that institution.

1.2.27.    "**Clearance Day Payments**" - payments posted by Lender, in whatever form and from whatever source, in reduction of the Obligations.

1.2.28.    "**Collateral**" – All Borrower's present and future personal property and Fixtures in which Borrower has an interest, now or hereafter existing or acquired, and wheresoever located, tangible or intangible, including but not limited to, all present or hereafter existing or acquired Accounts, tools, Goods, Inventory, Equipment, furniture, receivables, security agreements, notes, bills, acceptances, Instruments, Deposit Accounts, Letters of Credit, Letter of Credit Rights, installment paper, Chattel Paper, Electronic Chattel Paper, Documents, certificates of deposit, tax refund claims, license fees, insurance claims and proceeds, Investment Property, Commercial Tort Claims, including without limitation, the claims which are the subject of on-going litigation known as the "Michelin Litigation", and any other claims, conditional sale or lease contracts, cash or cash equivalents, chattel mortgages or deeds of trust, General Intangibles, all intellectual property including patents, trademarks, service marks, trade names, trade styles, and copyrights (and applications for all of the foregoing), contract rights, accounts receivable, and all other hypothecations, and promises or duties to pay money, now or hereafter owned or acquired by Borrower (including all rights of Borrower as an unpaid vendor), all guarantees and other security therefor, and all right, title and interest of Borrower in any returned, repossessed, rejected or unshipped goods, together with all of Borrower's books of accounts, ledger cards and records, all vehicles, all computer programs, software and systems owned or operated in connection therewith, all tradenames, trade styles, all of the above accruing present and future advances and all and all products, proceeds, collections, returns, add-ons, accessions, replacements and substitutions of any of the foregoing, and all proceeds of proceeds.

1.2.29.    "**Complete Termination**" – Complete Termination occurs upon satisfaction of all of the following conditions:

1.2.29.1.    Payment and performance in full of all Obligations of Borrower to Lender;

1.2.29.2.    If Lender has issued or caused to be issued guarantees, promises, or letters of credit on behalf of Borrower, acknowledgement from all beneficiaries thereof that neither Lender nor any other issuer has any outstanding direct or contingent liability in connection therewith;

*Loan and Security Agreement*



1.2.29.3.   No pending or threatened Avoidance Claims exist and the time period under which such claim(s) can be asserted against Lender has expired, and no Exposed Payments exist.

1.2.29.4.   Borrower has executed and delivered to Lender and the Lender Parties a General Release in form acceptable to Lender.

1.2.30.   "**Control Agreement**" – a deposit or securities account control agreement in form and substance acceptable to Lender between Lender, Borrower, any Obligor with an ownership interest in the account, and the financial institution holding the deposit or securities account being pledged to Lender.

1.2.31.   "**Credit Accommodation**" - any Advance or other extension of credit by Lender to or on behalf of Borrower hereunder.

1.2.32.   "**Default Rate**" – Thirty percent (30%) per annum in excess of the Interest Rate or the maximum rate permitted by law, whichever is lower.

1.2.33.   "**Early Termination Fee**" is waived

1.2.34.   "**Eligible Inventory**" – The lesser of (i) 20% of eligible raw materials limited to non-woven and unopened plastic canisters and lids less than 365 days aged; (ii) 60% of finished goods limited to less than 30 days aged; Inventory of Borrower which excludes all goods on consignment, and which is:

1.2.34.1.   Subject to Lender's valid first priority, perfected security interest; and

1.2.34.2.   Otherwise acceptable to Lender in its reasonable sole discretion.

1.2.35.   "**Event of Default**" - see Section 12 hereof.

1.2.36.   "**Evidence of Special Credit Accommodation**" - see Section 2.3 hereof.

1.2.37.   "**Exposed Payments**" – payments received by Lender from or for the account of an Account Debtor that has become subject to an Insolvency Proceeding, to the extent those payments cleared the Account Debtor's deposit account within ninety (90) Days of the commencement of the commencement of the Insolvency Proceeding or are or may otherwise be subject to a claim for recall or avoidance of those payments under Applicable Law, in Lender's determination.

1.2.38.   "**Factoring Agreement**" – means that certain Factoring and Security Agreement executed concurrently with this Agreement by and between Borrower and Lender.

1.2.39.   "**Facility Fee**" - means a fee in the amount of $45,000.

1.2.40.   "**GAAP**" - means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and pronouncements of the Financial Accounting Standards Board (or any successor authority) that are applicable as of the date of determination.

1.2.41.   "**Good Faith**" means "honesty in fact in the conduct or transaction concerned."

1.2.42.   "**Governmental Authority**" means any applicable federal, state, local, foreign or other governmental or administrative body, instrumentality, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute resolving panel or body, and any non-governmental organization with regulatory authority over the business or affairs of the Person.

1.2.43.   "**Guarantor**" – any Person now or hereafter executing the Guaranty or otherwise

*Loan and Security Agreement*



guaranteeing the Obligations or any portion thereof, and "**Guarantors**" means all Guarantors collectively.

1.2.44.    "**Guaranty**" – the Validity Guaranty executed by Borrower in favor of Lender.

1.2.45.    "**Incipient Default**" – any event or state of facts that would constitute an Event of Default but for the requirement of providing notice, the passage of time, whether to permit a cure or otherwise, or the granting of other forbearance.

1.2.46.    "**Intercreditor Agreement**" – an intercreditor agreement in form and substance acceptable to Lender wherein the rights, priorities and obligations of Lender and a Permitted Third Party Creditor are set forth with respect to the obligations owed by Borrower to Lender and the Permitted Third Party Creditor, respectively.

1.2.47.    "**Interest Rate**" – 18.50% per annum based on a 360-day year.

1.2.48.    "**Insolvency Date**" – The date on which Lender has reasonably determined that an Account Debtor has become Insolvent.

1.2.49.    "**Insolvent**" or "**Insolvency**"- An Account Debtor has become Insolvent or is experiencing Insolvency if its liabilities exceed its assets, it fails to pay an Eligible Account or other accounts as they come due, it admits its inability to honor its financial obligations or it otherwise meets the definition of that term under Applicable Law.

1.2.50.    "**Inventory**" - has the meaning as set forth in the UCC, plus all inventory now owned or hereafter acquired by Borrower, including, but not limited to, all raw materials, work in process, finished goods, inventory leased to others or held for lease, merchandise, parts and supplies of every kind and description, including inventory temporarily out of the Borrower's custody or possession, together with all returns on accounts.

1.2.51.    "**Inventory Credit Facility**" – means the credit facility provided pursuant to this Agreement to finance the Eligible Inventory.

1.2.52.    "**Key Employee(s)**" – Yarron Bendor

1.2.53.    "**Lender**" – See Preamble.

1.2.54.    "**Lender Account**" means an account established at a financial institution established by Lender, which account and institution may be changed from time-to-time at Lender's discretion.

1.2.55.    "**Lender Party**" – Lender and any of its Affiliates, and their respective equity owners, directors, managers, officers, employees and agents.

1.2.56.    "**Lender's Representatives**" - Lender's managers, officers, employees, agents, designees, attorneys, and accountants.

1.2.57.    "**Lending Office**" – 4530 E. Shea Blvd., Suite 170, Phoenix, AZ 85028 or any other or successor office designated by Lender or its successors.

1.2.58.    "**Loan Documents**" - this Agreement, the Note, each Guaranty, each Control Agreement, any Release and any other documents, instruments and agreements, executed and/or delivered in connection herewith or therewith, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.2.59.    "**Market Value**" – the estimated orderly liquidation value of the item.

*Loan and Security Agreement*


1.2.60.    "**Material Adverse Change**" means (a) a material adverse change in the business, operations, condition (financial or otherwise) or prospects of Borrower or any of its Affiliates, (b) a material impairment of the ability of Borrower, any Obligor or any their Affiliates' ability to perform their respective obligations under the Loan Documents to which the Person is a party or of Lender's ability to enforce the Loan Documents, exercise rights with respect to the Obligations or realize upon the Collateral, or (c) any impairment of the enforceability of the Loan Documents or priority of the Lender's Liens with respect to the Collateral.

1.2.61.    "**Maximum Amount**" – Three Million Dollars ($3,000,000) comprised of Two Million Dollars ($2,000,000) in the form of the Accounts Receivable Factoring Facility; Five Hundred Thousand Dollars ($500,000) in the form of the Inventory Credit Facility, and Five Hundred Thousand Dollars ($500,000) in the form of the Cash Facility.

1.2.62.    "**Minimum Monthly Borrowing**" is waived

1.2.63.    "**Monetary Collateral**" - cash, checks, deposits, cash-equivalents or other proceeds of Collateral, including electronic payments.

1.2.64.    "**Note**" – The Revolving Credit Note.

1.2.65.    "**Obligated Party**" - any entity obligated with respect to any Collateral.

1.2.66.    "**Obligations**" - all present and future obligations liabilities, covenants, agreements, guaranties, warranties and representations of any Obligor to any Lender Party of any and every kind and nature, owing by Obligor to Lender whether or not for the payment of money, howsoever created, incurred, acquired, arising or evidenced, , whether direct or indirect, absolute or contingent, due or to become due, joint or several, certain or uncertain, determined or undetermined, monetary or nonmonetary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, primary or secondary, as principal, guarantor or surety, direct or indirect, including any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations; and all principal, interest, fees, charges, expenses, attorneys, accountants and experts' fees and expenses chargeable to Borrower or any Obligor or incurred by Lender in connection with this Agreement and/or the transaction(s) related thereto, and regardless of whether the Obligation arises before, during or after the commencement of any Insolvency Proceeding in which an Obligor is a debtor.  By way of clarification, the Parties intend that the Obligations include all obligations owed by any Obligor to Lender or any of its Affiliates pursuant to any other contractual arrangements existing between them.

1.2.67.    "**Obligors**" – Borrower, all Guarantors and any other Person obligated to pay or perform any of the Obligations owed to Lender, whether pursuant to any of the Loan Documents, by operation of law, pursuant to successor liability or otherwise.

1.2.68.    "**Online Reporting Service**" - means the system set up on Lender's website where Borrower provides Lender with the pertinent data necessary for Lender to administer this Agreement.

1.2.69.    "**Permitted Third Party Creditor**" – See Schedule 1.2.69.

1.2.70.    "**Person**" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business trust, or other organizations, irrespective of whether it is a legal entity, and any Governmental Authority.

1.2.71.    "**Preference Reserve**" – has the meaning set forth in Section 18.1.

1.2.72.    "**Renewal Period**" – the period of time commencing on either the Anniversary Date or on any Renewal Termination Date and terminating on the date that is one year thereafter.

1.2.73.    "**Renewal Termination Date**" – the date on which a Renewal Period terminates.



1.2.74.    "**Special Credit Accommodation**" - see Section 2.3 hereof.

1.2.75.    "**Subsidiary**" of a Person means a corporation, partnership, limited liability company, trust or other entity in which that Person directly or indirectly owns or controls securities having voting power to elect a majority of the governing individual or body of that Person, with a twenty (20%) or greater ownership or controlling interest presumed to constitute sufficient control to elect that majority, unless Lender expressly approves otherwise in writing.

1.2.76.    "**Termination Date**" - the earlier of (i)(a) the Anniversary Date, or (b) the Renewal Termination Date, as the case may be, or (ii) the date on which Lender or Borrower elects to terminate this Agreement pursuant to the terms herein.

1.2.77.    "**Transaction Documents**" means with respect to Accounts, all agreements, promissory notes, instruments, UCC financing statements, and other documents executed and delivered in connection with the Accounts.

1.2.78.    "**UCC**" - The Uniform Commercial Code in the State of Arizona, as it may be amended from time to time.

1.2.79.    "**Value of Eligible Inventory**" - means, as determined by Lender in good faith, the lower of (a) cost, computed on a first-in-first-out basis in accordance with GAAP, or (b) Market Value.

2.    **Credit Facilities**.

2.1    **Advances**.  Subject to the terms and conditions of this Agreement, from the date on which this Agreement becomes effective until the Termination Date:

2.1.1.    Lender, shall, from time to time, at the request of Borrower, make advances ("Advances") to Borrower, less any Availability Reserves, so long as, before and after such Advance, the Obligations with respect to each of the Accounts Receivable Factoring Facility, the Inventory Credit Facility, and the Cash Facility do not exceed the Allowable Amount and all the conditions to the making of that Advance have been satisfied or waived in Lender's sole discretion.

2.2    **Borrowing Base**.  Lender may, in its discretion, from time to time, upon not less than two (2) days prior notice to Borrower, reduce the Borrowing Base to the extent that Lender determines in good faith that: (a) (1) the number of days of the turnover of the Inventory for any period has increased in any material respect, or (2) the Market Value of the Eligible Inventory, or any category thereof, has decreased, or (3) the nature and quality of the Inventory has deteriorated, or (b) Borrower, any Obligor or any Collateral has experienced or is expected to experience a Material Adverse Change or other material adverse circumstances.

2.2.1.    In determining whether to reduce the Borrowing Base, Lender may consider events, conditions, contingencies or risks which are also considered in determining Eligible Inventory, or in establishing Availability Reserves, including, without limitation, if Account Debtor becomes a party in an Insolvency Proceeding.

2.3    **Special Credit Accommodations**.  Lender may, in its sole and absolute discretion, from time to time, extend Credit Accommodations to Borrower in excess of the Allowable Amount (any Credit Accommodation extended pursuant to this Section 2.3 being a "Special Credit Accommodation").  Each Special Credit Accommodation may be evidenced by a writing in form and substance satisfactory to Lender in its sole discretion (any such writing, an "Evidence of Special Credit Accommodation").  Unless expressly stated to the contrary in any Evidence of Special Credit Accommodation, each Special Credit Accommodation shall be payable on demand and shall accrue interest at the Interest Rate.  The terms of the Loan Documents shall govern each Special Credit Accommodation except to the extent expressly stated otherwise in the applicable Evidence of Special Credit Accommodation.

*Loan and Security Agreement*


2.4    **General Provisions**.

2.4.1.    **Borrowing Base Certificate and Asset Report**.  Each request from Borrower for a Credit Accommodation shall be accompanied by a Borrowing Base Certificate and Asset Report, completed and signed by Borrower.

2.4.2.    **Crediting Borrower's Account**.  All Credit Accommodations by Lender may be made by deposits or transfers to any Borrower Account.

2.4.3.    **Authorization for Credit Accommodations**.  Subject to the terms and conditions of this Agreement, Lender is authorized to make Credit Accommodations:

2.4.3.1.    upon telephonic, email, electronic, written or other instructions received from anyone purporting to be an officer, employee or representative of Borrower or using Borrower's access codes or passwords, whether in the Online Reporting Service or otherwise, and Borrower assumes the risk of any requests, authorizations or instructions Lender believes originated by Borrower's authorized representatives, without any duty on the part of Lender to verify the authenticity of same; or

2.4.3.2.    At the sole discretion of Lender, and notwithstanding any other provision in this Agreement, if it determines are necessary or appropriate to protect any Collateral or its interests therein or to meet any Obligations, including any interest not paid when due.

2.4.4.    **Limitations on Credit Accommodations**.  Notwithstanding anything to the contrary contained herein, Lender shall not be obligated to make a Credit Accommodation if, before or as a result thereof, the Obligations shall with respect to each of the Accounts Receivable Factoring Facility, the Inventory Credit Facility, and the Cash Facility exceed the Allowable Amount, if an Event of Default or Incipient Default then exists or would exist by the making of that accommodation, if any of the other conditions to the making of the Advance are not satisfied in Lender's sole discretion, or Lender deems itself undersecured or would be undersecured based on the Collateral's Market Value.

3.    **Payments by Borrower**.

3.1    **In General**.

3.1.1.    **Amount and Timing of Payments**.  The Accounts Receivable Credit Facility shall be paid strictly in accordance with the Factoring Agreement. Principal, accrued interest and other amounts due with respect to the Inventory Credit Facility shall be paid as set forth in the Note, unless otherwise set forth in an Evidence of Special Credit Accommodation or other Loan Document. The Cash Facility together with all accrued interest thereon shall be paid in full within 30 days of the date of this Agreement.

3.1.2.    **Place of Payments**.  All payments due by Borrower hereunder shall be made by Borrower to Lender at the Lending Office, or to an Account designated by Lender; provided, however, that Borrower shall bear the risk of assuring that all payments made to Lender are actually received by Lender.

3.1.3.    **Prepayments; Application of Payments**.  Upon sixty (60) days' advance written notice to Lender, which may be waived in Lender's sole discretion, Borrower shall have the right to make prepayments at any time in reduction of the Obligations, in whole or in part, subject to Borrower's obligation to pay Lender the Early Termination Fee, unless waived by Lender in Lender's sole discretion; provided, however, that Lender may apply any payments received to the Obligations, or portion thereof, in any manner and in any order as Lender may determine in its sole discretion, notwithstanding contrary instructions received.  Unless otherwise required by law or determined by Lender, all payments received shall be credited first to outstanding costs and fees to be charged to Borrower, then to interest and finally to the principal amounts due hereunder.

3.1.4.    **Borrower Accounts**.  To facilitate payments either way to be made between Lender and Borrower, and to perfect Lender's security interest in Collateral included with any Borrower Account, Borrower,

Case 2:22-bk-00150-EPB    Doc 51-1    Filed 01/21/22    Entered 01/21/22 10:14:03    Desc
Exhibit A - Final DIP Facility Agreements    Page 9 of 62



Lender and each financial institution holding any Borrower Account shall enter into a Control Agreement in form and substance acceptable to Lender for each Borrower Account, except to the extent that a pledge of that account may be prohibited by law, such as for employee retirement or withholding accounts. In the event that Borrower is unable to obtain a Control Agreement from the financial institution for the remaining accounts in form acceptable to Lender, Borrower shall move that account to a financial institution acceptable to Lender which will enter into an acceptable Control Agreement. Borrower shall not own, operate or deposit any Collateral or funds into any account with a financial institution that is not subject to a Control Agreement, and the deposit of any funds into any other deposit or securities account of any kind (checking, savings, investment or otherwise) shall constitute a material breach of this Agreement.

      3.1.5.    **ACH Debits**. To satisfy any of the Obligations, Lender is hereby authorized by Borrower to initiate electronic debit entries through the ACH or other electronic payment system against any account maintained by Borrower, including any Borrower Account. This authorization is coupled with an interest and is therefore irrevocable. At the Lender's request, Borrower shall execute and deliver to Lender an authorization agreement for ACH debits and credits in form acceptable to Lender (the "<u>ACH Agreement</u>"). In the event that Borrower is unable to obtain an ACH Agreement from its current financial institution in form acceptable to Lender, upon Lender's request, Borrower shall move its operating account to a financial institution acceptable to Lender. The Control Agreement and ACH Agreements may be combined into one Agreement if acceptable to all parties thereto.

    3.2    **Interest and Fees**.

      3.2.1.    **Interest**.

        3.2.1.1.    **Interest on Advances**. Subject to Section 3.2.1.3 hereof, interest on the outstanding Advances on the outstanding amounts owed on Inventory Credit Facility and the Cash Facility shall accrue at the Interest Rate, and shall be payable monthly in arrears, but if not paid shall be capitalized and added to the balance due under the Note; provided, however, that the capitalization of that interest shall not excuse the failure to timely pay the interest.

        3.2.1.2.    **Default Interest**. Immediately upon the occurrence and during the continuance of an Event of Default, interest on the Obligations shall accrue at the Default Rate, subject to the provisions of Section 3.2.1.6 below.

        3.2.1.3.    **Accrual Regardless of Assessment**. Lender's failure to assess interest at the Default Rate as provided hereunder shall not be deemed a waiver by Lender to charge the Default Rate. Lender reserves the right to, and Borrower hereby acknowledges that Lender may, recalculate interest at the Default Rate.

        3.2.1.4.    **Calculation of Interest**. All interest charged hereunder shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed.

        3.2.1.5.    **Clearance Day Delay**. Lender shall, for the purpose of the computation of interest due hereunder, add the Clearance Days to any Clearance Day Payments, which is acknowledged by the parties to constitute an integral aspect of the pricing of Lender's facility to Borrower, and shall apply irrespective of the characterization of whether receipts are owned by Borrower or Lender. Should any check or item of payment not be honored when presented for payment, regardless of whether it is dishonored during or after expiration of the Clearance Days, then Borrower shall be deemed not to have made that payment, and interest shall be recalculated accordingly.

        3.2.1.6.    **Interest in Excess of Maximum Rates**. It is the intent of the parties to this agreement that all payments and Obligations owed by Borrower or any other Obligor to Lender hereunder, whether in the nature of interest, fees, charges, expenses or otherwise, that may be deemed to be interest pursuant to applicable law, shall be authorized by Borrower to be included in the interest rate to be charged to it hereunder. In no event, however, shall the amount of Interest due or payable hereunder exceed the maximum rate of interest allowed by applicable law. In the event payment is inadvertently paid by Maker or inadvertently received by Noteholder in violation of those maximum rates, then the excess sum shall be credited as a payment of principal unless Maker elects

*Loan and Security Agreement*



to have the excess sums refunded to it forthwith. It is the express intent hereof that Noteholder not receive, and Maker not pay or be obligated to pay, directly or indirectly, Interest in excess of that which may be legally paid by Maker under applicable law.

    3.2.2.    **Fees**.

    3.2.2.1.    **Facility Fee.**  Borrower shall pay the Facility Fee from an Advance on the Inventory Credit Facility within 30 days of the entry of an order of the Bankruptcy Court approving this Agreement.

    3.2.2.2.    **Miscellaneous Fees.**  Borrower shall pay fees of $30.00 for each wire transfer and fees of $5.00 for each ACH transfer.

    3.2.2.3.    INTENTIONALLY OMITTED

    3.2.2.4.    **Collateral Management Fee.** Borrower shall pay Lender together with each payment of interest hereunder, a Collateral Management Fee equal to $3,500 per month.

    3.2.2.5.    **Misdirected Payment Fee.** If any payment received by Borrower with respect to the Collateral is cashed, deposited or negotiated by Borrower pursuant to Section 6.2, it is understood by Borrower that the action shall constitute an Event of Default hereunder and may subject Borrower to civil liability and/or criminal prosecution. Notwithstanding that the action constitutes an Event of Default under this Loan and Security Agreement, Borrower shall immediately be obligated to pay said sum to Lender, plus an amount equal to Fifteen Percent (15%) of said sum, not as a penalty, but as liquidated damages to compensate Lender for additional administrative and collection expenses resulting from that action**.** In addition to all other remedies, Lender shall have the right to debit those amounts against any deposit account of Borrower, pursuant to Section 3.1.5.

    **4.**  <u>**Grant of Security Interest.**</u>  To secure the payment and performance in full of the Obligations under this Agreement, the other Loan Documents and any other now existing or future agreement between Borrower and Lender, the Borrower hereby (i) grants to the Lender a first priority security interest in the Collateral and all proceeds and products thereof, and (ii) hereby assigns, transfers and conveys to Lender all of Borrower's right, title and interest in and to all present and future Collateral.

The security interest in the Collateral shall extend and attached to:

    (a)  All Collateral which is presently in existence and which is owned by Borrower or in which Borrower has any ownership interests, and all Collateral which Borrower may purchase or in which Borrower may acquire any ownership interest at any time and from time to time in the future;

    (b)  All Collateral wherever located, including, without limitation, all Collateral which may be located on Borrower's premises, is in transit to or from Borrower's premises, or held by any carriers, forwarding agents, truckers, warehousemen, vendors, selling agents, finishers, converters, processors, or other third persons who may have possession of the Collateral; and

    (c)  All Collateral and any portion thereof which may be returned, rejected, reclaimed or repossessed by either of Borrower or Lender from Borrower's customers, or any other source, as well as to all supplies, goods, incidentals, packaging materials, and any other items which contribute to the finished goods or products manufacturing or processed by Borrower, or to the sale, promotion or shipment thereof.

Borrower's failure to promptly deliver to Lender any schedule, report, statement or other information required by this Agreement or any document related thereto shall not affect, diminish, modify or otherwise limit Lender's security interests in the Collateral or rights and remedies under this Agreement.

Notwithstanding the grant of any security interest in the Collateral to Lender, Lender shall have no duty as to the collection or protection of any Collateral or as to the preservation of any rights pertaining to it, except for the use of reasonable care in the custody and preservation of any Collateral in its actual possession.

*Loan and Security Agreement*



Borrower agrees to affix tracking devices supplied by Lender on any Collateral requested by Lender and if affixed, Borrower agrees that it shall not remove or disable those devices, nor shall it permit any other Person (other than any Lender Representative) to do so for so long as the items shall remain Collateral.

Borrower shall secure the following assurance from existing lienholders (or equivalent order of the Bankruptcy Court) subordinating all lien rights of such existing lienholders to the lien rights granted to Lender hereunder.

(y) <u>Gantz Trust</u>: full subordination of all claimed liens and indebtedness.

(x) <u>NSF</u>: full subordination of all claimed liens and indebtedness or written confirmation from NSF that it does not claim lien rights in any assets other than certain purchase money security interests or leased equipment on which it previously provided financing to Borrower.

Except as expressly excepted hereunder, Lender's liens and security interests shall be senior to all other liens and security interests and shall not be primed, surcharged, altered or impaired or otherwise adversely affected in any way.

5.  **<u>Authorization to File Financing Statements</u>.**

5.1    The Borrower irrevocably authorizes the Lender at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that:

5.1.1.    indicate the Collateral as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or as being of an equal or lesser scope or with greater detail;

5.1.2.    contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrower is an organization, the type of organization, and any organization identification number issued to the Borrower and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates; and

5.1.3.    contain a notification that the Borrower has granted a negative pledge to the Lender, and that any subsequent lienor may be tortiously interfering with Lender's rights;

5.1.4.    advise third parties that any notification of Borrower's Account Debtors by those creditors will interfere with Lender's collection rights.

5.2    The Borrower agrees to furnish any information related to Account Debtors, third party creditors and related obligations to the Lender promptly upon request.

5.3    The Borrower ratifies its authorization for the Lender to have filed any like initial financing statements or amendments thereto if filed prior to the date hereof.

5.4    The Lender may add any supplemental language to any financing statement as Lender may determine to be necessary or helpful in acquiring or preserving rights against third parties.

6.  **<u>Collection and Administration of Accounts</u>**.

6.1    **Collection**.  Except to the extent prohibited by any Intercreditor Agreement to which Lender is a party:

6.1.1.    Borrower shall place a notification on its invoices sent to any of its Account Debtors and to all other Persons owing it money that payments made to or for the benefit of Borrower or other Monetary Collateral be (or, if received by Borrower, shall cause same to be):

Page 11 of 34

*Loan and Security Agreement*

Case 2:22-bk-00150-EPB    Doc 51-1    Filed 01/21/22    Entered 01/21/22 10:14:03    Desc
Exhibit A - Final DIP Facility Agreements    Page 12 of 62


6.1.1.1.    sent to a post office box designated by or in the name of Lender or Borrower but as to which access is limited solely to Lender (the "Lockbox").  Borrower shall have no access to the Lockbox or to Lender's Account.  Lender may endorse and deposit those payments into Lender's Account.  This authorization is coupled with an interest and is irrevocable.  Upon collection thereof, the payments shall be credited against the Obligations as otherwise provided herein: or

6.1.1.2.    deposited into Lender's Account or another blocked bank account under arrangements with the depository bank under which all funds deposited to the blocked bank account are required to be transferred to Lender.

6.1.1.3.    In connection with the foregoing, Borrower shall execute post office box and/or blocked bank account agreements as Lender shall specify, to the extent not already addressed in the applicable Control Agreements.

6.1.1.4.    In the event that Borrower receives any payments directly from a payee rather than the payment being directed into the Lockbox, Borrower shall immediately forward those payments to the Lockbox (or directly to Lender's Account), endorsing any negotiable instruments to Lender but without cashing or otherwise first depositing the same into Borrower's accounts.  Failure of Borrower to do so within three Business Days of receipt of those funds shall be a material breach of this Agreement.

6.2    **Payments to Borrower**.  In the event that Lender is entitled to receive Monetary Collateral as set forth in Section 6.1 or pursuant to any of the other Loan Documents, and in the event Borrower receives payments or other proceeds of Collateral in the form of checks, wire transfer or other funds transfer mechanism, Borrower shall immediately transfer those funds to Lender.  Borrower shall immediately forward any checks received to Lender, endorsed to Lender but without deposit of those instruments into Borrower's deposit or other accounts.

6.3    **Lender's Powers**.  Borrower hereby authorizes Lender, at Borrower's sole expense, to exercise at any time in Lender's discretion, and without any obligation on Lender's part, to do all or any of the following powers, which powers are irrevocable until all of the Obligations have been paid in full:

6.3.1.    receive, take, endorse, assign, deliver, accept and deposit, in the name of Lender or Borrower, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof;

6.3.2.    After an Event of Default or an Incipient Default:

6.3.2.1.    Take or bring, in the name of Lender or Borrower, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to effect collection of or other realization upon any Collateral;

6.3.2.2.    Change the address for delivery of Borrower's mail to Lender and to receive and open mail addressed to Borrower;

6.3.2.3.    Extend the time of payment of, compromise, or settle for cash, credit, return of merchandise, any and all rights or claims related to any Collateral and discharge or release any Obligated Party without affecting any of the Obligations;

6.3.3.    Execute, file and serve, in its own name or in the name of Borrower, mechanics lien or similar notices, or claims under any payment or performance bond for the benefit of Borrower or Lender, as appropriate, and

6.3.4.    Pay any sums necessary to discharge any lien or encumbrance which is senior to Lender's security interest in the Collateral, which sums shall be included as Obligations hereunder, and which sums shall accrue interest at the Default Rate until paid in full.

Lender's performance of any of the foregoing shall not be deemed to be a cure of any Event of Default or Incipient



Default by Borrower.

6.4     **Release**.  Upon execution of this Agreement, upon the making of any Advance or the provision of any other Credit Accommodation, Borrower hereby and thereby shall be deemed to have released and exculpated Lender and Lender's Representatives from any liability arising from any acts under this Agreement or any of the other Loan Documents, or in furtherance thereof, whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for their gross negligence or willful misconduct.  In no event shall Lender or Lender's Representatives have any liability to Borrower for lost profits or other indirect, special, incidental or consequential loss or damage whether caused by tort (including negligence), breach of contract or otherwise, which may arise in respect of this Agreement or any other Loan Document, Lender's obligations hereunder or thereunder, for any of the transactions contemplated hereunder or thereunder, or from the use of the Online Reporting Service, including equipment or property used in connection with the Online Reporting Service, or for loss of business, revenue, goodwill or anticipated savings.

**7.**     **Conditions Precedent to All Credit Accommodations**.  Subject to the other terms and conditions contained herein, Lender's obligation to make any Credit Accommodation available to Borrower is subject to the satisfaction of, or waiver of, immediately prior to or concurrently with the making of the Credit Accommodation, the following conditions precedent:

7.1     **Agreement, Note and Other Loan Documents**.  Lender shall have received this Agreement, the Note drawn to its order, and the other Loan Documents, all duly executed by the Borrower, all of which shall remain in effect.

7.2     **Borrowing Base Certificate**.  Lender shall have received a Borrowing Base Certificate which includes (i) a detailed calculation of the Borrowing Base as of the date of the requested Advance, and (ii) detail regarding all Accounts.

7.3     **Intercreditor Agreement.** Lender, Borrower and Permitted Third Party Creditor shall have entered into the Intercreditor Agreement on terms acceptable to Lender, if applicable.

7.4     **Organizational Documents.**  Lender shall have received copies of Borrower's Certificate of Incorporation, Articles of Organization, Bylaws, Shareholder Agreements, Operating Agreement or other organizational documents, as amended, and as applicable (collectively, the "Organizational Documents"), certified by the Secretary of Borrower;

7.5     **Evidence of Authorization.** Lender shall have received certified copies of all actions (in form, scope and substance satisfactory to Lender) taken by the Borrower and any Guarantor to authorize the execution, delivery and performance of this Agreement, the Note, the Guaranties and other Loan Documents, if any, together with other papers as Lender or its counsel may require.

7.6     **Financial Condition.** Lender shall be satisfied that the financial statements previously delivered to Lender by Borrower and any other Obligor fairly present the business and financial condition of the Borrower and that Obligor as of the date thereof and that no Material Adverse Change in their financial condition has occurred.

7.7     **Equipment and Inventory Liens.** Unless waived by Lender in its sole discretion, Lender shall have received evidence satisfactory to Lender in its sole and absolute discretion that Lender's Liens have been endorsed on all certificates of title with respect to Equipment or Inventory which are in existence as of the date of the requested Credit Accommodation to the extent that endorsement is required to perfect Lender's Liens under Applicable Laws;

7.8     **Insurance.**  Lender shall have received a certificate of insurance with respect to Borrower, together with the endorsements thereto, as are required by Section 9.9, the form and substance of which shall be satisfactory to Lender;

7.9     **Legal Opinion.**  Lender shall have received an opinion of counsel to each Obligor in form and substance satisfactory to Lender;


7.10 **Tax Returns.** Lender shall have received satisfactory evidence (including a certificate of the chief financial officer of the Borrower) that all tax returns required to be filed by Borrower and its Affiliates have been timely filed and all taxes upon Borrower, its Affiliates, and their respective properties, assets, income, and franchises (including real property taxes, sales taxes, and payroll taxes) have been paid;

7.11 **Due Diligence**. Lender shall have completed its business, legal, and Collateral due diligence and Lender shall be satisfied with the results thereof;

7.12 **Further Documents.** Lender shall have received such further documents, instruments and agreements as Lender may request in form and substance satisfactory to Lender and Lender's counsel in their sole discretion.

7.13 **Representations and Warranties**. The representations and warranties contained in the Loan Documents shall be true and correct in all respects on and as of the date of the Credit Accommodation, certified by Borrower to that effect.

7.14 **Covenants**. The covenants contained in the Loan Documents shall be true and correct in all respects on and as of the date of the Credit Accommodation, certified by Borrower to that effect.

7.15 **No Event of Default or Incipient Default**. No Event of Default or Incipient Default shall have occurred and be continuing on the date of any Advance.

7.16 **Payment of All Fees**. Borrower shall have paid to Lender all accrued and unpaid fees and other amounts due and payable hereunder or any other Loan Document.

7.17 **Automatic Perfection and Lift of Stay**. On the filing date of the Bankruptcy Case or as soon as practicable thereafter, Borrower shall use its best efforts to file with the Bankruptcy Court a motion, in form and substance acceptable to Lender in its discretion, requesting that Lender's liens and security interests are automatically perfected without further action by Lender, and the Bankruptcy Court shall have entered orders approving such motion. The orders of the Bankruptcy Court shall have not been appealed, stayed, modified, or amended, and shall be made effective immediately upon their entry without any stay of the effect of such orders so as to permit immediate funding within the provisions and protections of 11 U.S.C. §364.

7.18 **Super-Priority Administrative Expense Claim.** The Bankruptcy Court shall have granted Lender a super-priority administrative claim on account of the Advances pursuant to 11 U.S.C. § 364(c)(1), with priority over all other administrative expense claims except those payable for quarterly fees to the Office of the United States Trustee, and an agreed carve-out for Debtor's post-petition professional fees. The final order of the Bankruptcy Court authorizing the valid and perfected first priority liens and security interests and super-priority administrative expense claims in favor of the Lender shall also contain a finding by the Bankruptcy Court that (a) the extension of credit and making of loans by Lender hereunder to Borrower are secured by valid and perfected first position liens and security interests upon the Collateral including all Inventory, (b) the extension of credit and making of loans by Lender hereunder to Borrower is being made in good faith and, therefore, Lender shall be entitled to the full protections of 11 U.S.C. §364(e) and (c) shall be made effective immediately without any stay of the effect of such Order (including, without limitation, any stay pursuant to Bankruptcy Rule 6004(h) so as to permit immediate funding within the provisions and protections of 11 U.S.C. §364(e).

8. **Authorization of Lender.** The Borrower irrevocably authorizes Lender to take any and all appropriate action and to execute any and all documents and instruments, in the name of Borrower, that may be necessary or desirable to accomplish the purposes of this Agreement including the following, provided, however that Lender shall be under no obligation to do any of those items:

8.1 upon the occurrence and during the continuance of an Event of Default or Incipient Default, generally to sell, transfer, pledge, make any agreement with respect to, or otherwise deal with any of the Collateral in a manner as is consistent with the UCC and as though the Lender were the absolute owner thereof, and to do at the

*Loan and Security Agreement*


Borrower's expense, all acts which the Lender deems necessary or appropriate to protect, preserve, or realize upon the Collateral and the Lender's security interest therein, to effect the intent of this Agreement, including, without limitation:

    8.1.1.    the filing and prosecuting of registration and transfer applications with the appropriate federal or local agencies or authorities with respect to trademarks, copyrights and patentable inventions and processes;

    8.1.2.    the execution, delivery, and recording, in connection with any sale or other disposition of any Collateral, of the endorsements, assignments, or other instruments of conveyance or transfer with respect to the Collateral; or

    8.1.3.    the filing on behalf of Borrower with any Governmental Authority as are appropriate documents (including applications, certificates, and tax returns) as may be required for purposes of having Borrower qualified to transact business in a particular state or geographic location.

    **9.**    **Affirmative Covenants of Borrower**.  Until full payment of the Obligations and termination of this Agreement:

    9.1.1.    **Financial Statements, Reports and Certifications**.  Borrower shall furnish the unaudited financial statements of Borrower on a monthly basis and of each Guarantor to Lender but not less than annually, in form and substance satisfactory to Lender.

    9.1.2.    **Tax Returns**.  Borrower shall furnish copies of each of Borrower's and Guarantors':

    9.1.2.1.    federal income tax returns, and any amendments thereto, within ten (10) days of the filing thereof with the Internal Revenue Service and each applicable state; and

    9.1.2.2.    federal payroll tax returns within ten (10) days of filing, together with proof, satisfactory to Lender, that all taxes noted therein have been paid.

    9.1.3.    **Asset Reports and Certifications**.  Borrower shall furnish:

    9.1.3.1.    Asset Reports with respect to all of Borrower's Accounts, Inventory, and Equipment, to be provided: (a) on a monthly basis, (b) whenever Borrower requests an Advance, together with a Borrowing Base Certificate, and (c) whenever otherwise requested by Lender.

    9.1.3.2.    Unless otherwise excused by Lender, Certifications from each sales person or sales entity employed by Borrower, certifying, in the form prescribed by Lender, as to the accuracy and completeness of the Accounts, Inventory and Equipment in the sales person's or sales entity's possession. Those Certifications shall be provided to Lender (i) within twenty (20) days of the date hereof, (ii) quarterly thereafter, within thirty (30) days of the end of each quarter, and (iii) whenever requested by Lender.

    9.2    **Services Relating to Transaction Documents**.  In consideration of the Advances to be made by Lender pursuant hereto, Borrower covenants and agrees to diligently and faithfully perform the following services relating to the Transaction Documents, unless and until notified by Lender that it does not desire Borrower to continue to perform any or all of those services:

    9.2.1.    Borrower shall keep or will cause to be kept in a safe place, at its chief executive office, accurate and complete copies (or the originals if Lender determines in its sole discretion to allow Borrower to retain the originals) of the Transaction Documents, and all necessary, proper and accurate books, records, ledgers, correspondence and other documents or instruments related to or concerning the Accounts, the Collateral, and the Transaction Documents.

*Loan and Security Agreement*


9.2.2.     Borrower will use commercially reasonable efforts to collect all payments due under the Accounts.  Borrower shall promptly inform Lender, in writing, of all decisions regarding collection efforts concerning any Accounts, and concerning enforcement of rights and remedies thereof.

9.3     **Title to Property**.  Upon Lender's request, Borrower will promptly deliver to Lender, properly endorsed, any and all evidence of ownership of, certificates of title, or applications for title to any items of Collateral.

9.4     **Maintenance of Properties**.  Borrower will maintain and preserve all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply at all times with the provisions of all leases to which it is a party as lessee so as to prevent any loss, default or forfeiture thereof or thereunder.  Borrower shall not permit any item of Personal Property Collateral to become a fixture to Real Property or an accession to other property, and it shall assure that the Personal Property Collateral shall at all times remain personal property.

9.5     **Inspections.**

9.5.1.     Borrower will permit Lender or any representatives thereof, during usual business hours, without notice to Borrower, to periodically:

9.5.1.1.     have access to all premises where Collateral is located, including, without limitation, all premises utilized by Borrower's sales representatives to safe-keep Collateral, for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Borrower's books and records and the Transaction Documents; and

9.5.1.2.     permit Lender or its designees to inspect, audit, make copies of, and make extracts from Borrower's records and the Transaction Documents as Lender may request.

9.5.2.     without expense to Lender, Borrower authorizes Lender to use any of Borrower's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of Accounts and realization on other Collateral as Lender, in its sole discretion, deems appropriate.

9.6     **Expenses.**

9.6.1.     **Generally**.  Borrower shall pay all out-of-pocket expenses of Lender (including, but not limited to, fees and disbursements of Lender's counsel) incident to (whether by judicial proceedings or otherwise, and whether any resulting dispute resolution procedure involving tort, contract or other claims):

9.6.1.1.     the preparation, negotiation and execution of the Loan Documents, whether or not executed;

9.6.1.2.     the administration and enforcement of the Loan Documents, any amendments, extensions and renewals thereof, and any other documents prepared in connection with any transactions between Borrower and Lender, whether or not executed;

9.6.1.3.     any expenses incurred by Lender (whether or not for the benefit of Borrower) under this Agreement, including, without limitation, all expenses for postage relating to the mailing of statements, invoices, and verifications, and all expenses relating to any portion of the Collateral;

9.6.1.4.     the protection of Lender's rights under the Loan Documents;

9.6.1.5.     defending against any and all claims against Lender relating to any of its acts of commission or omission directly or indirectly relating to the Loan Documents or in any way arising out of or in connection with any federal or state Insolvency proceeding commenced by or against Borrower, including those (i)

Case 2:22-bk-00150-EPB    Doc 51-1    Filed 01/21/22    Entered 01/21/22 10:14:03    Desc
Exhibit A - Final DIP Facility Agreements    Page 17 of 62


arising out the automatic stay, (ii) seeking dismissal or conversion of the Insolvency Proceeding, (iii) opposing confirmation of Borrower's plan thereunder, and (iv) expenses incurred in enforcing or defending Lender's claims against Borrower or the Collateral, defending any avoidance actions, and expenses related to the administration of said proceeding.

        9.6.1.6.    the actual amount of all costs and expenses, including attorneys' fees, which Lender may incur in connection with appraisals, inspections and verifications of Lender's books and records and Collateral, including travel, lodging and other out-of-pocket expenses for inspections;

        9.6.1.7.    the actual amount of all costs and expenses, including attorneys' fees, which Lender may incur in connection with forwarding Advances and collections pursuant to this Agreement, collecting checks, credit card payments and other items of payment related to Eligible Inventory and the Collateral, if applicable, establishing and maintaining payment accounts and lock boxes;

        9.6.1.8.    the actual amount of all costs and expenses, including attorneys' fees, which Lender may incur from usage of Borrower's on-line computer and electronic data transmission services;

        9.6.1.9.    the actual amount of all costs and expenses, including attorneys' fees, which Lender may incur as a result of any special or additional reports or statements prepared by Lender or by Borrower for Lender;

        9.6.1.10.    the actual amount of all costs and expenses, including attorneys' fees, which Lender may incur in connection with any claim, suit, litigation, prosecution or defense of any civil or criminal proceeding or litigation with any Account Debtor or any other Person related to the Loan, the Loan Documents, any Collateral or the rights of any other creditor of Borrower.

        9.6.2.    **Tax Indemnification.**  Borrower will indemnify and save Lender and Lender's Representatives harmless from any and all liability with respect to any stamp or other taxes (other than income taxes) which may be determined to be payable in connection with the execution of the Loan Documents or any action of Lender or Lender's Representatives with respect to the Collateral, including, without limitation, the transfer of the Collateral to Lender's name or that of Lender's nominee or any purchaser at a foreclosure sale.

        9.7    **Enforcement of Judgments.**  Borrower will reimburse Lender for all costs and expenses, including attorneys' fees, which Lender incurs in obtaining and/or enforcing any judgment rendered in connection with this Agreement.  This provision is severable from all other provisions hereof and shall survive, and not be deemed merged into, such judgment.

        9.8    **Taxes and Expenses Regarding Borrower's Assets**.

        9.8.1.    Borrower shall make timely payment or deposit of all taxes, assessments or contributions required of Borrower.  If Borrower fails to make any payment or deposit or furnish proof of that payment immediately upon Lender's request, Lender may, in its sole discretion and without obligation to do so or to provide notice to Borrower:

        9.8.1.1.    make payment of the same or any part thereof; or

        9.8.1.2.    set up reserves against the Obligations as Lender deems necessary to satisfy the liability therefore, or both.

        9.8.2.    Lender may conclusively rely on statements of the amount owing or other official statements issued by the appropriate Governmental Authority.  Any payment made by Lender shall constitute neither:

        9.8.2.1.    an agreement by Lender to make similar payments in the future; nor

*Loan and Security Agreement*



9.8.2.2.    a waiver by Lender of any default under the Loan Documents.  Lender need not inquire into, nor contest the validity of, any expense, tax, security interest, encumbrance or lien, and the receipt of the usual official notice requiring the payment thereof shall be conclusive evidence that the same was validly due and owing.

9.8.3.    Any payment made by the Lender pursuant to this Section 9.8 shall be treated as an additional Advance to the Borrower and shall bear interest at the Default Rate.

9.9    **Maintenance of Insurance**.  Borrower shall assume the risk of loss of any Collateral and Lender shall have no responsibility concerning the Collateral except to the extent Lender has obtained possession of that Collateral.  The Borrower will maintain with financially sound and reputable insurers insurance with respect to its properties and business against casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas.  All insurance shall be in minimum amounts that the Borrower will not be deemed a co-insurer under applicable insurance laws, regulations, and policies and otherwise shall be in amounts, contain terms, be in forms and be for periods as may be reasonably satisfactory to the Lender.  In addition, all insurance shall be payable to the Lender under a Lender Loss Payable Endorsement.  Without limiting the foregoing, the Borrower will:

9.9.1.    Keep all of its physical property, including without limitation, all of its Inventory, insured with casualty or physical hazard insurance on an "all risks" basis, with broad form flood and earthquake coverage and electronic data processing coverage, with a full replacement cost endorsement and an "agreed amount" clause in an amount equal to 100% of the full replacement cost of that property;

9.9.2.    Maintain all workers' compensation or similar insurance as may be required by law;

9.9.3.    Maintain, in amounts and with deductibles equal to those generally maintained by businesses engaged in similar activities in similar geographic areas, general public liability insurance against claims of bodily injury, death, or property damage occurring, on, in or about the properties of the Borrower; business interruption insurance; and product liability insurance.

9.10    **Compliance with Laws**.  Borrower will cause the Transaction Documents, and all actions and transactions by Borrower in connection therewith to comply with the requirements of all Applicable Laws.  Borrower shall within five (5) Business Days notify Lender in writing of any violation of any Applicable Laws, statute, regulation or ordinance of any governmental entity, or any agency thereof, applicable to Borrower which may adversely affect any of the Collateral or Borrower's operations.

9.11    **Existence**.  Borrower will at all times preserve and keep in full force and effect Borrower's and its Affiliates' valid existence and good standing and any rights and franchises material to Borrower's or its Affiliates' businesses.

9.12    **Environmental**.  Borrower shall (a) keep any property either owned or operated by Borrower or its Affiliates free of any environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by any environmental Liens, (b) comply with environmental laws and provide to Lender documentation of that compliance which Lender reasonably requests, (c) promptly notify Lender of any release of a hazardous material in any reportable quantity from or onto property owned or operated by Borrower or its Affiliates and take any remedial actions required to abate said release or otherwise to come into compliance with applicable environmental law, and (d) promptly provide Lender with written notice within ten (10) days of the receipt of any of the following:  (i) notice that an environmental Lien has been filed against any of the real or personal property of Borrower or its Affiliates, (ii) commencement of any environmental action or notice that an environmental action may be filed against Borrower or its Affiliates, and (iii) notice of a violation, citation, or other administrative order which relates to any applicable environmental law.

9.13    **Disclosure Updates**.  Promptly and in no event later than five (5) Business Days after obtaining knowledge thereof, notify Lender if any written information, exhibit, or report furnished to Lender contained any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained

Page 18 of 34

*Loan and Security Agreement*

Case 2:22-bk-00150-EPB    Doc 51-1    Filed 01/21/22    Entered 01/21/22 10:14:03    Desc
Exhibit A - Final DIP Facility Agreements    Page 19 of 62



therein not misleading in light of the circumstances in which made. The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

9.14    **Due Diligence**.  Cooperate fully with Lender in connection with Lender's due diligence, from time to time, with respect to property proposed by Borrower as Collateral.   Lender shall be entitled to procure appraisals, brokers' price opinions, lien search reports, tax filing reports, title reports, evaluations or other reports, certifications or information as it may require in connection with its evaluation or reevaluation of any Collateral.

9.15    **Relationship with Customers and Obligors**.  Borrower shall obtain credit reports with respect to all Account Debtors of all customers and Obligors in accordance with Borrower's required procedures, as disclosed to and approved by Lender.  Upon Lender's reasonable request, Borrower shall make available to Lender as soon as available, copies of all write ups, credit reports, term sheets, and other information pertaining to Borrower's transactions with existing or prospective customers and Obligors, in each case as prepared or obtained in accordance with Borrower's required procedures, as disclosed to and approved by Lender.  Borrower shall promptly notify Lender of (a) any material default, Incipient Default or material event of default under the Transaction Documents, (b) any other default or event of default under the Transaction Documents which continues uncured or for which a waiver has not been granted by Borrower with respect thereto, for a period of sixty (60) days following Borrower's obtaining knowledge thereof, and (c) the occurrence of any other event which may impair the prospect of payment of any Eligible Account.

9.16    **Use of Advances**.  Borrower shall use the proceeds from Advances only for its working capital purposes and not for any personal, family, household, consumer or agricultural purposes.

**10.**    **Representations and Warranties of Borrower**.  To induce Lender to enter into this Agreement, and the other Loan Documents, Borrower represents, warrants and covenants as follows (it being understood that (i) each such representation and warranty will be deemed made as of the date hereof and shall not be affected by any knowledge of, or any investigation by, Lender, and (ii) the accuracy of each representation, warranty and covenant will be a condition to the Credit Accommodations and the other Loan Documents):

10.1    **Existence and Authority**.  Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or formation.  Borrower is and will continue to be qualified and licensed to do business in all jurisdictions in which the nature of its operations makes that qualification necessary or appropriate to enable it to enforce its rights against any Account Debtor and the Collateral.  The execution, delivery and performance by Borrower of this Agreement and the other Loan Documents have been duly and validly authorized, do not violate Borrower's Organizational Documents, or any law or any agreement or instrument or any court order which is binding upon Borrower or its property, do not constitute grounds for acceleration of any indebtedness or obligation under any agreement or instrument which is binding upon Borrower or its property, and do not require the consent of any Person.  This Agreement and the other Loan Documents have been duly executed and delivered by, and are enforceable against, Borrower, and all other Obligors who have signed them, in accordance with their respective terms.

10.2    **Name; Trade Names and Styles**.  The name of Borrower set forth in the heading to this Agreement is its correct and complete legal name as of the date hereof.  Borrower shall give Lender at least thirty (30) days' prior written notice before changing its name or doing business under any other name.  Borrower has complied with all laws relating to the conduct of business under a fictitious business name.  Set forth in Schedule 10.2, is each prior true name of Borrower and each fictitious name, trade name and trade style by which Borrower has been, or is now known, or has previously transacted, or now transacts business.

10.3    **Binding Agreements**.  This Agreement and the other Loan Documents executed and/or delivered in connection herewith or therewith, when issued and delivered pursuant hereto for value received shall constitute the valid and legally binding obligations of the Borrower and each Guarantor or other Obligor, enforceable in accordance with their respective terms, except as enforcement may be limited by principles of equity, bankruptcy, Insolvency, or other laws affecting the enforcement of creditors' rights generally.

*Loan and Security Agreement*



10.4     **No Conflicting Laws or Agreements**.  The execution, delivery and performance by Borrower of this Agreement, the Note, and the other Loan Documents:  (i) does not violate any provision of the Organizational Documents of Borrower, (ii) does not violate any order, decree or judgment, or any provision of any statute, rule or regulation, (iii) does not violate or conflict with, result in a breach of or constitute (with notice, or lapse of time, or both) a default under any shareholder agreement, stock preference agreement, mortgage, indenture or other contract or undertaking to which the Borrower is a party, or by which any of its properties is bound, and (iv) does not result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any property or assets of the Borrower, except for the liens granted hereunder to the Lender.  The foregoing representations and warranties are also true and applicable to all other Obligors.

10.5     INTENTIONALLY DELETED

10.6     **Inventory.**

10.6.1.     All the Inventory of Borrower is used or held for use in their business and is fit for those purposes.

10.6.2.     INTENTIONALLY DELETED

10.6.3.     All of the Inventory of Borrower is listed on Schedule 10.6.2, which schedule will list which Inventory is Eligible Inventory and which is not Eligible Inventory, together with the reasons why it is not eligible.

10.7     **Place of Business; Location of Collateral.**  Borrower's address is Borrower's chief executive office, and it is the location of its books and records.  Borrower will give Lender at least thirty (30) days' prior written notice before or changing its chief executive office or the location of its books and records to a location other than Borrower's address, and will execute and deliver all financing statements and other agreements, instruments and documents which Lender shall require as a result thereof.

10.8     **Compliance with Laws**.  Borrower has complied in all material respects with all provisions of all Applicable Laws, including those relating to Borrower's ownership of real or personal property, the conduct and licensing of Borrower's business, the payment and withholding of taxes, ERISA and other employee matters, safety and environmental matters.

10.9     **Use of Proceeds**.  All proceeds of the Credit Accommodations will be used solely for lawful business purposes.

10.10    **Litigation**.  INTENTIONALLY OMITTED

10.11    **Title to Collateral.**  Borrower has good and marketable title to the Collateral.  The Collateral now is and will remain free and clear of any and all liens, charges, security interests, encumbrances and adverse claims, except for liens of the Permitted Third Party Creditor, if any.  Lender now has, and will continue to have, a first-priority perfected and enforceable security interest in the Accounts, Inventory and all of the other Collateral, except that Lender may in its discretion accept a second-priority perfected and enforceable security interest in the Equipment, in each case subject only to the now existing liens of Permitted Third Party Creditor pursuant to the Intercreditor Agreement, if any, and Borrower will at all times defend Lender and the Collateral against all claims of others.  None of the Collateral which is Equipment is or will be affixed to any real property in a manner, or with intent, as to become a fixture.  Except for leases or subleases as to which Borrower has delivered to Lender a landlord's waiver in form and substance satisfactory to Lender, Borrower is not a lessee or sublessee under any real property lease or sublease pursuant to which the lessor or sublessor may obtain any rights in any of the Collateral, and no lease or sublease now prohibits, restrains, impairs or conditions, or will prohibit, restrain, impair or condition, Borrower's right to remove any Collateral from the premises.  Whenever any Collateral is located upon premises in which any third party has an interest (whether as owner, mortgagee, beneficiary under a deed of trust, lien or otherwise), Borrower shall cause the third party to execute and deliver to Lender, in form and substance acceptable to Lender, waivers and subordinations as Lender shall specify, so as to ensure that Lender's rights in the Collateral are, and will continue to be, superior to

*Loan and Security Agreement*


the rights of the third party. Borrower will keep in full force and effect, and will comply with all the terms of, any lease of real property where any of the Collateral now or in the future may be located.

10.12   **Documents Genuine, Legal Compliance, Disposition**.   All statements made and all unpaid balances appearing in the Online Reporting Service and in all invoices, instruments and other documents evidencing the Accounts are and shall be true and correct. Borrower's inclusion of Inventory in the Online Reporting Service or other reports to Lender accurately differentiates Eligible Inventory from all other Inventory. All invoices, instruments, signatures and other documents and all of Borrower's books and records are and shall be genuine and in all respects what they purport to be and all signatories and endorsers have full capacity to contract. All sales and other transactions underlying or giving rise to each Account shall fully comply with all applicable Laws and governmental rules and regulations. All documents, instruments and agreements are and shall be legally enforceable in accordance with their terms. Borrower has not, and shall not hereafter sell, assign, pledge, encumber, forgive (completely or partially), settle for less than payment in full, or transfer or dispose of any Account, or agree to do any of the foregoing, except pursuant to established limits prescribed by Lender from time to time, which limits shall cease upon the occurrence of any Event of Default or Incipient Default.

10.13   **Maintenance of Collateral**.   Borrower has maintained and will hereafter maintain at Borrower's sole cost and expense the Collateral and all of Borrower's assets useful or necessary in the conduct of Borrower's business in good working order and condition, free form defects, except Collateral sold in the ordinary course of business or Collateral which in the aggregate constitutes an immaterial and insignificant monetary amount. Borrower has not and will not use the Collateral or any of Borrower's other properties, or any part thereof, in any unlawful business or for any unlawful purpose and has not and will not secrete or abandon the Collateral, those properties, or any part thereof. Borrower has not and will not store any of the Collateral with any bailee, warehouseman or any other third party without Lender's prior written consent. Borrower will immediately advise Lender in writing of any event causing loss or depreciation and of any Material Adverse Change in the condition of the Collateral or of any of Borrower's other properties and Schedule 10.13 lists any of those events that affect any of the Collateral on the date hereof.

10.14   **Books and Records.**   Borrower has maintained and will continue to maintain at Borrower's Address complete and accurate books and records comprising a standard and modern accounting system in accordance with generally accepted accounting principles applied on a consistent basis that accurately and correctly record and reflect Borrower's income, expenses, liabilities, operations, accounts, and ownership and location of the Collateral and any other asset now or hereafter belonging to Borrower. Borrower's books and records shall itemize and describe the kind, type, quality and quantity of the Collateral nd shall note Lender's security interest therein. All reserves (including, without limitation, reserves for bad debts, depreciation and taxes) provided for upon Borrower's books and records are now, and will hereafter be, maintained in sufficient amounts in accordance with generally accepted accounting principles consistently applied. All books and records and all documents relating to any of the Collateral are and will continue to be genuine and in all respects what they purport to be and will contain information as may be requested by Lender.

10.15   **Financial Condition, Statements and Reports**.   All financial statements delivered to Lender by or on behalf of Borrower and any other Obligor completely and fairly reflect the financial condition of Borrower and that Obligor, at the times and for the periods therein stated. Between the last date covered by the financial statement provided to Lender and the date hereof, there has been no Material Adverse Change in the financial condition or business of Borrower or that Obligor. Borrower and each Obligor are solvent and, at all times hereafter, will continue to be solvent and able to pay their debts as they come due, and each has sufficient capital to carry on its business as now conducted and as proposed to be conducted. All schedules, reports and other information and documentation delivered by Borrower or an Obligor to Lender are, or will be, when delivered, true, correct and complete as of the date delivered or the date specified therein. Borrower and each Obligor have kept and will keep adequate records and books of account with respect to their business activities in which proper entries are made reflecting all of their financial transactions, and will cause to be prepared and furnished to Lender data and other information (financial and otherwise) as Lender, from time to time, may reasonably request, bearing upon or related to their financial condition or results of operations, including, but not limited to, business projections, business plans, budgets and cash flow statements for Borrower and the Obligor within five (5) days after Lender's request.

*Loan and Security Agreement*



10.16     **Tax Returns.**  Borrower has timely filed, and will hereafter timely file, all tax returns and reports required by foreign, federal, state or local Law, except for year 2020 state and federal tax returns.  Other than year 2020 state and federal tax returns, Borrower has timely paid, and will hereafter timely pay, all foreign, federal, state and local taxes, assessments, deposits, contributions, claims, penalties, interest and other charges related thereto (including, but not limited to, income, franchise, personal property, real property, FICA, excise, withholding, sales and use taxes) now or hereafter owed by Borrower.  Borrower is unaware of any claims or adjustments proposed for any of Borrower's prior tax years which could result in additional taxes becoming due and payable by Borrower.

10.17     **Notification of Changes.**  Borrower will promptly notify Lender in writing of any change in its officers, directors, or managing members, as applicable, the opening of any new bank account or other deposit account, or any Material Adverse Change in the business or financial affairs of Borrower or other Obligor, or the existence of any circumstance which would make any representation or warranty of Borrower or any Obligor in any Loan Documents to be  untrue in any material respect or constitute a material breach of any covenant of Borrower or any Obligor.

10.18     **Borrower Accounts.**  Schedule 10.18 lists all Borrower Accounts held with any financial institution, indicating the type of account (e.g., checking, savings, investment, payroll, tax withholding, etc.) for that account.  Borrower has no other accounts at any other financial institution and shall not create or fund any accounts at any other financial institution so long as any Obligations are outstanding without Lender's prior written consent.

10.19     **Further Assurances.**  Borrower agrees, at its expense, to take all actions, and execute or cause to be executed and delivered to Lender all agreements, instruments, documents as Lender may request from time to time, to fully effectuate the transactions contemplated by this Agreement and the other Loan Documents.

10.20     **Continuing Effect.**  All representations, warranties and covenants of Borrower contained in this Agreement and any other agreement with Lender shall be true and correct at the time of the effective date of that agreement and shall be deemed continuing and shall remain true, correct and in full force and effect until payment and satisfaction in full of all of the Obligations, and Borrower acknowledges that Lender is and will be expressly relying on all these representations, warranties and covenants in making advances to Borrower.

**11.   Negative Covenants.**  Until full payment of the Obligations and Complete Termination of this Agreement, Borrower will not:

11.1     **Modify Account Obligations**.  After written notice by Lender to Borrower, and automatically, without notice, after an Event of Default, Borrower shall not, without the prior written consent of Lender:

11.1.1.     grant any extension of time for payment of any Accounts;

11.1.2.     compromise or settle any Accounts for less than the full amount thereof;

11.1.3.     release in whole or in part any Account Debtor; or

11.1.4.     grant any credits, discounts, allowances, deductions, return authorizations, or the like with respect to any Accounts.

11.2     **Indebtedness**.  Without Lender's prior written consent, create, incur, assume, suffer to exist, permit, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any indebtedness, except indebtedness evidenced by this Agreement and the other Loan Documents.

11.3     **Liens**.  Create, incur, assume, or permit to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Liens consented to in advance by Lender.

11.4     **Restrictions on Fundamental Changes**.

*Loan and Security Agreement*



11.4.1.    Enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its stock or membership interests.

11.4.2.    Liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution).

11.4.3.    Convey, sell, lease, license, assign, transfer, or otherwise dispose of, in one transaction or a series of transactions, all or any substantial part of its assets.

11.4.4.    Change its jurisdiction of organization.

11.5    **Disposal of Assets.**  Convey, sell, lease, license, assign, transfer, or otherwise dispose of any of any Borrower's assets other in the ordinary course of business without Lender's prior written consent.

11.6    **Change Name**.  Change Borrower's or its Affiliates' name, FEIN, organizational identification number, corporate structure, or identity, or add any new fictitious name; provided, however, that Borrower and any of its Affiliates may change their respective names or add any new fictitious names upon at least thirty (30) days' prior written notice to Lender of the change and so long as, at the time of the written notification, Borrower or its Affiliates, as applicable, provides any financing statements or fixture filings necessary to perfect and continue perfected the Lender's Liens.

11.7    **Nature of Business**.   Make any change in the principal nature of its business.

11.7.1.    Prepay, redeem, defease, purchase, or otherwise acquire any indebtedness of any Obligated Party, other than the Obligations in accordance with this Agreement, and

11.7.2.    Directly or indirectly, amend, modify, alter, increase, or change any of the terms or conditions of any agreement, instrument, document, indenture, or other writing evidencing or concerning indebtedness.

11.8    **Change of Control**. Cause, permit, or suffer, directly or indirectly, any Change of Control.

11.9    **Distributions**.  Without the prior written consent of Lender, either (a) make any distribution or declare or pay any dividends (in cash or other property, other than common equity) on, or purchase, acquire, redeem, or retire any of Borrower's or its Affiliates' Stock, of any class, whether now or hereafter outstanding, (b) make any payments on subordinated debt, or (c) pay more than the required amounts on any senior or pari-passu debt obligations to any other creditor unless at least an equal amount of that excess payment is paid to Lender at the same time.

11.10    **Accounting Methods**. Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP) or enter into, modify, or terminate any agreement currently existing, or at any time hereafter entered into with any third party accounting firm or service bureau for the preparation or storage of Borrower's accounting records without said accounting firm or service bureau agreeing to provide  Lender information regarding the Collateral or Borrower's or its Affiliates' financial condition.

11.11    **Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any transaction with any Affiliate of Borrower except for transactions that are in the ordinary course of Borrower's business, upon fair and reasonable terms, that are fully disclosed to Lender, and that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-Affiliate.

11.12    **Suspension**.    Suspend or go out of a substantial portion of its business.

11.13    **Use of Proceeds**.  Use the proceeds of the Advances for any purpose other than (a)  to pay

Page 23 of 34

*Loan and Security Agreement*

Case 2:22-bk-00150-EPB    Doc 51-1    Filed 01/21/22    Entered 01/21/22 10:14:03    Desc
Exhibit A - Final DIP Facility Agreements    Page 24 of 62



transactional fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, and (b) for working capital and general corporate purposes, each consistent with the terms and conditions hereof, for its lawful and permitted purposes, and (c) to pay off certain subordinated debt with Lender's prior written consent and subject to the limitations set forth herein.

        11.14    **Change in Location of Chief Executive Office; Equipment or Inventory with Bailees**. Relocate its chief executive office, its books and records, or a substantial portion of any other Collateral to a new location without providing thirty (30) days' prior written notification thereof to Lender and so long as, at the time of the written notification, Borrower or the applicable Affiliate provides any financing statements or fixture filings necessary to perfect and continue perfected the Lender's Liens and also provides to Lender a Collateral Access Agreement with respect to the new location in form acceptable to Lender in its discretion. The Equipment and Inventory shall not at any time now or hereafter be stored with a bailee, warehouseman, or similar party without Lender's prior written consent.

        11.15    INTENTIONALLY DELETED

**12.**   **Events of Default**. Each of the following events or conditions shall constitute an "Event of Default":

        12.1    Borrower defaults in the payment of any Obligations when due, whether at maturity, upon acceleration, or otherwise;

        12.2    Borrower is in default with respect to the Loan Documents or any other now existing or future agreements between Borrower and Lender;

        12.3    The Obligations at any time exceed the Allowable Amount;

        12.4    An adverse change occurs with respect to the financial condition or operations of Borrower which results in a material impairment of the prospect of repayment of the Obligations;

        12.5    This Agreement or any other Loan Document that purports to create a Lien, shall, for any reason, fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien on or security interest in the Collateral covered hereby or thereby;

        12.6    Borrower or any of its Affiliates defaults pursuant to any agreement between any of them and Lender or any Lender Affiliate, whether pursuant to any other financing arrangements or otherwise;

        12.7    A Change of Control of Borrower or any other Obligor occurs;

        12.8    INTENTIONALLY DELETED

        12.9    Any Obligor (i) dies, becomes disabled, dissolves or otherwise ceases functioning as a going concern in the ordinary course of business, (ii) defaults in the performance of its obligations to Lender, regardless of whether the default arises out of a Guaranty or out of any other agreement between the Obligor and Lender, (iii) notifies Lender of its intention to rescind, modify, terminate or revoke the Guaranty or other agreement with respect to future transactions, or (iv) the Guaranty shall cease to be in full force and effect for any reason whatever, or it defaults on its obligations owed to any other creditor;

        12.10    Permitted Third Party Creditor fails to perform or observe any of its Permitted Third Party Creditor's obligations under the Intercreditor Agreement, or notifies Lender of the Permitted Third Party Creditor's intention to do so.

        12.11    A federal or state tax lien is filed against any of Borrower's assets;

        12.12    Any material portion of Borrower's or any Obligor's assets is attached, seized, subjected to a writ

*Loan and Security Agreement*



or distress warrant, levied upon, or becomes subject to any judgment or comes into the possession of any third Person;

12.13    Borrower or any Obligor is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, and the court order is not dissolved within five (5) Business Days;

12.14    If a notice of Lien, levy, or assessment with respect to any of Borrower's or any Obligor's assets is filed of record with a Governmental Authority;

12.15    If there is a default in any material agreement to which Borrower or any Obligor is a party, provided that no default shall constitute an "Event of Default" hereunder if (i) Borrower has notified the Lender that it is disputing the existence of the default in good faith and (ii) the Lender determines in its sole discretion that (A) the dispute is in fact in good faith and (B) there has been no material adverse impact in the ability of Borrower to perform its obligations under the Loan Documents;

12.16    If Borrower or any Obligor makes any payment on account of indebtedness that has been contractually subordinated in right of payment to the payment of the Obligations without Lender's express prior written approval;

12.17    If any material misstatement or misrepresentation exists now or hereafter in any warranty, representation, statement, or record made to Lender by Borrower, or its Affiliates, or any officer, employee, agent, or director of Borrower or any of its Affiliates;

12.18    Any Key Employee fails to devote substantially all of his or her efforts in furtherance of the business affairs of Borrower or Obligor, as applicable, other than during reasonable vacation periods, or ceases to be employed by Borrower or the Obligor in the capacity that the employee held as of the date of this Agreement;

12.19    Any provision of this Agreement or any of the Loan Documents ceases, for any reason, to be valid and binding on Borrower;

12.20    Borrower delivers any document, financial statement, schedule or report to Lender which is false or incorrect in any material respect;

12.21    Lender, at any time, acting in good faith and in a commercially reasonable manner, deems itself insecure;

12.22    Borrower voluntarily suspends the transaction of business or allows to be suspended, terminated, revoked or expired any permit, license or approval of any governmental body necessary to conduct the Borrower's business as now conducted; or

12.23    Any injury or damage to a material part of the collateral or a material part of the Collateral shall be lost, stolen or destroyed, regardless of the presence of insurance to cover that loss.

13.  **Remedies**.

13.1    Upon the occurrence of any Event of Default at Lender's option:

13.1.1.    Lender may declare this Agreement and all of Lender's obligations hereunder terminated, but without affecting any of Lender's Liens on the Collateral and without affecting the Obligations;

13.1.2.    Lender may declare all Obligations to be immediately due and payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by Borrower;

13.1.3.    all Obligations shall accrue interest at the Default Rate; and

*Loan and Security Agreement*



13.1.4.    Lender may, immediately and without expiration of any period of grace, enforce payment of all Obligations and exercise any and all other remedies granted to it under the Loan Documents, at law, in equity, or otherwise.

13.1.5.    Lender may have a receiver appointed as a matter of right. The receiver may be an employee for or counsel to Lender.  The receiver may serve without a bond, and all fees and expenses of the receiver shall become part of the Obligations, accruing interest at the Default Rate until paid in full.  The receiver may be appointed by the court upon ex parte application and without notice to Borrower and any other Obligor, that notice being hereby waived.

13.1.6.    Lender, if it seeks to exercise its rights and remedies with respect to an Event of Default, shall provide written notice ("Written Notice") to Borrower, Borrower's bankruptcy counsel in the Bankruptcy Case, the United States Trustee, and counsel for any Official Committee appointed in the Bankruptcy Case. Any party shall have five (5) calendar days from the receipt of Written Notice in which to cure the default or file a controverting affidavit with respect to the Event of Default. If the Event of Default is not cured within such five (5) day period, Lender may file an emergency motion in the Bankruptcy Case seeking relief from the automatic stay of 11 U.S.C. § 362 to commence and exercise its available rights and remedies. Borrower hereby consents to the Bankruptcy Court setting an emergency hearing on the emergency motion as soon as the court's calendar will permit and agrees that it will have one (1) business day following the filing of any emergency motion to file an objection or other response.

13.2    **BORROWER WAIVES ANY REQUIREMENT THAT LENDER INFORM BORROWER BY AFFIRMATIVE ACT OR OTHERWISE OF ANY ACCELERATION OF BORROWER'S OBLIGATIONS HEREUNDER. FURTHER, LENDER'S FAILURE TO CHARGE OR ACCRUE INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY LENDER OF ITS CLAIM THERETO.**

13.3    Lender shall have all other remedies permitted it pursuant to law, equity or otherwise, regardless of whether an Event of Default or Incipient Default has occurred.  Lender may exercise setoff rights against any amounts it owes to Borrower or any Obligor pursuant to any Loan Document.  No Borrower or Obligor shall have or exercise setoff rights against Lender or any other Lender Party without Lender's express prior written consent.

13.4    Borrower shall pay Lender any deficiencies remaining after disposition of any Collateral, but Borrower shall not be permitted to delay payment of any Obligations owed to Lender pending disposition of any Collateral.

**14.    Standards for Exercising Remedies.**

14.1    To the extent that Applicable Law imposes duties on the Lender to exercise remedies in a commercially reasonable manner, the Borrower acknowledges and agrees that:

14.1.1.    Lender's exercise of its standard practices in connection with the Collateral shall be presumed to be commercially reasonable,

14.1.2.    notice to Borrower of any action (other than acceleration of the Termination Date, which shall require no notice) on at least ten (10) days' notice shall be commercially reasonable, and

14.1.3.    it is commercially reasonable for the Lender:

14.1.3.1.    to incur expenses for the account of Borrower to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

14.1.3.2.    to obtain third party consents for access to Collateral to be disposed of, or to obtain Governmental Authority or third Person consents for the collection or disposition of Collateral to be collected or disposed of;

*Loan and Security Agreement*



14.1.3.3. to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral;

14.1.3.4. to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists;

14.1.3.5. to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature;

14.1.3.6. to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature;

14.1.3.7. to dispose of Collateral by using Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets;

14.1.3.8. to dispose of assets in wholesale rather than retail markets;

14.1.3.9. to disclaim all disposition warranties; and

14.1.3.10. to purchase insurance or credit enhancements to insure the Lender against risks of loss, collection or disposition of Collateral or to provide to the Lender a guaranteed return from the collection or disposition of Collateral, and

provided further, that nothing in this Agreement shall impose any duty of Lender to do any of the foregoing.

14.2 The Borrower acknowledges that the purpose of this Section 14 is to provide non-exhaustive indications of what actions or omissions by the Lender would not be commercially unreasonable in the Lender's exercise of remedies against the Collateral and that other actions or omissions by the Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section. Without limitation upon the foregoing, nothing contained herein shall be construed to grant any rights to the Borrower or to impose any duties on the Lender that would not have been granted or imposed by this Agreement or by Applicable Law in the absence of this Section 14.

**15. Proceeds and Expenses of Dispositions**. The Borrower shall pay to the Lender on demand any and all expenses, including attorneys' fees and disbursements, incurred or paid by the Lender in protecting, preserving, or enforcing the Lender's rights under or in respect of any of the Obligations or any of the Collateral. After deducting all of said expenses, the residue of any proceeds of collection or sale of the Obligations or Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations as provided in this Agreement, notwithstanding contrary instructions received by Lender from the Borrower or any other third party.

**16. Liquidation Success Premium**. If Borrower shall substantially cease operating as a going concern, and the proceeds of Collateral created after that event are in excess of the Obligations at the time of Default, Borrower shall pay to Lender a liquidation success premium of ten (10%) percent of the amount of the excess.

**17. Term and Termination**.

17.1 This Agreement shall become effective upon the execution and delivery hereof by Borrower and Lender, shall continue in full force and effect for one year from the date hereof, and shall be automatically renewed for successive Renewal Periods unless either Borrower or Lender provides written notice to the other that it does not intend to renew this Agreement, such notice to be provided by Borrower at least sixty (60) days, or by Lender at least thirty (30) days, prior to either (A) the Anniversary Date, or (B) the Renewal Termination Date of the Renewal Period then in effect, as applicable.

*Loan and Security Agreement*


17.2    Upon the Termination Date, the unpaid balance of the Obligations shall be due and payable without demand or notice.

**18.  Exposed Payments.**

18.1 Upon termination of this Agreement, Borrower shall pay to Lender (or Lender may retain), to hold in a non-segregated non-interest bearing account the amount of all Exposed Payments (the "Preference Reserve").

18.2 Lender may charge the Preference Reserve with the amount of any Exposed Payments that Lender pays to the bankruptcy estate of the Account Debtor that made the Exposed Payment, on account of a claim asserted under Section 547 of the Bankruptcy Code.

18.3 Lender apply to outstanding Obligations or if none, shall refund to Borrower from time to time that balance of the Preference Reserve for which a claim under Section 547 of the Bankruptcy Code can no longer be asserted due to the passage of the statute of limitations, settlement with the bankruptcy estate of the Payor or otherwise.

**19.  Avoidance Claims.**

19.1.1.    Borrower shall indemnify Lender from any loss or other Obligations arising out of the assertion of any Avoidance Claim.

19.1.2.    Borrower shall notify Lender within two (2) Business Days of it becoming aware of the assertion or threatened assertion of an Avoidance Claim.

**20.  Revocation of Borrower's Right to Sell Inventory Free and Clear of Lender's Security Interest.**  Lender may, upon the occurrence of an Event of Default or Incipient Default, revoke Borrower's right to sell Inventory free and clear of Lender's security interest therein.

**21.  No Lien Termination without Full Satisfaction of the Obligations.**  In recognition of Lender's right to have all its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Borrower, Lender shall not be required to record any terminations or satisfactions of any of its liens on the Collateral unless and until unless and until Complete Termination has occurred. **Borrower understands that this provision constitutes a waiver of its rights under §9-513(c) of the UCC.**

**22.  Online User Standards.**

22.1 Lender shall use reasonable efforts to post all of Borrower's account activity on Lender's website, which shall constitute Borrower's Online Statement of Account.  Lender need not send Borrower any hard copies of any activities which constitute Borrower's Online Statement of Account.  Provided that there is no Event of Default or Incipient Default, Lender shall provide Borrower with reasonably continuous access to view the Online Statement of Account, subject to periodic or occasional maintenance or outages or due to communication or other situations beyond Lender's control.  Borrower shall be solely responsible for checking its Online Statement of Account.  If Borrower disputes any entry on the Online Statement of Account, it shall, within thirty (30) days after the first posting of the event, send to Lender a written exception to that event.  Unless Lender receives a timely written exception to the activity posted to the Online Statement of Account, within thirty (30) days after it is first posted, the Online Statement of Account shall become an account stated and be deemed accepted by Borrower and shall be conclusive and binding upon the Borrower.  Lender shall have no liability for errors in the information posted in the Online Statement of Account so long as those errors are not due to Lender's intentional misconduct.

22.2 Online Conducting of Business.  Lender and Borrower intend to conduct business contemplated by this Agreement through the internet and through Lender's Online Reporting Service.  Lender is the sole and exclusive owner of the Online Reporting Service.  Borrower hereby accepts a non-exclusive, non-transferable, terminable right to access the Online Reporting Service, upon the terms and subject to the conditions contained herein.

22.3 Standards Regarding Conducting Business Online.  Borrower and Lender agree as follows:

*Loan and Security Agreement*



22.3.1.     Lender shall have the right to terminate or limit Borrower's access to the Online Reporting Service upon the occurrence of an Event of Default or at any other time within Lender's discretion.

22.3.2.     Borrower shall not: (i) copy the Online Reporting Service nor otherwise reproduce the same other than for normal system operation backup; (ii) translate, adapt, vary, or modify the Online Reporting Service; or (iii) disassemble, decompile or reverse engineer the Online Reporting Service.

22.3.3.     Lender shall not be liable to Borrower for any loss or damage whatsoever or howsoever caused, whether caused by tort (including negligence), breach of contract, or otherwise arising directly or indirectly in connection with the use of the Online Reporting Service, including for any inability of Borrower to obtain access to the on-line system or for unauthorized access to that system by others. Borrower hereby waives any legal rights it has with respect to the foregoing rights and to its data privacy to the fullest extent permitted by Law.

22.3.4.     Borrower acknowledges that any and all of the copyright, trademarks, trade names, patents and other intellectual property rights subsisting in or used in connection with the Online Reporting Service, including all documentation and manuals relating thereto, and all modifications, improvements and additions thereto, are, and shall remain, the sole property of the Lender. Borrower shall not, during or at any time after the expiry or termination of its use of the Online Reporting Service, in any way question or dispute the ownership by Lender thereof.

22.3.5.     To the extent permitted by applicable Law, Lender excludes all warranties with respect to the Online Reporting Service, either express or implied, including, but not limited to, any implied warranties of merchantability, satisfactory quality or fitness for any particular purpose.

22.3.6.     Borrower is solely responsible for virus scanning the Online Reporting Service, and Lender makes no representations or warranties regarding any virus associated with the Online Reporting Services.

22.3.7.     All information, data, drawings, specifications, documentation, software listings, source or object code which Lender may have imparted and may from time to time impart to the Borrower relating to the Online Reporting Service is proprietary and confidential. Borrower hereby agrees that it shall use the same solely in accordance with the provisions of this Agreement and that it shall not, at any time during or after expiry or termination of this Agreement, disclose the same, whether directly or indirectly, to any third party or use it in connection with any purpose other than the Transactions.

22.3.8.     Borrower shall be responsible for restricting access to passwords and systems relating to the Online Reporting Service and shall only provide passwords and access to the Online Reporting System to those individuals on an as needed basis. Upon learning of any breach of security or suspected breach of security to the Online Reporting System, Borrower shall report the incident immediately to Lender. Borrower agrees to implement and follow authentication procedures and protocols requested by Lender. Borrower shall be solely responsible for safeguarding the confidentiality of its authentication codes and passwords, and Borrower assumes all responsibility for any transactions undertaken in Borrower's name through the use of those authentication codes, passwords or using Borrower's electronic signature. Lender shall have no duty to verify or authenticate that the person(s) using Borrower's systems are authorized to act on behalf of Borrower.

22.3.9.     Borrower assumes all risk of loss of or inability to access its data. Borrower shall keep copies of all invoices, reports and other materials furnished to Lender, and Lender shall have no responsibility to return or provide copies thereof to Borrower.

22.4  <u>Online Access</u>.  Upon an Event of Default, all of Borrower's rights and access to any online internet services that Lender makes available to Borrower shall be provisional pending Borrower's curing of all such Events of Default and Lender may elect to terminate Borrower's online access as provided for herein. During that period of time, Lender may limit or terminate Borrower's access to online services. Borrower acknowledges that the information Lender makes available to Borrower through online internet access, both before and after an Event of Default, constitutes and satisfies any duty to respond to a request for accounting or request regarding a statement of account that is referenced in the UCC.

*Loan and Security Agreement*



23. **Retention of Records**. Lender shall retain any documents, schedules, invoices or other papers delivered by Borrower only for such period as Lender, at its sole discretion, may determine necessary, after which time Lender may destroy such records without notice to or consent from Borrower.

24. **Notices to Third Parties**. Lender shall have the right at any time to give any Guarantor, Obligor, Permitted Third Party Creditor or any other interested Person notice of any fact or event relating to this Agreement, as Lender may deem necessary or desirable in Lender's sole discretion, including, without limitation, Borrower's financial condition. Borrower shall provide to each Guarantor, Obligor, and Permitted Third Party Creditor or Person a copy of each notice, statement or report required to be given to Lender under any of the paragraphs of this section.

25. **Information to Participants**. Lender may furnish any financial or other information concerning Borrower, or any of its Affiliates, heretofore or hereafter provided by Borrower to Lender, pursuant to this Agreement or otherwise, to any prospective or actual purchaser of any participation or other interest in any loans made by Lender to Borrower (whether under this Agreement or otherwise), or to any prospective purchaser of any securities issued or to be issued by Lender.

26. **Entire Agreement**. This Agreement supersedes all other agreements and understandings between the parties hereto, verbal or written, express or implied, relating to the subject matter hereof. No promises of any kind have been made by Lender or any third party to induce Borrower to execute this Agreement. No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

27. **Miscellaneous**.

    27.1    **Notices.**

        27.1.1.    All notices required to be given to either party hereunder shall be deemed given upon the first to occur of: (a) three (3) business days after deposit thereof in a receptacle under the control of the United States Postal Service; (b) upon transmittal by electronic means to a receiver under the control of the party to whom notice is being given if provided before 5:00 p.m., local time of the recipient on a Business Day, or if thereafter on the next Business Day; or (c) upon the delivery to the party to whom notice is being given, or an employee or agent of thereof, or upon the attempted delivery thereof if the recipient does not make itself available during business hours to receive the delivery. For purposes hereof, the addresses of the parties are as set forth below or as may otherwise be specified from time to time in a writing sent by one party to the other in accordance with the provisions hereof:

**BORROWER**

| | |
|---|---|
| Address: | 190 S. McQueen Road |
| | Gilbert, Arizona 85233 USA |
| Attention: | Yarron Bendor |
| Email Address: | YBendor@gpmicompany.com |
| Telephone: | 623-688-1906 |

**LENDER**

| | |
|---|---|
| Address: | 4530 E. Shea Blvd., Suite 170 |
| | Phoenix, AZ 85028 |
| Attention: | Robyn Barrett |
| Email Address: | robyn@fswfunding.com |
| Telephone: | 602-535-5984 |

    27.2    **Survival.** All representations, warranties and agreements herein contained shall be effective so long as any portion of this Agreement remains executory.

    27.3    **Amendment and Waiver**. Neither this Agreement nor any provisions hereof may be changed,

*Loan and Security Agreement*



waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by all parties to this Agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

      27.4    **No Waiver.**  No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which Lender may have, nor shall any delay be construed to be a waiver of any of those rights, powers, or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver by Lender of any breach or default by Borrower hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to Lender hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, the right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies that Lender would otherwise have. Any waiver, permit, consent or approval by Lender of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in the writing and only as to that specific instance.

      27.5    **Choice of Law.**  This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Arizona, excluding its choice of law principles.

      27.6    **Waiver of Statute of Limitations**. Borrower waives the pleading of any statute of limitations with respect to any and all actions in connection herewith. To the extent that Borrower may now or in the future have any claim against Lender, arising out of this agreement or the transactions contemplated herein whether in contract or tort or otherwise, Borrower must assert the claim within one year of it accruing, regardless of the lack of actual knowledge by Borrower of the potential claim. Failure to assert a claim within one year shall constitute of waiver thereof. Borrower agrees that this period is reasonable and sufficient for it to investigate and act upon the claim. This Section shall survive any termination of this agreement. A copy of the waiver may be filed as a written consent in any judicial proceeding.

      27.7    **Indemnity.**  Borrower shall indemnify, defend and hold the Lender Parties harmless from and against any and all losses of any kind or nature which any of the Lender or any Lender Party may sustain or incur in connection with, or arising from, this Agreement, any other present or future agreement, or the breach by Borrower of any representation, warranty, covenant or provision contained herein or therein, the transactions or any other transactions contemplated hereby or thereby or relating hereto or thereto, or any other matter, cause or thing whatsoever, occurred, done, omitted or suffered to be done by Lender or the Lender Party relating in any way to Borrower or any Obligor, Account Debtor, Permitted Third Party Lender or other Person related to this Loan. This indemnity is in addition to all other indemnities set forth in this Agreement and any other agreement between Borrower and any Lender Party. Notwithstanding any other provision of this Agreement to the contrary, all the indemnities shall survive termination of this Agreement, and Lender's security interest in the Collateral shall survive until the full satisfaction of these Obligations, notwithstanding any release of Lender's liens in the interim. This indemnity shall be without regard to the presence of any insurance held by Lender or the refusal of any insurer to pay or perform its obligations.

      27.8    **Venue**. The parties agree that any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance or breach of this Agreement, shall, if Lender so elects, be instituted in courts located within Maricopa County, Arizona (the "<u>Acceptable Forums</u>"), each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the State of Arizona or otherwise in those courts in any such suit, action or proceeding. Should a proceeding be initiated in any other forum, Borrower waives any right to oppose any motion or application made by Lender to move the matter to an Acceptable Forum.

      27.9    **Counterparts.**  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile or other form of electronic communication shall be effective as delivery of a manually executed counterpart of this Agreement.

*Loan and Security Agreement*



27.10    **Electronic Signatures.**  The Parties intend to conduct business contemplated by this Agreement by electronic means.  Each document, which is the subject of this Agreement, that a Party has affixed a typed or electronic signature or other authentication and then transmitted electronically to the other shall be intended as and constitute an original and deemed to contain a valid signature of the Party for all purposes.  In furtherance of the above, Borrower hereby authorizes Lender to regard Borrower's printed name or reasonable approximation thereof, electronic approval or other confirmation process authorized  by Borrower to be by or on behalf of Borrower for any document, agreement, assignment schedule or invoice as the equivalent of a manual signature by one of the Borrower's authorized officers or agents.  The Parties agree that in any legal proceedings between them respecting or in any way relating to this Agreement or any transactions hereunder, each waives the right to raise any defense based on its execution hereof in counterparts or the delivery of executed counterparts by electronic signature and delivery.  The Parties waive, to the fullest extent permitted by Law, any provisions of applicable Law to the contrary.

Lender may rely upon, and assume the authenticity of, any approval and material applicable to that approval as the duly confirmed, authorized and approved signature of Borrower by the person approving the same which constitute an Authenticated Record for all purposes including under the UCC and shall satisfy the requirements of any applicable statute of frauds.

27.11    **Severability.**  Should any provision, clause or condition of this Agreement be held by any court of competent jurisdiction to be void, invalid, inoperative, or otherwise unenforceable, the defect shall not affect any other provision, clause or condition, and the remainder of this Agreement shall be effective as though the defective provision, clause or condition had not been a part hereof.

27.12    **Time of Essence.**  Time is of the essence in the performance by Borrower of each and every obligation under this Agreement.  There is no grace period, cure right or other indulgence afforded Borrower except as expressly provided in the Loan Documents.

27.13    **Joint and Several Liability.**  The liability of each Borrower, if more than one, and any Guarantors and Obligors shall be joint and several and the compromise of any claim with, or the release of, any Borrower shall not constitute a compromise with, or a release of, any other Borrower, Guarantor or other Obligor.

27.14    **Benefit of Agreement.**  The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, permitted assigns, heirs, beneficiaries and representatives of the Parties hereto; provided, however, that Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Lender, and any prohibited assignment shall be void.  No consent by Lender to any assignment shall relieve Borrower or any Guarantor or other Obligor from liability for the Obligations.  Without limiting the generality of the foregoing, all rights and benefits of Lender under this Agreement may be assigned in whole or in part, and it may be exercised by any institution with which Lender maintains any relationship and by any other person or entity designated by Lender.

27.15    **Section Headings, Construction.**  Section headings are used herein for convenience only.  Borrower acknowledges that the same may not describe completely the subject matter of the applicable Section, and the same shall not be used in any manner to construe, limit, define or interpret any term or provision hereof.  This Agreement has been fully reviewed and negotiated between the Parties and no uncertainty or ambiguity in any term or provision of this Agreement shall be construed strictly against Lender or Borrower under any rule of construction or otherwise.

27.16    **Waiver of Homestead**.  Borrower, on behalf of itself and its Affiliates and any other Obligors, waives and renounces all exemptions and rights under homestead laws, to the fullest extent permitted by law.

27.17    **Arbitration.**

27.17.1.    Except for "**Core Proceedings**" under the United States Bankruptcy Code, or as noted below in the next paragraph of this section 13.18, the parties agree to submit to binding arbitration all claims, disputes and controversies between or among them, whether in tort, contract or otherwise (and their respective employees, officers, directors, attorneys, and other agents) arising out of or relating to in any way (i) this Agreement

*Loan and Security Agreement*



or any other agreement, instrument, certificate or document entered into between the parties, or any dispute, claim or controversy between them related to any of the transactions contemplated by this Agreement. Any arbitration proceeding will (i) proceed in Maricopa, County, Arizona; (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code); and (iii) be conducted in accordance with the Commercial Arbitration rules of the America Arbitration Association ("**AAA**"), as modified by these provisions.

27.17.2.  Notwithstanding the foregoing, however, the arbitration requirement does not limit the right of Lender to (i) foreclose against any Collateral; (ii) exercise self-help remedies relating to Collateral or proceeds of Collateral permitted to Lender, like setoff or repossession; or (iii) obtain provisional ancillary remedies like replevin, injunctive relief, attachment or the appointment of a receiver, before, during or after the pendency or any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of either party to submit any dispute to arbitration, including those arising from the exercise of the actions detailed in this paragraph.

27.17.3.  Any arbitration proceeding will be before a single arbitrator selected according to the Commercial Arbitration Rules of the AAA. The arbitrator will be a neutral attorney who has practiced in the area of commercial law for a minimum of ten (10) years. The arbitrator will determine whether or not an issue is arbitrable and will give effect to the statutes of limitation in determining any claim. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.

27.17.4.  In any arbitration proceeding, the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication.

27.17.5.  In any arbitration proceeding discovery will be permitted at the arbitrator's discretion and will be governed by the Arizona Rules of Civil Procedure unless otherwise ordered by the arbitrator. The arbitrator shall award costs and expenses of the arbitration proceeding in accordance with the provisions of this Agreement.

27.18  **Waiver of Trial by Jury.  IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT THE CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

**Borrower, by executing this Agreement, warrants and represents that it has fully read this Agreement, has had the opportunity to be represented by counsel and to ask and receive answers to any questions it may have concerning this Agreement, that it fully understands all of the terms and provisions hereof, and that this Agreement, although drafted by Lender, shall not be interpreted or construed against Lender.**

*{Signature page follows}*

*Loan and Security Agreement*



IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

GPMI, Co.

By: _____

Name: YARRON BENDOR

Title: C.E.O.

STATE OF Arizona )

County of Maricopa ) ss.

On this, the 19th day of January, 2022, before me personally appeared Yarron Bendor [and _____, each] known to me to be the person[s] whose name is [names are] subscribed to the within instrument and acknowledged that the person[s] executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

Shelley R Bankert
Notary Public
My Commission Expires:

SHELLEY R BANKERT
Notary Public, State of Arizona
Maricopa County
Commission # 556044
My Commission Expires
August 19, 2022

FACTORS SOUTHWEST, L.L.C., dba FSW Funding

By: _____

Name: Robyn Barrett

Title: Managing Member

## ACCEPTANCE BY GUARANTOR

The undersigned Validity Guarantor hereby acknowledges that his warranties and representations contained in the Validity Guaranty dated January 12, 2022 apply to the above Loan and Security Agreement.

Dated as of the date first noted above.

_____

Yarron Bendor, Validity Guarantor
C.E.O - GPMI Company.



## FACTORING AND SECURITY AGREEMENT

**DATE:**  January 11, 2022

| | |
|---|---|
| **SELLER:** GPMI, Co. | **FSW:** FACTORS SOUTHWEST, L.L.C., |
| an Arizona corporation | an Arizona Limited Liability Company |
| 1224 N. Hobson Street | 4530 E. Shea Blvd., Ste. 170 |
| Gilbert, AZ 85233 | Phoenix, AZ 85028 |

### Recitals

WHEREAS, on January 10, 2022, GPMI, Co., an Arizona corporation ("**Seller**") filed a voluntary petition for Chapter 11 bankruptcy pending before the United States Bankruptcy Court District of Arizona (the "**Bankruptcy Court**") captioned in case number 2:22-bk-00150-EPB ("**Bankruptcy Proceeding**").

WHEREAS, Seller has continued in possession of its assets in the management of its business pursuant to Sections 1106 and 1107 of the Bankruptcy Code and is operating as a debtor-in-possession (the "**DIP**").

WHEREAS, concurrently with the execution of this Factoring and Security Agreement (the "**Agreement**"), Seller and Factors Southwest, LLC ("**FSW**") have entered into that certain Loan and Security Agreement (the "**Loan Agreement**") pursuant to which FSW has agreed to make certain financial accommodations in the form of 3 credit facilities including the financial accommodations set forth in this Agreement.

WHEREAS, Seller desires to offer for sale and purchase all of Seller's Accounts (as defined in Addendum A) and receive financial accommodations from FSW in accordance with the terms of this Agreement and the Loan Agreement, and pursuant to the Bankruptcy Code and applicable law.

WHEREAS, subject to the approval of the Bankruptcy Court upon notice and a hearing in accordance with the Bankruptcy Code, Seller and FSW desire to enter into and perform under this Agreement.

### 1.  Purpose of Agreement.

The purpose of this Agreement, together with <u>Addendum A Definitions</u> and <u>Addendum B Debtor-In-Possession</u>, each attached hereto and incorporated herein by this reference, is to set forth the terms and conditions relating to the sale by Seller and the purchase by FSW, as its sole factor, from time to time, of Seller's Accounts now existing or hereafter arising from the sale and delivery of goods or the rendering of services in the regular course of Seller's business. As used in this Agreement, "Seller" means the Seller named above and any subsidiaries and other affiliates presently in existence or created in the future and their respective successors and permitted assigns, including Seller in its capacity as a DIP and after termination of the Bankruptcy Proceeding. Capitalized terms not defined in the context shall have the meanings given those terms in the Addendum A to this Agreement.

### 2.  Sale; Purchase Price; Billing; Reserve Account.

#### 2.1  Assignment and Sale.

2.1.1  Seller does hereby agree to offer for sale to FSW all of its Accounts arising from time to time and FSW may purchase, at FSW's offices in Phoenix, Arizona, those said Accounts as are acceptable to FSW, in its sole and absolute discretion. FSW shall have no obligation to purchase any Account from Seller which it does not approve and accept. In this regard, FSW reserves the right to reject an Account regardless of whether FSW may have purchased Accounts of a particular customer in the past.

2.1.2  Accounts shall be offered by Seller to FSW upon forms as may be provided by FSW, accompanied by original or copies of invoices therefor (as FSW may request), together with satisfactory evidence of shipping or proof of

Page 1 of 16

Case 2:22-bk-00150-EPB    Doc 51-1    Filed 01/21/22    Entered 01/21/22 10:14:03    Desc
Exhibit A - Final DIP Facility Agreements    Page 36 of 62



delivery or performance of services, and other documents as FSW may from time to time require. FSW shall have the right to withhold any advance against the purchase price for those Accounts so accepted until Seller furnishes those documents.

2.1.3    Upon acceptance in writing of the purchase and assignment of an Account by a duly authorized agent of FSW, said assignment shall vest full, absolute and irrevocable title and ownership to said Factored Account in FSW, as the sole and absolute owner thereof, together with the proceeds thereof and Seller's title to the goods represented thereby. As the full and sole owner of the Factored Account, FSW shall be entitled to all of the ownership, title, rights, or guarantees which Seller possessed with respect thereto and with respect to the goods represented thereby, including without limitation, the right to stoppage in transit, reclamation or replevin of the goods, the right to the goods which may be rejected, returned, or reconsigned and in and to any new Account created through the resale or exchange of those goods, the right to file in the name of Seller or FSW materialmen's liens and claims under any payment bond, and the right to contact Seller's Customers at any time for the purpose of verifying any information relating to any Factored Account in the name of Seller or FSW, without notice to or consent of Seller. Seller shall have no right or power to modify, change or alter the terms, price or other conditions of any Factored Account, without first obtaining the prior written approval of FSW.

2.1.4    Notwithstanding the foregoing, FSW will only purchase Accounts of Seller, so long as, at the time of that purchase, the unpaid balance of the Factored Accounts does not exceed, before and after that purchase, the Maximum Amount, *provided, however*, that all term and conditions of this Agreement shall apply in the event the Maximum Amount is exceeded and Seller shall remain liable for all Obligations in the event thereof. Notwithstanding the foregoing, nothing contained herein shall be deemed to constitute a commitment by FSW to purchase any Accounts from Seller.

2.1.5    It is specifically understood and agreed that notwithstanding the foregoing, FSW shall not as a result of purchasing those Accounts, either expressly or impliedly, be deemed to have assumed any liability or obligation which Seller may now or at any time hereafter have to its Customers, and in this regard Seller shall indemnify, defend and hold FSW harmless from any and all liability with respect thereto.

2.1.6    Each Customer of every Factored Account may be notified in writing that its Account has been sold and assigned to FSW and that all payments on said Factored Account shall be made only to FSW, which notification shall be done at the option of and in a manner as FSW shall reasonably prescribe from time to time.

2.2    **Purchase Price/Reserve Account.**

2.2.1    The purchase price for each Factored Account will be the Net Face Amount thereof, less the Initial Factoring Fee, plus the amounts owed pursuant to Section 2.2.5, if any. At the time that the Account is purchased in FSW's sole discretion, FSW may advance to Seller an amount equal to the Advance Percentage set forth in this Agreement, with the remaining amount to be withheld and credited to a non-interest bearing Reserve Account to be maintained on the books of FSW for Seller. Additional Factoring Fees computed on the Net Face Amount of the Account may be charged by FSW for each Additional Factoring Fee Period and deducted from the Reserve Account at the time as the Factored Account is paid, charged back, repurchased, or otherwise settled by Seller. No Factored Account shall be deemed to be paid until the expiration of three (3) Business Days after the remittance is received by FSW, or a longer period as is necessary to allow for clearance of the remittance by FSW's bank.

2.2.2    All remittances by FSW shall be by check, ACH or wire transfer within two (2) Business Days after submission to FSW of all documents referred to in Section 2.1.2. Any remittance to be paid by FSW to Seller may be reduced by any amounts due to FSW from Seller pursuant to this Agreement, *provided, however*, that failure to reduce those amounts shall not relieve Seller of its liability to pay FSW for such amounts due.

2.2.3    The Reserve Account shall be held by FSW and may be applied to any Obligations of Seller to FSW. Provided that no Event of Default has occurred, the excess over the Required Reserve Amount may be paid to Seller at least twice each month with respect to those Factored Accounts which have been paid, less all FSW's Costs, Additional Factoring Fees, the Net Face Amount of any Factored Account to be charged back or repurchased by Seller, adjustments, short payments, or discounts made or allowed on any Factored Account, or sums or Obligations owing from Seller to FSW, whether arising out of this Agreement or otherwise. In the event there is a Reserve Shortfall, Seller agrees to pay to FSW on demand the amount thereof. FSW, in its sole discretion, may adjust the percentage of the Reserve. No interest shall be paid by FSW or earned by Seller on the Reserve Account.

2.2.4    It is further understood that notwithstanding anything to the contrary contained in this Agreement, upon the occurrence of an Event of Default, FSW shall have no obligation to disburse any sums to Seller from the Reserve

Case 2:22-bk-00150-EPB    Doc 51-1    Filed 01/21/22    Entered 01/21/22 10:14:03    Desc
Exhibit A - Final DIP Facility Agreements    Page 37 of 62

Page 2 of 16



Account until the time as all Obligations of Seller to FSW, arising out of this Agreement or otherwise, have been fully paid and satisfied and Seller has otherwise cured any Events of Default or any Incipient Defaults.

2.2.5 ☐ If checked here, in addition to the amounts otherwise set forth in this Agreement, as additional purchase price for the Accounts, Seller will pay FSW interest on the Daily Balance. Interest will be calculated daily at a rate per annum equal the Daily Balance Rate plus the Base Rate (the "**Interest Rate**") and will be charged to Seller on the last day of the month. In no event will the Base Rate be lower than the Minimum Base Rate at any time. Any publicly announced decrease or increase in the Base Rate will result in an adjustment to the Interest Rate on the next Business Day. After the occurrence of an Event of Default and for so long as the Event of Default continues, all the Obligations will, at FSW's option, with or without the notice to Seller, bear interest at a rate per annum equal to the Daily Balance Default Rate. Seller shall pay FSW a Collateral Management Fee, which Interest will be calculated on the basis of a 360-day year for the actual number of days elapsed. In no event will the total amount of interest received by FSW exceed the amount of interest or other charges permitted by applicable Law and in the event excess interest or charges are determined by a court of competent jurisdiction to have been paid by Seller to FSW, the excess amount will be applied as a credit against the outstanding Obligations and Seller will not have any action against FSW or any damages arising out of the payment or collection of those excess interest or charges if so applied or the excess amounts are refunded to Seller. If an Account or any payment is charged back to Seller after the collection date, Seller will pay FSW interest at the Interest Rate on that Account or on that payment from the date of the chargeback until Seller has paid FSW for Obligation related to that Account in full.

## 3. Repurchase Of Factored Accounts.

3.1 It is understood that all Factored Accounts purchased by FSW will be with full recourse to Seller and FSW may require Seller to repurchase, by payment of the then unpaid Net Face Amount thereof, together with any unpaid fees relating to the Factored Account in the event that the Factored Account:

3.1.1 is subject to a Customer Dispute, FSW being under no obligation to determine whether the dispute is bona fide. Until the Factored Account is repurchased by Seller, it is understood and agreed that any returned goods shall be and remain the property of FSW. FSW shall have the right, in its discretion, to dispose of any returned or rejected goods at a price and upon terms reasonably available to FSW under the circumstances, in the sole opinion of FSW and as required by Law;

3.1.2 does not conform to the warranties and representations set forth in this Agreement;

3.1.3 is owed by a Customer who, in FSW's reasonable credit judgment, has become insolvent or has defaulted on its obligations to Seller or any of its other creditors; or

3.1.4 remains unpaid beyond the Late Payment Date.

3.2 The repurchase or charge back of any Factored Account shall be accomplished in any one of the following manner or combination thereof, at FSW's sole discretion:

3.2.1 deducting the Net Face Amount of the Factored Account from the amount which would otherwise be advanced to Seller in connection with the purchase of additional Accounts;

3.2.2 deducting the Net Face Amount of the Factored Account from the Reserve Account which would otherwise be paid to Seller;

3.2.3 deducting the Net Face Amount of the Factored Account from any other funds which come into the possession of FSW and which would otherwise be paid to Seller;

3.2.4 debiting the Net Face Amount of the Factored Account against any deposit account of Seller, pursuant to Section 13.1; or

3.2.5 payment from Seller, which shall be paid within one (1) Business Day following demand by FSW.

## 4. Security Interest in Collateral.

It is the express intention of the parties that the sale of the Accounts be deemed to be a true sale and not a financing arrangement. The Factored Accounts are and shall remain solely the property of FSW at all times during the term of this



Agreement until the Obligations are paid in full by Seller, and shall not be the property of Seller's bankruptcy estate in the Bankruptcy Proceeding.

4.1     Notwithstanding the true sale nature of the sale of the Account, in the event that such assignment and conveyance of any of the Purchased Accounts is characterized by any court of competent jurisdiction as a loan rather than a sale, and to secure Seller's Obligations hereunder, Seller authorizes FSW at any time and from time to time to file any financing statements and amendments thereto that it deems appropriate to perfect its security interest in the Collateral, including describing the Collateral as "all assets of Seller" or words of similar effect. FSW may, at its election, include a statement that Seller has agreed not to assign its Accounts or other Collateral to any other party. It may also include a statement that any grant of a subsequent security interest may constitute a tortious interference with FSW's rights under this Agreement.

4.2     In the event Seller's principal(s) including, but not limited to its owners, managers, officers or directors, and their employees and agents (collectively with Seller, the "**Seller Parties**") during the term of this Agreement or while Seller remains liable to FSW for any Obligations under this Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, cause to be formed a new entity or otherwise become associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise in a business similar to or competitive with that of Seller, that entity shall be deemed to have jointly and severally with Seller expressly assumed the Obligations due FSW under this Agreement. Seller and that entity shall notify FSW of the formation of any such entity within one (1) Business Day after that formation. With respect to any such entity, Seller shall be deemed to have been granted FSW an irrevocable power of attorney with authority to file, naming the newly formed or existing entity, an initial UCC-1 financing statement and to have it filed with any and all appropriate secretaries of state or other UCC filing offices. FSW shall be held harmless by Seller and its principals and be relieved of any liability as a result of FSW's authentication and filing of any such financing statement or the resulting perfection of its ownership or security interests in the entity's assets. The Seller Parties shall, and shall cause the new entity, to execute and deliver to FSW agreements substantially identical to this Agreement and all other agreements between Seller and FSW or its affiliates, within five (5) Business Days following FSW's request to do so. FSW shall have the right to notify the entity's Customer of FSW's rights, including without limitation, FSW's right to collect all Accounts, and to notify any creditor of the entity that FSW has such rights in the entity's assets. Nothing in this Section shall authorize or excuse the formation by any of the foregoing of a new company or entity or to otherwise divert or attempt to divert accounts, assets, income or business away from Seller or FSW. Notwithstanding the above, the terms and conditions set forth in this Section 4.2 remain subject to any covenants contained in Section 8 below, including, but not limited to, any requirements that Seller receive FSW's consent and approval prior to any merger, sale or other similar transaction as specified in Section 8.9 of the Seller's business or assets.

5.     **Collection of Factored Accounts.**

5.1     All remittances, including cash, checks and other proceeds arising from the Factored Accounts shall be the sole and exclusive property of FSW. Seller acknowledges and agrees that it shall not have any right to, or interest in, or power or authority to deposit or in any way exercise dominion or control over the proceeds of any Factored Account. Upon receiving any inquiry from a Customer relating to payment of Factored Account, Seller shall inform the Customer to make payment directly to FSW.

5.2     If for any reason Seller should receive any payment or other proceeds with respect to a Factored Account, Seller agrees to hold that payment or proceeds in trust for FSW separate and apart from any property of Seller and shall deliver the same to FSW on the same or next Business Day, in the form received without negotiation, together with any voucher or memoranda. **If any payment received by Seller with respect to a Factored Account is cashed, deposited or negotiated by Seller, it is understood by Seller that the action shall constitute an Event of Default hereunder and may subject Seller to civil liability and/or criminal prosecution. Notwithstanding that the action constitutes an Event of Default under this Agreement, Seller shall immediately be obligated to pay said sum to FSW, plus an amount equal to 15% of said sum, not as a penalty, but as liquidated damages to compensate FSW for additional administrative and collection expenses resulting from that action. In addition to all other remedies, FSW shall have the right to debit those amounts against any deposit account of Seller, pursuant to Section 13.1.**

5.3     Any remittance made by a Customer, unless specifically designated as being in payment of a particular Factored Account, including remittances representing C.O.D. sales, may be applied by FSW in its sole discretion.

5.4     To facilitate the collection of the Factored Accounts, Seller does hereby make, constitute and appoint FSW, any agents designated by FSW, as its attorney-in-fact with full power to receive, take, accept, endorse, and deposit in the name of FSW or Seller any check, note, draft, money order or other evidence of payment which may come into the possession of FSW pertaining to any Factored Account; receive, open and dispose of all mail addressed to Seller pertaining to the Factored Accounts; demand, collect, receive, receipt for, give releases for, or compromise or settle the payment of or prosecute, or defend any action or proceeding pertaining to the Factored Accounts in its own name or in the name of Seller; sign Seller's name on any notice of assignment, materialman's lien or waiver thereof, or on any other instrument or document with respect



to those Factored Accounts; prepare and sign Seller's name and file a proof of claim in bankruptcy or similar document with respect to any Customer and do all acts and things necessary to facilitate the collection of those Accounts. The authority granted FSW shall be coupled with an interest and remain in full force and effect until all Factored Accounts are paid in full or all Obligations of Seller to FSW have been fully paid and satisfied. FSW shall have no obligation to engage in any collection or other action with respect to the collection of any Factored Account, nor shall it have any direct or indirect liability to Seller for its actions undertaken or not undertaken in connection herewith. All fees and expenses of any attorney or collection agency employed by FSW or on its behalf to collect any Factored Account with respect to which FSW has or which is otherwise subject to a notice of a dispute, claim, offset, defense or counterclaim by the Customer shall be charged to Seller's account (including, at FSW's election, the Reserve Account) and shall be paid by Seller, as part of its Obligations to FSW.

5.5     Seller agrees to cooperate, at Seller's expense, with FSW in making a good faith, commercially reasonable effort to assist FSW in collecting the Factored Accounts.

5.6     Seller releases FSW from any claim which Seller may now or hereafter have arising out of FSW's endorsement and deposit of any check issued by Seller's customer stating that the check is in full payment of a Factored Account, but issued for less than the full amount which may have been owed. Seller authorizes FSW to accept, endorse and deposit on behalf of Seller, any check tendered by customer "in full payment" of its obligation to Seller. Seller shall not assert against FSW any claim arising therefrom, irrespective of whether that action by FSW is an accord and satisfaction of Seller's claim under the Uniform Commercial Code or otherwise.

5.7     Seller shall notify FSW immediately in the event of a Customer Dispute, or in the event that any goods represented by any Factored Account are returned to Seller for any reason. Seller shall, subject to FSW's prior approval, promptly adjust and settle the same at its expense and advise FSW of any such adjustment. Seller shall, on demand, pay over to FSW the amount of any such adjustment or repurchase said Factored Account, or in the alternative, FSW may offset against any such sums as may be due to Seller the amount of that adjustment or the full unpaid balance thereon. In either event, Seller shall also pay any and all expenses and attorneys' fees and disbursements that FSW may have incurred. Until said Factored Account is repurchased by Seller, it is understood and agreed that all returned or rejected goods shall be and remain the property of FSW. FSW shall have the privilege of disposing of any returned or rejected goods at a price and upon terms reasonably available to FSW under the circumstances, in the sole opinion of FSW, and in accordance with Law.

## 6.     Conditions to all Purchases.

6.1     Any purchase of proposed Accounts by FSW, including the initial purchase, is subject to the following conditions:

6.1.1     No Event of Default or Incipient Default shall have occurred and be continuing; and

6.1.2     The Seller shall have delivered to FSW on or prior to each date of purchase, in form and substance satisfactory to FSW, complete information with respect to each proposed Account submitted together with additional information as may reasonably be requested by FSW; and

6.1.3     There shall be no material adverse change in the financial position or business prospects of the Seller or its customers, as compared to that existing on the date hereof.

6.1.4     This Agreement has been approved by an order of the Bankruptcy Court entered in accordance with the provisions of Section 7.17 and Section 7.18 of the Loan Agreement.

6.1.5     All conditions set forth in Article 7 of the Loan Agreement have been satisfied.

## 7.     Warranties, Representations and Covenants.

As an inducement for FSW to enter into this Agreement and to purchase Accounts from Seller from time to time, and with full knowledge that the truth and accuracy of these warranties, representations and covenants are being relied upon by FSW, regardless of any credit investigation, diligence or knowledge of FSW, Seller warrants, represents and covenants as follows, which warranties, representations and covenants shall be deemed to be made at the time each Account is purchased by FSW:

7.1     Seller is an entity duly organized under the Laws of the State of its organization, and is and at all times hereinafter will be in good standing under the Laws of such state and is duly qualified and in good standing in every other state in which it is required to be registered or licensed.

7.2     The Seller has full power and authority to own or lease its properties and to conduct its business as presently conducted and, subject to the approval of the Bankruptcy Court in the Bankruptcy Proceeding, to execute, deliver and perform



this Agreement, any assignment and any other documents related thereto to which it is a party and to consummate the transactions contemplated hereby and thereby;

7.3     Subject to the approval of the Bankruptcy Court in the Bankruptcy Proceeding, the execution and delivery of this Agreement by the Seller and the consummation of the transactions contemplated hereby will not result in a breach of any of the terms and provisions of, or constitute a default under, or conflict with, any contract, the organization documents of the Seller, any judgment, decree, order or award of any court, governmental body or arbitrator or any federal, state, municipal, local or foreign Laws, statute, ordinance, rule or regulation applicable to the Seller.

7.4     This Agreement, each assignment and all other instruments and documentation being delivered hereunder has been duly and validly authorized, executed and delivered by the Seller and, subject to approval of the Bankruptcy Court in the Bankruptcy Proceeding, constitutes a valid and legally binding obligation of the Seller, enforceable against the Seller in accordance with its terms and any conditions imposed by order of the Bankruptcy Court;

7.5     Seller is presently doing business only under the company and Trade Names set forth in this Agreement or as otherwise disclosed to FSW in writing.

7.6     The place of business of Seller, or if Seller has more than one place of business, the location of its chief executive office, is at the location set forth in the preamble of this Agreement and will not be moved therefrom, without at least thirty (30) days' prior written notice to FSW.

7.7     All records of Seller pertaining to the Accounts shall be kept and stored at Seller's address set forth in the preamble of this Agreement and will not be moved therefrom, without at least thirty (30) days' prior written notice to FSW.

7.8     Upon termination of the Bankruptcy Proceeding, Seller will be solvent and able to pay its debts as they mature.

7.9     Seller is the true and lawful owner of the Accounts and the Collateral.

7.10     All financial statements, applications and information delivered to FSW or financial records or Seller's Books which may be shown to FSW at any time shall be true and correct in all material respects and kept in accordance with consistently applied accounting principals, and, except as otherwise disclosed to FSW, there has been no adverse change in the condition, financial or otherwise, of the business since the date thereof. All actions, suits, proceedings or investigations pending or, to the knowledge of the Seller, threatened or contemplated, before any court, administrative agency, arbitrator, governmental body or other tribunal (collectively the "**Claims**") are identified on Schedule 7.10. Except as specifically disclosed in Schedule 7.10, there are no Claims against Seller relating to: (i) the Accounts, (ii) Seller; or (iii) to Seller's knowledge, the Customers, any of which could have a material adverse affect on the transactions contemplated herein, the ability of the Seller to perform hereunder or FSW's ability to collect the Factored Accounts or realize upon the Collateral. If any of the foregoing arises, Seller shall immediately notify FSW in writing with respect thereto.

7.11     All of the Accounts and all Collateral are owned by Seller only and are free and clear of any and all liens, claims or security interests of any party and no financing statement covering the Accounts, the Collateral or the proceeds therefrom is or shall be on file at any public office, except as provided in Section 4.2 above.

7.12     Each Factored Account:

7.12.1     purchased by Seller hereunder shall be  owned by Seller free and clear of any security interest of any other party;

7.12.2     is genuine and in all respects what it purports to be and represents a bona fide sale in the ordinary course of Seller's business of the kind, quantity and quality of the goods or services described therein, and that the goods or services described therein have been completely delivered, installed or performed in accordance with any warranty, guaranty or service standards offered by Seller and in a commercially reasonable manner, and at the time of delivery or installation have been accepted by the Customer without condition;

7.12.3     is not owed by a Customer in which Seller or any manager, director, officer or equity owner of Seller has any legal or financial interest or represents services furnished or provided to or on behalf of any subsidiary, parent, person, associate or other entity affiliated with the Seller;

7.12.4     is not owed by a Customer who has commenced or has had a petition under the Bankruptcy Code commenced against it, and none of those proceedings are threatened;

7.12.5     is due and payable in thirty days or less or on other terms as are acceptable to FSW, in its sole discretion, which are expressly set forth on the face of the invoice;



7.12.6 is not subject to any credit, deduction, discount, allowance exceeding the Dilution Rate, or any Customer Dispute, and the goods represented by said Account have not been sold on consignment or with any return privilege whatsoever (excepting defective merchandise);

7.12.7 is not subject to any defense or setoff, counterclaim, recoupment, defense, abatement, suspension, deferment, deductible, reduction, dispute or termination which could be asserted by way of defense or counterclaim against Seller or FSW by the Customer, nor does any condition exist which would give rise thereto;

7.12.8 arose in a commercial transaction and is not for personal, family, household or agricultural purposes or in connection with the sale of residential real estate;

7.12.9 has been originated and the products sold and/or services rendered that underlie that Account were undertaken in full compliance with all legal duties of Seller and its agents.

7.13 Seller has not settled, compromised, released or adjusted any Factored Account and will not bring any suit or attempt to collect thereon, without FSW's prior consent.

7.14 Seller has notified FSW and will continue to notify FSW of the occurrence of any of the following: (i) a tax lien or warrant is issued/filed against any of Seller, Seller's principals or Seller's assets; (ii) any of Seller or its principals fails to pay any tax when due; or (iii) any of Seller or its principals) receives any notice of tax assessment, deficiency or levy.

7.15 Seller has no subsidiaries or other affiliates other than those disclosed in writing to FSW prior to the Effective Date, and no additional subsidiaries or other affiliates have been or will be created on or after the date of this Agreement without FSW's prior written consent, which consent may be withheld in FSW's absolute discretion or conditioned upon any such subsidiary or other affiliate entering into an agreement similar to this Agreement with FSW.

7.16 Seller has not and will not, without first satisfying in full all of Seller's Obligations to FSW, (1) merge or consolidate with or into another legal entity; (2) sell, lease, or otherwise substantially dispose of all or substantially all of its assets to another person or legal entity; or (3) purchase all or substantially all the stock or other equity interests in or assets of another person or legal entity.

7.17 Seller has and will continue to provide to FSW all such information about Seller's ownership, officers, directors and corporate structure as may be required by FSW.

7.18 Seller operates its business in material compliance with all applicable local, federal and state Laws.

7.19 The Seller has submitted all necessary documentation and supplied all necessary information for payment of each Factored Account to the Customer and has fulfilled all of its other obligations in respect thereof, including verification of the eligibility of the Factored Account for payment by such Customer.

7.20 Neither the Factored Account nor any related contract has been satisfied, subordinated or rescinded or, except as disclosed in writing to FSW, amended in any manner.

7.21 True and correct copies of all claims, invoices, agreements and other documents relating to the creation of each Factored Account have been delivered to FSW.

7.22 Subject to the approval of Bankruptcy Court, no action other than the execution and delivery of this Agreement and any assignment, the filing of financing statements on Form UCC-1 or such successor form as may from time to time be necessary or desirable, in the state in which the Seller has been formed or otherwise incorporated and the provision of consideration by FSW is required to perfect the interest of FSW, as the owner, assignee and transferee of the Factored Accounts with a first priority security interest therein, and to perfect FSW as secured party with a first priority lien and security interest in the other Collateral pledged to FSW, and all such actions have been or will be accomplished no later than the date of purchase of the Factored Accounts therefor. Subject to the approval of the Bankruptcy Court, the Seller has the right to sell, assign and transfer ownership of each Factored Account.

7.23 The Seller has and shall treat the sale and assignment of Factored Accounts as a true sale for all purposes, including, without limitation, tax and accounting, it being understood that it is the intention of both parties that the assignment of Factored Accounts pursuant to this Agreement and assignment be treated as a sale for all purposes. The Seller shall mark its books and records to show the Factored Accounts as sold to FSW.

7.24 The Seller has sold and will sell the Factored Accounts and the other Collateral to FSW without markup over the actual sales price and terms offered to the Customer, and Seller sold the goods or services underlying the Factored Accounts in good faith, for fair and reasonably equivalent value, and without intent to hinder, delay or defraud the Seller's present or future creditors.



7.25    Except as disclosed to FSW in writing, the Seller has no knowledge of any fact which should have led it to expect at the time of sale of such Factored Account to FSW that such Factored Account would not be paid in full, when due, in the normal course.

7.26    The proceeds of the sale of the Factored Accounts will be used exclusively for the business and commercial purposes of the Seller.

## 8.    Additional Covenants of Seller.

8.1    Seller shall keep proper and accurate books, correspondence, records and papers pertaining to all Accounts and the Collateral and make proper entries in its books reflecting the sale of the Factored Accounts to FSW. From time to time as requested by FSW, at the sole expense of Seller, FSW or its designee shall have access, during reasonable business hours, if prior to an Event of Default, and at any time on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's Books, and Seller shall permit FSW or its designee to make copies or extracts therefrom as FSW may request. Without expense to FSW, FSW may use any of Seller's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as FSW, in its sole discretion, deems appropriate. Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to FSW at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller, including information that may be confidential or proprietary,

8.2    Seller shall within five (5) Business Days of request by FSW furnish FSW information relating to the Accounts, the Collateral, Seller and its financial condition, or any other matter related to the transactions contemplated by this Agreement as FSW may request from time to time. Seller shall also deliver to FSW within ninety (90) days after the close of Seller's fiscal year its financial statements certified either by an independent CPA or, at FSW's option, an authorized representative of Seller, and any other financial reports or statements prepared by or for Seller, within twenty days after preparation or receipt, as applicable.

8.3    Seller shall conduct its business in a lawful matter and in compliance with all applicable Laws, and shall pay when due all lawfully imposed taxes, liens and assessments upon its property, business and income.

8.4    Seller agrees, during the term of this Agreement, not to assign or grant a security interest in any of its Accounts to any other party and will not grant a security interest in any of the Collateral to any other party, excepting purchase money security interests in equipment, which Seller shall discharge in full before the due date of those obligations. Seller shall not create, permit or suffer to exist any lien, claim or right in, to or on the Factored Accounts other than the interest of FSW. Seller shall take actions as are necessary to remove, and will defend the right, title and interest of FSW in and to the Factored Accounts against the claims and demands of all persons whomsoever, other than those created hereby.

8.5    Seller agrees to make timely payments or deposits of all taxes when due (including OASDI, Medicare Tax, withholding tax payments and other mandatory withholdings), not permit any tax delinquency and furnish to FSW on demand evidence of that payment or deposit of all taxes have been made.

8.6    Seller agrees not in any manner whatsoever to take any action or to refrain from taking any action, which in either case may interfere with or hinder the collection of the Factored Accounts or interfere with any of FSW's rights under this Agreement.

8.7    Seller shall, at all times, at Seller's expense, insure all of the insurable Collateral, and all of Seller's books and records, by financially sound and reputable insurers acceptable to FSW, in the form of extended coverage policies against loss or damage by theft, embezzlement, fire, explosion, flood, sprinkler, or any other insurable event or risk that FSW may require, to the fullest extent of the insurable value thereof. All insurance policies shall name FSW as the exclusive loss payee, shall provide that proceeds payable thereunder shall be payable directly to FSW unless written authority to the contrary is obtained from FSW, and shall also provide that no act or default of Seller or any other person shall affect the right of FSW to recover thereunder. Upon receipt of the proceeds of insurance, FSW shall apply the proceeds in reduction of the Obligations, whether or not then due, in the order and manner as FSW shall determine, in its sole discretion. Seller shall provide FSW with the original or a certificate of each policy of insurance which shall contain a provision requiring the insurer to give not less than thirty (30) days' advance written notice to FSW in the event of cancellation or termination of the policy for any reason whatsoever. If Seller fails to provide or pay for any insurance required pursuant to this Section 8.7, FSW is authorized (but not obligated) to procure the same at Seller's expense. Seller agrees to deliver to FSW, promptly as rendered, true and correct copies of all reports made to all insurance companies.

8.8    Seller will, when requested by FSW, execute any document or instrument or do any other thing necessary to effectuate more fully the purposes and provisions of this Agreement.

8.9    Notwithstanding any provision contained herein, including, but not limited to, Section 4.2 above, Seller shall not hereafter, without FSW's prior written consent: merge, consolidate, dissolve, acquire any other entity; enter into any



transaction not in the usual course of business; make any investment in any securities other than securities of the United States of America; guarantee or otherwise become in any way liable with respect to the obligations of another party or entity; pay or make any distributions upon Seller's equity interests; redeem, retire, purchase or otherwise acquire, directly or indirectly, any of Seller's equity interest; make any change to Seller's name, identity, corporate or capital structure; alter any of Seller's business objectives, purposes, or operations or financial structure in a manner as to adversely affect the ability of Seller to pay or perform any of the Obligations; lend or distribute any of Seller's property or assets; incur any debts, outside of the ordinary course of Seller's business, except extensions of existing debts and interest thereon; sell, lease, transfer, assign or otherwise dispose of any of the Collateral; or make any capital expenditures or leasehold improvements at a cost in the aggregate in any twelve-month period of more than $75,000.

8.10    Seller shall immediately give notice to FSW (and in no event later than one (1) Business Day following actual knowledge thereof), in reasonable detail, (i) of any security interest, lien, set- off, recoupment, defense, claim or dispute asserted or made against any of the Factored Accounts, the Seller or the Collateral, (ii) any litigation or administrative claim commenced or threatened against Seller, the Collateral or the Factored Accounts; (iii) of the occurrence of any breach by the Seller of any of its representations, warranties and covenants contained herein; (iv) the occurrence of any Event of Default by Seller hereunder, and (v) of the occurrence of any other event which could in either case, with the giving of notice or the passage of time, or both, have an adverse effect on the aggregate value or collectability of the Factored Accounts.

8.11    Seller shall not offer proposed Accounts to FSW for purchase while there is pending an uncured Event of Default or Incipient Default by Seller hereunder without the express prior written consent of FSW after notification of the Event of Default or Incipient Default.

8.12    Upon request of FSW, the chief financial officer (or equivalent thereof of the Seller shall deliver a certificate to FSW stating as of such date, (i) that all representations and warranties herein are true and correct; (ii) that the conditions set forth herein have been fulfilled; (iii) that no Event of Default or Incipient Default exists and is continuing; and (iv) such other statements and information as has been reasonably requested by FSW.

8.13    Seller will not, without the prior written consent of FSW, (a) grant any extension of time for payment of any of the Factored Accounts; (b) compromise or settle any of the Factored Accounts for less than the full value thereof; (c) release in whole or in part any Customer under a Factored Account, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Factored Accounts. Notwithstanding the foregoing, so long as no Event of Default or Incipient Default exists, Seller may grant credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the Factored Accounts in the ordinary course of business, provided that any discount offered by Seller, as agent of FSW, shall not exceed the Dilution Rate and that Seller be liable to FSW for any such discounts.

## 9.    Indemnity.

Seller does hereby indemnify, defend and agree to hold FSW, its affiliates, and their respective managers, directors, officers, employees, attorneys, representatives and agents (collectively, the "**FSW Parties**") harmless from any and all claims, demands, liabilities, loss, damage or expenses, including reasonable attorneys' fees which any of the FSW Parties may at any time sustain, suffer or incur by reason of any action which may be brought against any FSW Party by Seller, any of Seller's Customers or any third party. This indemnity is in addition to all other indemnities set forth in this Agreement and any other agreement between Seller and any FSW Party. All the indemnities shall survive the termination of this Agreement and shall not be deemed to be released by the general release referred to in Section 13.10 of this Agreement.

FSW shall have no liability for any indirect, special, incidental or consequential loss or damage whether caused by tort (including negligence), breach of contract or otherwise, which may arise in respect of this Agreement, FSW's obligations hereunder, or the Online Reporting Service, including equipment or property used in connection with the Online Reporting Service, or for loss of profit, business, revenue, goodwill or anticipated savings, even if FSW was informed of or had reason to know of such losses or damages.

## 10.    Default/Remedies.

10.1    Event of Default. Any one or more of the following shall be an "Event of Default" hereunder:

10.1.1    Any warranty or representation made herein proves to be false in  any respect.

10.1.2    Seller breaches any covenant, term or provision contained in this Agreement or under any other agreement or contract between Seller and FSW.

10.1.3    The occurrence or continuation of events of default under Seller's duties and obligations under the



Bankruptcy Proceeding, or if Seller fails to abide by the duties and obligations imposed on debtor's in possession as provided in the Bankruptcy Code

      10.1.4   The Bankruptcy Proceeding is converted to a Chapter 7 or other liquidation, or any involuntary petition in bankruptcy shall be filed against Seller and not dismissed within sixty days.

      10.1.5   Any levy of attachment, execution, tax lien or similar process shall be issued against Seller or the Collateral and shall not be released within five days thereof.

      10.1.6   Seller ceases or suspends normal business operations.

      10.1.7   A material portion of the Collateral is damaged or destroyed, or cannot be located within five days after FSW makes demand upon Seller to inspect the same.

      10.1.8   The chief executive officer (by whatever title known) of Seller dies, becomes incompetent or is no longer associated with Seller.

      10.1.9   Failure on the part of the Seller to promptly remit any sums payable by it hereunder when due.

      10.1.10 Failure on the part of the Seller to deliver any information and/or notices required pursuant to this Agreement.

      10.1.11 Seller changes its name or principal place of business (or residence of Seller if Seller is an individual), without the prior written consent of, and thirty (30) days' notice to, FSW.

      10.1.12 The occurrence of an event of default under any Guaranty or other agreement between Seller and any FSW Party.

      10.1.13 There is a change in the ownership or control of the Seller, without the prior written consent of FSW.

Upon an Event of Default, FSW shall give Seller written notice ("Written Notice") to Seller, Seller's bankruptcy counsel in the Bankruptcy Proceeding, the United States Trustee, and counsel for any Official Committee appointed in the Bankruptcy Proceeding. Any party shall have (5) calendar days from receipt of Written Notice in which to cure the Event of Default or file a controverting affidavit with respect to the Event of Default. If the Event of Default is not cured within such five (5) day period, FSW may file an emergency motion in the Bankruptcy Proceeding seeking relief from the automatic stay of 11 U.S.C. § 362 to commence and exercise its available rights and remedies. Seller hereby consents to the Bankruptcy Court setting an emergency hearing on the emergency motion as soon as the court's calendar will permit and agrees that it will have one (1) business day following the filing of any emergency motion to file an objection or other response.

      10.2    Rights and Remedies. Upon an Event of Default, FSW may, at its election, take any or all of the following actions, to be exercised concurrently or successively:

      10.2.1   Cease purchasing Accounts from Seller or making any remittances to Seller from the Reserve Account until all Obligations of Seller to FSW have been fully paid and satisfied.

      10.2.2   Require Seller to repurchase, on demand, all Factored Accounts, and pay to FSW all Obligations of Seller.

      ~~10.2.3   Setoff any and all Obligations of Seller to FSW~~ against any and all funds that may come into the possession of FSW which would otherwise be paid to Seller. Notwithstanding anything in this Agreement to the contrary, Seller may not setoff, deduct or otherwise reduce its obligations owed to FSW by any amounts owed (or claimed to be owed) by FSW to Seller.

      10.2.4   Notify the post office authorities to change the address for delivery of mail addressed to Seller to an address as FSW may designate. FSW shall have the right to open and dispose of all mail in a manner as FSW may deem appropriate, retaining all mail pertaining to the Factored Accounts, the Accounts and the Collateral, making available to Seller all other mail, without any duty to forward it.



10.2.5   Notify all Account Debtor of the security interest of FSW and proceed to collect those Accounts, having all rights as are granted to FSW pursuant to Section 5 of this Agreement with respect to the Factored Accounts and Section 9-607 of the Uniform Commercial Code.

10.2.6   Take or bring, in the name of FSW or Seller, all steps, actions, suits proceedings deemed by FSW necessary or desirable to effect collection of or other realization upon the Accounts and other Collateral.

10.2.7   Enter, with or without process of Law and without the necessity of posting a bond, upon any premises where the Collateral is or is believed to be located and take possession of said premises, the Collateral and Seller's Books.

10.2.8   Require Seller to assemble the Collateral and Seller's Books and make them available to FSW at a place designated by FSW, at Seller's expense, or, at FSW's election, deliver the same to FSW at a place which is reasonably convenient to the parties.

10.2.9   Pay any sums necessary to discharge any lien or encumbrance which is senior to FSW's security interest in the Collateral, which sums shall be part of FSW's Costs.

10.2.10  Sell the Collateral in its then condition, or after further manufacturing, processing or preparing the same, at either public or private sale or both for cash or on terms, in a manner and at a place (including Seller's premises) as is commercially reasonable in the sole discretion of FSW, after at least five days notice is given to Seller prior to said public sale or the time when a private sale will take place. FSW shall have the right to purchase all or any portion of the Collateral at any public sale. All proceeds from said sale after payment of all costs and expenses incurred therein shall be applied to any and all Obligations of Seller to FSW returning any excess to Seller who shall remain liable to FSW for any deficiency.

10.3   <u>Ongoing Rights</u>. At all times, FSW shall have the right to exercise any and all rights of a secured party under the Uniform Commercial Code and/or any other applicable Law. No exercise by FSW of any right or remedy shall be deemed an election thereof, except to the extent required by Law.

10.4   <u>Default Rate</u>. Any amounts owed by Seller to FSW that are not paid to FSW when due shall bear interest at the lesser of the Daily Balance Default Rate or the highest rate permitted by Law, until the amount is paid in full. The assessment of interest shall not relieve Seller from its obligations to pay the amounts owed or to excuse or waive Seller's default.

10.5.   <u>No Assignment</u>. Seller acknowledges that this Agreement is in the nature of a financial accommodation to or for the benefit of Seller within the meaning of Section 365(c)(2) of the Bankruptcy Code, and as such may not be assumed or assigned.

## 11.   **Online User Standards.**

11.1   FSW may post of Seller's account activity on FSW's website, which shall constitute Seller's Online Statement of Account. No hard copies of any activities which constitute Seller's Online Statement of Account will be sent to Seller by FSW. Provided there is no Event of Default, FSW shall provide Seller with reasonably continuous access to view the Online Statement of Account, subject to periodic or occasional maintenance. FSW shall have no liability for outages or other situations beyond Seller's control. Seller shall be solely responsible for checking its Online Statement of Account. If Seller disputes any entry on the Online Statement of Account it shall, within thirty (30) days after the first posting of the event, send to FSW a written detailed explanation of such dispute. Unless FSW receives a timely written dispute to the activity posted to the Online Statement of Account within thirty (30) days after it is first posted, the Online Statement of Account shall become an account stated and be deemed accepted by Seller and shall be conclusive and binding upon the Seller.

11.2   <u>Online Conducting of Business</u>. FSW and Seller intend to conduct business contemplated by this Agreement through the internet and through FSW's Online Reporting Service. FSW is the sole and exclusive owner of the Online Reporting Service. Seller hereby accepts a non-exclusive, non- transferable, terminable right to access the Online Reporting Service, upon the terms and subject to the conditions contained herein.

11.3   <u>Standards Regarding Conducting Business Online</u>. Seller and FSW agree as follows:

11.3.1   FSW shall have the right to terminate or limit Seller's access to the Online Reporting Service upon the occurrence of an Event of Default or at any other time within FSW's discretion.

11.3.2   Seller shall not: (i) copy the Online Reporting Service nor otherwise reproduce the same other than for normal system operation backup; (ii) translate, adapt, vary, or modify the Online Reporting Service; or (iii) disassemble,



decompile or reverse engineer the Online Reporting Service.

11.3.3 FSW shall not be liable to Seller for any loss or damage whatsoever or howsoever caused, whether caused by tort (including negligence), breach of contract, or otherwise arising directly or indirectly in connection with the use of the Online Reporting Service, including for any inability of Seller to obtain access to the on-line system or for unauthorized access to that system by others. Seller hereby waives any legal rights it has with respect to data privacy to the fullest extent permitted by Law.

11.3.4 Seller acknowledges that any and all of the copyright, trademarks, trade names, patents and other intellectual property rights subsisting in or used in connection with the Online Reporting Service, including all documentation and manuals relating thereto, are, and shall remain, the sole property of the FSW. Seller shall not, during or at any time after the expiry or termination of its use of the Online Reporting Service, in any way question or dispute the ownership by FSW thereof.

11.3.5 To the extent permitted by applicable Law, FSW excludes all warranties with respect to the Online Reporting Service, either express or implied, including, but not limited to, any implied warranties of merchantability, satisfactory quality or fitness for any particular purpose.

11.3.6 Seller is solely responsible for virus scanning the Online Reporting Service, and FSW makes no representations or warranties regarding any virus associated with the Online Reporting Services.

11.3.7 All information, data, drawings, specifications, documentation, software listings, source or object code which FSW may have imparted and may from time to time impart to the Seller relating to the Online Reporting Service is proprietary and confidential. Seller hereby agrees that it shall use the same solely in accordance with the provisions of this Agreement and that it shall not, at any time during or after expiry or termination of this Agreement, disclose the same, whether directly or indirectly, to any third party or use it in connection with any purpose other than the transactions contemplated herein.

11.3.8 Seller shall be responsible for restricting access to passwords and systems relating to the Online Reporting Service and shall only provide passwords and access to the Online Reporting System to those individuals on an as needed basis. Upon learning of any breach of security or suspected breach of security to the Online Reporting System, Seller shall report the incident immediately to FSW. Seller agrees to implement and follow authentication procedures and protocols requested by FSW. Seller shall be solely responsible for safeguarding the confidentiality of its authentication codes and passwords, and Seller assumes all responsibility for any transactions undertaken in Seller's name through the use of those authentication codes, passwords or using Seller's electronic signature. FSW shall have no duty to verify or authenticate that the person(s) using Seller's systems are authorized to act on behalf of Seller.

11.4 Online Access. Upon an Event of Default, all of Seller's rights and access to any online internet services that FSW makes available to Seller shall be provisional pending Seller's curing of all such Events of Default and FSW may elect to terminate Seller's online access as provided for herein. During that period of time, FSW may limit or terminate Seller's access to online services. Seller acknowledges that the information FSW makes available to Seller through online internet access, both before and after an Event of Default, constitutes and satisfies any duty to respond to a request for accounting or request regarding a statement of account that is referenced in the UCC, including § 9-210.

12. **Term of this Agreement, Minimum Monthly Factoring Fee.** This Agreement shall be in effect for the Original Term and shall automatically renew for consecutive like periods (each a "Renewal Term") unless terminated by either party giving the other written notice not less than thirty (30) days prior to the end of the Original Term or any Renewal Term, which written notice shall clearly state its intention to terminate at the end of the current term. FSW may terminate this Agreement at any time after an Event of Default. No termination of this Agreement shall affect the liabilities and obligations of Seller or the rights, powers and remedies of FSW under this Agreement, or the security interest granted to FSW hereunder until all Obligations have been fully paid and satisfied. Any termination of this Agreement or notice of termination by Seller, and notwithstanding payment in full of all Obligations by Seller, is conditioned on Seller's execution and delivery to FSW of a general release in a form satisfactory to Purchaser as set forth in Section 13.9

## 13. **Miscellaneous.**

13.1 Bank Lockbox. Unless alternate written arrangements are made acceptable to FSW, in its sole discretion, Seller shall cause all remittances by Client and any obligors on the Factored Accounts to be remitted to a bank lockbox established by FSW, subject to terms and conditions as are deemed appropriate by FSW and the financial institution, which shall remain in effect so long as any Obligations remain unpaid to FSW. FSW is also hereby authorized by Seller to initiate



electronic debit or credit entries through the ACH system to any deposit account maintained by Seller wherever located. Seller shall execute all forms, agreements or authorizations required in connection with these authorizations, which agreement and authorizations are coupled with an interest and are irrevocable.

13.2    _Disposal of Papers._ Seller authorizes FSW, in its sole discretion, to dispose of any documents, schedules, invoices or other papers delivered to FSW at any time six (6) months after they are delivered to FSW, unless Seller requests, in writing, the return of the same, which shall be made at Seller's expense.

13.3    _Waiver._ No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which FSW may have, nor shall any such delay be construed to be a waiver of any of its rights, powers, or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver by FSW of any breach or default by Seller hereunder be deemed a waiver of any default or breach subsequently occurring. FSW shall not be deemed to have waived any of its rights or remedies hereunder unless that waiver is in writing and signed by FSW. Failure or delay by FSW in exercising or enforcing any right, power, privilege, lien, option or remedy hereunder shall not operate as a waiver thereof and a waiver by FSW of any default by Seller under this Agreement shall not be construed of any subsequent or other default or effect or impair any right or power resulting therefrom.

13.4    _Notices._ All written notices which are to be given under this Agreement by either party shall be delivered, sent electronically or mailed postage prepaid to the address stated in the preamble hereto or to any other address as may be designated in writing. All notices required to be given to Seller shall be deemed given upon the first to occur of (i) upon deposit thereof in a receptacle under the control of the United States Postal Service, (ii) transmittal by electronic means to a receiver under the control of Seller with an acknowledgement of receipt; (iii) the following day after delivery to a reputable national overnight delivery courier, or (iv) actual receipt by Seller or an employee or agent of Seller. All notices to FSW hereunder shall be deemed given upon actual receipt by a responsible officer of FSW.

13.5    _Entire Agreement; Amendment._ This Agreement, together with the recitals hereto and the Addendums referenced herein, constitutes the full and complete Agreement of the parties hereto and shall supersede in its entirety any prior agreement or understanding between the parties, whether written or oral. Seller specifically acknowledges and agrees that FSW has not made and shall not at any time be deemed to have made and hereby disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future of by FSW except as specifically set forth herein. This Agreement shall not be modified or amended in any respect, except by an agreement in writing signed by both of the parties.

13.6    _Severability._ If any provision of this Agreement is determined to be legally invalid or unenforceable, the validity or enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby.

13.7    _Attorneys' Fees._ Seller shall reimburse FSW for all attorneys' fees and disbursements incurred in preparing this Agreement or any modifications thereto, in administering this Agreement or the transactions, obtaining or enforcing any right or remedy arising out of this Agreement, realizing upon any of the Collateral or incurred in any litigation, dispute, suit or proceeding, whether commenced by FSW or by way of defense or intervention in any such action or proceeding, which attorneys' fees and all court costs shall be deemed to constitute a part of FSW's Costs.

13.8    _Effectiveness._ This Agreement shall become effective only when and if it is executed by an authorized officer of FSW.

13.9    _General Release._ In recognition of the FSW's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by Collateral, and notwithstanding payment in full of all Obligations by Seller, FSW shall not be required to record any terminations or satisfactions of any of FSW's liens on the Collateral unless and until Seller has executed and delivered to FSW a general release in a form suitable to FSW, for no additional consideration. Seller understands that this provision constitutes a waiver of its rights under § 9-513 of the Uniform Commercial Code.

13.10    _True Sale._ It is the expressed intention of the parties that the transactions contemplated by this Agreement with respect to the Factored Accounts involve a true purchase of Accounts with transfer of title thereto, and shall not be deemed to be a loan. Notwithstanding this express intention, should a court of competent jurisdiction determine that the transactions contemplated herein shall be construed to be a loan by FSW to Seller and that all deductions, rebate charges, FSW's costs and any other charges hereunder are to be treated as interest on funds advanced, then Seller shall be deemed to have agreed to pay that rate of interest as is determined resulting from all charges paid or to be paid by Seller arising out of this Agreement.

13.11    _Binding Agreement._ This Agreement shall inure to and be binding upon the parties hereto, their personal representatives, successors and assigns; _provided, however,_ that Seller shall not have the right to assign this Agreement or any rights hereunder without FSW's prior written consent and any assignment made without that consent shall be void and of no effect whatsoever. FSW shall have the right at any time to assign or grant a security interest or participation interest in this Agreement to any party, without obtaining the consent of Seller.



13.12    Interpretation. No portion of this Agreement shall be interpreted against the party that drafted it as each party has been represented by or had the opportunity to be represented by counsel. Unless otherwise given a defined meaning in this Agreement, terms defined in the Uniform Commercial Code shall have the meanings given those terms in that code in the applicable jurisdiction. The term "including" shall mean "including without limitation," regardless of whether so stated. The use of the singular shall include the plural and vice versa, and the use of any gender shall apply to any other gender, as the context shall require.

13.13    Counterparts. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile or electronic mail shall be effective as delivery of a manually executed counterpart of this Agreement.

13.14    Electronic Signatures. The parties intend to conduct business contemplated by this Agreement by electronic means. Each document, which is the subject of this Agreement, that a party has affixed a typed or electronic signature or other authentication and then transmitted electronically to the other shall be intended as and constitute an original and deemed to contain a valid signature of the party for all purposes. In furtherance of the above, Seller hereby authorizes FSW to regard the Seller's printed name or reasonable approximation thereof, electronic approval or other confirmation process authorized by FSW to be by or on behalf of Seller for any document, agreement, assignment schedule or invoice as the equivalent of a manual signature by one of the Seller's authorized officers or agents. The parties agree that in any legal proceedings between them respecting or in any way relating to this Agreement or any transactions hereunder, each waives the right to raise any defense based on its execution hereof in counterparts or the delivery of executed counterparts by electronic signature and delivery. The parties waive, to the fullest extent permitted by Law, any provisions of applicable Law to the contrary.

13.15    Reporting. Seller's failure to promptly deliver to FSW any schedule, report, statement or other information required by this Agreement or any document related thereto shall not affect, diminish, modify or otherwise limit FSW's security interests in the Collateral or rights and remedies under this Agreement. FSW may rely upon, and assume the authenticity of, any approval and material applicable to that approval as the duly confirmed, authorized and approved signature of Seller by the person approving the same which constitute an Authenticated Record for all purposes including under the UCC and shall satisfy the requirements of any applicable statute of frauds.

13.16    Credit Reports. Seller authorizes FSW to obtain credit reports for Seller, any other Seller Party and all guarantors at any time, in FSW's sole discretion.

13.17    Joint and Several Liability. The liability of each Seller and any and each guarantor shall be joint and several and the compromise of any claim with, or the release of, any Seller shall not constitute a compromise with, or a release of, any other Seller or guarantor.

13.18    Governing Law. This Agreement shall be deemed to have been made, executed and is to be performed in the County of Maricopa, State of Arizona and all rights and obligations of the parties shall be governed, construed and enforced according to the Laws of the State of Arizona.

13.19    Jurisdiction. Seller does hereby agree to submit to the jurisdiction of the Bankruptcy Court with respect to any actions or proceedings arising out of or related to the Bankruptcy Proceeding. Subject to the arbitration provisions set forth in Section 13.21 hereof, all actions or proceedings relating directly or indirectly hereto to protect FSW's interest in the Collateral or otherwise shall, at the option of FSW, be litigated in exclusively in any federal or state court in Maricopa County, State of Arizona. Seller hereby consents to the exclusive jurisdiction and venue of the federal and state courts located in Maricopa County, Arizona and consents to service of process in any such action or proceeding by personal delivery or any other method permitted by law; and waives any and all rights Seller may have to object to the jurisdiction of any such court, or to transfer or change the venue of any such action or proceeding.

13.20    **Waiver of Jury Trial. Subject to the arbitration provisions set forth in Section 13.21 in the event an action or proceeding should take place in a federal or state court, in recognition of the higher cost and delay which may result from a jury trial, the parties hereto do hereby waive any right to a jury trial of any action arising hereunder, or in any way connected with or incidental to the dealings of the parties. Any party hereto may file an original counterpart or a copy of this section with any court as written evidence of the consent of the parties hereto to the waiver of their right to a jury trial.** The parties agree that service of process may be made upon a party by United States Mail, certified mail, return receipt requested, postage prepaid, sent to the party at its last known address of record.

13.21    Arbitration. Except for the Bankruptcy Proceeding, or as otherwise provided for in Section 13.19 herein, the parties (and their respective employees, officers, directors, attorneys, and other agents) agree to submit to binding arbitration all claims, disputes and controversies between or among them, whether in tort, contract or otherwise, arising out of or relating to in any way this Agreement or any other agreement, instrument, certificate or document entered into between the parties, or any dispute, claim or controversy between them related to any of the transactions contemplated by this Agreement. Any arbitration proceeding will (i) proceed in Maricopa, County, Arizona; (ii) be governed by the Federal



Arbitration Act (Title 9 of the United States Code); and (iii) be conducted in accordance with the Commercial Arbitration rules of the America Arbitration Association ("**AAA**"), as modified by these provisions.

Notwithstanding the foregoing, however, the arbitration requirement does not limit the right of FSW to (i) foreclose against any Collateral; (ii) exercise self-help remedies relating to Collateral or proceeds of Collateral permitted to FSW, such as setoff or repossession; or (iii) obtain provisional ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before, during or after the pendency or any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of either party to submit any dispute to arbitration, including those arising from the exercise of the actions detailed in this paragraph.

Any arbitration proceeding will be before a single arbitrator selected according to the Commercial Arbitration Rules of the AAA. The arbitrator will be a neutral attorney who has practiced in the area of commercial law for a minimum of ten (10) years. The arbitrator will determine whether or not an issue is arbitrable and will give effect to the statutes of limitation in determining any claim. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.

In any arbitration proceeding, the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication.

In any arbitration proceeding discovery will be permitted at the arbitrator's discretion and will be governed by the Arizona Rules of Civil Procedure unless otherwise ordered by the arbitrator. The arbitrator shall award costs and expenses of the arbitration proceeding in accordance with the provisions of this Agreement.

13.22 **Seller, by executing this Agreement, warrants and represents that Seller has fully read this Agreement, has had the opportunity to be represented by counsel and to ask and receive answers to any questions Seller may have concerning this Agreement, and that Seller fully understands all of the terms and provisions hereof, and that said Agreement, although drafted by FSW, shall not be interpreted or construed against FSW.**

[Remainder of page left blank.]



IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year stated above.

**SELLER: GPMI, Co.**

By: _____

Name: <u>Yarron Bendor</u>

Title:    <u>CEO</u>

STATE OF <u>Arizona</u> )

County of <u>Maricopa</u> ) ss.

On this, the 12th day of January , 2022, before me personally appeared *Yarron Bendor* [and_____, each] known to me to be the person[s] whose name is [names are] subscribed to the within instrument and acknowledged that the person[s] executed the same for the purposes therein contained.

**IN WITNESS WHEREOF,** I hereunto set my hand and official seal.

*Shelley R Bankert*
Notary Public
My Commission Expires:

SHELLEY R BANKERT
Notary Public, State of Arizona
Maricopa County
Commission # 556044
My Commission Expires
August 19, 2022

**FSW:   FACTORS SOUTHWEST, L.L.C.**

By: _____
    Robyn Barrett
    Managing Member

Date of Acceptance:_____(the "**Effective Date**")


## ADDENDUM A TO FACTORING AND SECURITY AGREEMENT

THIS ADDENDUM A to Factoring and Security Agreement ("**Addendum A**") shall constitute an addendum to the Factoring and Security Agreement entered into between Factors Southwest, L.L.C. and GPMI, Co. dated [DATE] (the "**Agreement**"). This Addendum A shall be effective as of [DATE] (the "**Addendum A Effective Date**").

The terms used in the Agreement, including any Addendums attached thereto, shall have the following meaning and all capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code in effect in Arizona (the "**UCC**"):

1. "**Accounts**" shall have the meaning ascribed to such term in the UCC, whether or not evidenced by an instrument or chattel paper, and all substitutions, replacements and additions to the foregoing, all proceeds related to the foregoing.

2. "**Account Debtor**" shall have the meaning ascribed to such term in the UCC.

3. "**Additional Factoring Fee**" shall mean the Net Face Amount of a Factored Account multiplied by the Additional Factoring Fee Percentage for each Additional Factoring Fee Period or portion thereof, that any portion thereof remains unpaid, computed from the date on which the Initial Factoring Fee Period expires to and including the date that the Account is paid or the Late Payment Date, whichever first occurs.

4. "**Additional Factoring Fee Percentage**" shall be 0.65%

5. "**Additional Factoring Fee Period**" shall be fifteen (15) days

6. "**Advance Percentage**" shall mean an amount up to Eighty Five Percent (85%)

7. "**Agreement**" shall mean the Factoring and Security Agreement entered into between the parties, this Addendum A, the Debtor in Possession Addendum B and any subsequent addendum or rider thereto, and all amendments or modification which may be executed between the parties from time to time.

8. "**Base Rate**" shall mean the highest prime rate publicly announced from time to time by The Wall Street Journal as the prime rate or base rate or equivalent rate, or if The Wall Street Journal ceases to publish the prime rate, another published prime rate as chosen by FSW, in its sole discretion.

9. "**Business Day**" shall mean any day except a Saturday, a Sunday, or any other day on which U.S. national banks or banks in Phoenix, Arizona are required or authorized to close.

10. "**Collateral Management Fee**" shall be waived

11. "**Collateral**" shall mean all assets of Seller now owned or hereafter created or acquired, including but not limited to Accounts, contract rights, inventory (including raw materials, work in process and finished goods and all packing and shipping materials related thereto), instruments, documents, chattel paper, equipment, and general intangibles (including patents, copyrights, trademarks, trade names and trade secrets of Seller, tax refunds, deposits and credit balances held by FSW for the account of Seller), all proceeds thereof of each of the foregoing, including proceeds of insurance covering the foregoing and all of Seller's Books relating to the foregoing. The inclusion of Accounts in the foregoing definition shall not be construed to detract from the nature of the sale of the Accounts by Seller as a true sale with recourse and not a financing transaction, but those accounts are included as a precautionary matter as noted in the Agreement.

12. "Guaranty" shall mean the Validity Guaranty executed by Seller in favor of FSW concurrently with the Agreement.

13. "**Guaranty Party**" shall mean the party or parties executing the Guaranty.

14. "**Customer**" shall mean Seller's customer or the Account Debtor who is obligated on an Account.

![FSW FUNDING logo]

15.   **"Customer Dispute"** shall mean an asserted claim, defense, dispute or offset by the Customer of any kind whatsoever, either arising out of the Factored Account or against Seller, whether valid or invalid, arising either before and/or after the Account has been purchased by FSW, or any reason a Customer refuses payment.

16.   **"Daily Balance"** shall mean the outstanding balance of all monies remitted, paid or otherwise advanced by FSW to Seller in accordance with the Agreement (less all amounts credited to Seller), plus all factoring fees, charges, and expenses charged to Seller in accordance with the Agreement.

17.   **"Daily Balance Default Rate"** shall mean the Base Rate plus 30%.

18.   **"Effective Date"** shall mean the date FSW shall accept the Agreement, unless a different effective date is specified in writing by the parties to that Agreement.

19.   **"Event of Default"** shall have the meaning as set forth in Section 10.1 of the Agreement.

20.   **"Factored Accounts"** shall mean Accounts purchased hereunder which have not been repurchased.

21.   **"Initial Factoring Fee"** shall mean the Net Face Amount of a Factored Account multiplied by the Initial Factoring Fee Percentage at the time of purchase by FSW, for the Initial Factoring Fee Period or portion thereof.

22.   **"Initial Factoring Fee Percentage"** shall be 0.65%

23.   **"Initial Factoring Fee Period"** shall be fifteen (15) days

24.   **"Daily Balance Rate"** shall be waived

25.   **"Daily Balance Fee"** shall be waived

26.   **"FSW's Costs"** shall mean and include all applicable bank charges, filing, recording, publication and search fees which are paid or incurred by FSW; all costs and expenses incurred by FSW in enforcing its rights and remedies under this Agreement or defending this Agreement or its interest in the Factored Accounts or its security interest in the Collateral; fees and costs of FSW's attorneys incurred in connection with drafting and negotiation of this Agreement and in connection with Seller's bankruptcy proceeding; photocopying and long distance telephone charges, facsimile and delivery charges, expenses of field examinations of Seller's Books; costs and expenses incurred in gaining possession of, maintaining, handling, preserving, storing, repairing, shipping, selling, preparing for sale and advertising to sell the Collateral whether or not a sale is consummated; expenses involved or incurred in collecting the Accounts; all sums advanced by FSW to reasonably protect and preserve its interest in the Factored Accounts and the Collateral; and all attorneys' fees and expenses of FSW incurred in connection with the foregoing; which sums so advanced shall become due and payable from Seller to FSW on written demand and shall bear interest at 24% per annum if not paid within ten days after demand.

27.   **"Incipient Default"** shall mean any event shall have occurred and be continuing, which would with the giving of notice or passage of time, or both, constitute an Event of Default.

28.   **"Late Payment Date"** shall mean the date which is the earlier of (a) ninety days from the invoice date of a Factored Account, (b) the Customer or Seller ceases to be doing business in the ordinary course, (c) the Customer makes an assignment for the benefit of creditors, becomes the Debtor in a bankruptcy filing or otherwise is subject to an insolvency proceeding, whether voluntary or involuntary, or (d) the Bankruptcy Proceeding is converted to a Chapter 7 proceeding or other liquidation.

29.   **"Maximum Amount"** shall mean the amount of Two Million Dollars ($2,000,000)

30.   **"Minimum Base Rate"** shall be waived

31.   **"Net Face Amount"** shall mean the gross amount of an Account, less any returns, allowance or discount allowed in the ordinary course of business.

32.   **"Obligations"** shall mean all present and future indebtedness, liabilities and obligations owing by Seller

{0005407.0001;2}1523 DOC}

Case 2:22-bk-00150-EPB    Doc 51-1    Filed 01/21/22    Entered 01/21/22 10:14:03    Desc
Exhibit A - Final DIP Facility Agreements    Page 53 of 62



to FSW, whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising out of this Agreement or otherwise and whether arising before, during or after the commencement of any bankruptcy proceedings commenced by or against Seller, including but not limited to the Bankruptcy Proceeding, and all FSW's Costs which Seller is required to pay or reimburse FSW for, pursuant to this Agreement, or by law.

33. **"Online Reporting Service"** shall mean the system set up on FSW's website where Seller provides FSW with the pertinent data necessary for FSW to purchase Accounts under the Agreement and otherwise administer the Agreement.

34. **"Online Statement of Account"** shall have the meaning as described in Section 11.1 of the Agreement.

35. **"Original Term"** shall mean the term of the Agreement commencing on the Effective Date and concluding on the Termination Date.

36. **"Renewal Term"** shall have the meaning as set forth in Section 12 of the Agreement.

37. **"Required Reserve Amount"** shall mean an amount of up to Fifteen Percent (15%) multiplied by the unpaid balance of Purchased Accounts, as may be modified from time to time.

38. **"Reserve Account"** shall mean a bookkeeping account on the books of the FSW representing the unpaid portion of the purchase price of each Factored Account so purchased, which is maintained by FSW to ensure Seller's performance and disbursed to Seller at the time said Factored Account is paid, in accordance with Section 2.2.3 of the Agreement. The Reserve Account is a bookkeeping account only and FSW shall have no duty to segregate the amounts related to Seller from those of FSW or its other clients, and Seller shall have no interest in the Reserve Account.

39. **"Reserve Shortfall"** shall mean the amount by which the Reserve Account is less than the Required Reserve Amount.

40. **"Seller's Books"** shall mean and includes all of Seller's books and records including ledgers and records, computer programs, computer disks or tape files, computer printouts, and other computer prepared information pertaining to the Accounts, the Collateral or Seller's business.

41. **"State"** shall mean the state of Arizona

42. **"Termination Date"** shall mean the later of the expiration of the Original Term or any Renewal Term.

43. **"Trade Name"** shall mean each of the following: _____.

[SIGNATURE PAGE TO FOLLOW]



IN WITNESS WHEREOF, the Parties have executed this Addendum A to Factoring and Security Agreement as of the day and year stated above.

**SELLER: GPMI, Co.**

By: _____

Name:   Yarron Bendor
Title:       CEO

**FSW: FACTORS SOUTHWEST, L.L.C.**

By: _____

Name:   Robyn Barrett_____

Title:        Managing Member_____

Date of Acceptance:_____("**Effective Date**")



SCHEDULE 7.11

CLAIMS AGAINST SELLER

*VIA FACSIMILE, E-MAIL & US MAIL*

December 30, 2021

**Re: Notice of Assignment of Payments for GPMI, Co.**

Ladies and Gentlemen:

We are happy to announce that due to rapid growth, **GPMI, Co.** has outsourced capital funding of all their invoices to FSW Funding. In keeping with maximum efficiency, **GPMI, Co.** has assigned all present and future invoices directly to FSW Funding.

Under these arrangements, Arizona law requires that your payment be made directly to FSW Funding for the account of **GPMI, Co.**. FSW Funding's security interest has been duly recorded under Article 9 of the Uniform Commercial Code. This letter may only be revoked in writing by one of FSW Funding's officers. Payments should be mailed to the following address:

|  |  |
|---|---|
| **FSW Funding for the account of**<br>**GPMI, Co.**<br>**P. O. Box 467**<br>**Des Moines, IA 50302-0467** | <u>**Or ACH/Wire**</u> **Bankers Trust Company**<br>**602-224-2021 (telephone)**<br>**ABA: 073000642**<br>**Acct: 0000045837**<br>**Acct Name: Factors Southwest, LLC** |

*Payment made directly to GPMI, Co. does not discharge your obligation to pay FSW Funding.*

No changes to the payment instructions above can be made unless preapproved by contacting FSW Funding at 602- 535-5984. If you have any questions regarding this assignment, please contact FSW Funding.

**FSW Funding**

**GPMI, Co.**

_____

Robyn Barrett
Managing Member

Yarron Bendor,
CEO

{0006407.0001/01302717.DOCX / 2}



## AUTHORITY OF INDIVIDUALS

Date: December 30, 2021

The following individuals are authorized by GPMI, Co. of perform all of the transactions in furtherance of the Factoring and Security Agreement, including, but not limited to, submitting funding/advance requests, requesting reserve releases, and receiving account information.

PLEASE INDICATE "YES" OR "NO" FOR EACH AUTHORIZED REPRESENTATIVE

| Print Name | Signature | May submit Advance requests/ reserve release? | May communicate with FSW? | Personalized Login for e-Factor? | May submit new customer credit research forms? | Allow non-factored payments, assist with remittance advice. | Sign Borrowing Base Certificate. |
|---|---|---|---|---|---|---|---|
| Yarron Bendor | | YES/NO | YES/NO | YES/NO | YES/NO | YES/NO | YES/NO |
| Thomas K Werning | Thomas KWB | YES/NO | YES/NO | YES/NO | YES/NO | YES/NO | YES/NO |
| Shelley Bankert | Shelley Bankert | YES/NO | YES/NO | YES/NO | YES/NO | YES/NO | YES/NO |

Client: _____ GPMI, Company _____

By: _____ Yarron Bendor

Its: _____ CEO _____

{0006407.0001/01302717.DOCX / 2}



## COMPLIANCE REPORTING REQUIREMENTS

Date: December 30, 2021

Client: GPMI, Co.

### Required Financial Reporting

| Report | Frequency | Date Due |
|---|---|---|
| Bank Statement | Monthly | Due by 15th of the following month |
| Accounts Receivable Aging – Detailed by Invoice Date | Monthly | Due by 5th of the following month |
| Accounts Payable Aging – Detailed by Invoice Date | Monthly | Due by 5th of the following month |
| 940/941 Tax Deposits | Quarterly | Within 3 days of deposit being made |
| Income Statement (Profit & Loss Statement) | Monthly | Due by 15th of the following month |
| Balance Sheet | Monthly | Due by 15th of the following month |
| Inventory Report/Valuation | Monthly | Due by the 15th of the following month |
| Liability Insurance Rider naming FSW certificate holder | Annually | Due prior to the expiration of the current certificate |

Seller agrees to provide to FSW the above listed reports and frequency per Section 8.2 of the Factoring and Security Agreement.

Agreed: 1/12/22

Company: G P M I, Company

By: Thomas K W

Print Name and Title: Thomas K Werning
CFO

{0006407.0001/01302717.DOCX / 2}





**\*\*Any new banking information will take one Business Day to become active\*\***

- All information is required.
- You'll need information from your bank to complete this form.
- When requesting the routing number, be sure to get the number your bank uses for wire transactions (NOT the routing number for electronic funds transfers, if different).
- Once established, wire instructions remain in place until you delete them.
- New instructions will not replace existing ones unless you also tell us to delete the existing ones.
- *Print form and enter information filled out by hand. Write clearly in black ink.*

☐

## 1. Account

*Include authorized individuals. AT LEAST ONE OWNER MUST BE LISTED. For additional owners, use a copy of this section.*

Business Name _____

*Authorized Individuals:* _____

First Name _____

First Name _____

*Will complete when new account at National Bank of Arizona has been opened*

*TW*

*1/12/22*

## 2. Bank Account

☐ *Attach a voided check.*

Bank Name _____

Bank Account Number _____

Bank Address _____

Routing/ABA Number _____

Person: (Name, phone _____

## 3. Special Instructions

☐ *DELETE the following account.*

| Bank Name | | Bank ACH Routing/ABA Number |
|---|---|---|
| Bank Account Number | Routing/ABA Number | |
| Bank Address | | Bank Contact Person: (Name, phone number) |

## 4. Business/Entity Account Certification

*All businesses or entities must complete this section. If there is only one officer, that officer must sign.*
By signing below, you state you are authorized to enter into transactions on behalf of the organization.

| Print Authorized Individual Name | Authorized Individual Signature | Date (MM/DD/YYYY) |
|---|---|---|
| Print Authorized Individual Name | Authorized Individual Signature | Date (MM/DD/YYYY) |

For FSW Funding only – sign and date

| Entered in banking | Entered in FSQL | Verified by FSW Analyst |
|---|---|---|

{0006407.0001/01302717.DOCX / 2}

## VALIDITY GUARANTY

January 12, 2022

Factors Southwest, L.L.C. dba FSW Funding ("FSW")
4530 East Shea Blvd., Suite 170
Phoenix, AZ 85028

      RE: GPMI, Co. ("Seller") and FSW as specified in the Factoring and Security Agreement dated January 12, 2022

Ladies and Gentlemen:

The undersigned is the Chief Executive Officer of the Seller. In order to induce FSW to extend financial accommodations to the Seller pursuant to the Factoring and Security Agreement the Loan and Security Agreement, and other various financing agreements (the "Agreements") with the Seller, the undersigned hereby warrants and represents to FSW as follows:

1.     All Seller's accounts which have been or will be reported to FSW by or on behalf of the Seller and in which FSW has or will purchase or hold a security interest ("Accounts"), whether such reports are in the form of agings, Schedule of Accounts, borrowing base certificates, collateral reports or financial statements, are genuine and in all material respects what they purport to be, represent bona fide obligations of Seller's customers arising out of the performance of a service or the sale and completed delivery of merchandise sold by the Seller (the "Sold Goods") in the ordinary course of its business in accordance with and in full and complete performance of customer's (each, a "Customer") order therefor.

2.     All original checks, drafts, notes, letters of credit, acceptances and other proceeds of the Accounts, received by the Seller, will be held in trust for FSW and will immediately be forwarded to FSW upon receipt, in kind, in accordance with the terms of the Agreements.

3.     None of the Accounts are or will be the subject of any offsets, defenses or counterclaims of any nature whatsoever, and Seller will not in any way impede or interfere with the normal collection and payment of the Accounts.

4.     No Account is owing by an employee or officer of the Seller, or by a company related to the Seller as a parent, subsidiary or affiliate.

5.     INTENTIONALLY OMITTED.

6.     The Sold Goods are and will be up to the point of sales, the sole and absolute property of the Seller, and the Accounts and Sold Goods will be free and clear of all liens and security interests, except FSW's security interest.

7.     The due dates of the Accounts will be as reported to FSW by or on behalf of the Seller.

8.     Seller will promptly report to FSW all disputes, rejections, returns and resales of Sold Goods and all credits allowed by the Seller upon all Accounts.

9.     All reports, which FSW receives from the Seller, including *but not limited* to those concerning its Accounts and its inventory, will be true and accurate except for minor inadvertent errors.

10.     Seller will not sell its inventory except in the ordinary course of business.

11.     Seller agrees to make timely payments or deposits of all taxes (including OASDI, Medicare Tax, withholding tax payments and other mandatory withholdings) prior to delinquency and furnish to FSW on demand evidence of that payment or deposit.  This paragraph does not apply to any tax that is subject to a valid deferment under applicable law.

The undersigned hereby indemnifies FSW and holds FSW harmless from any direct, indirect, or consequential damage or loss which FSW may sustain as a result of the material breach of any representation or warranty contained herein, (all of which are continuing and irrevocable for so long as the Seller is indebted to FSW), or of FSW's reliance (whether such reliance was reasonable) upon any misstatement (whether or not intentional), fraud, deceit or criminal act on the part of the undersigned and to the best of the undersigned's knowledge, on the part of any officer, employee, or agent of the Seller, or any costs (including reasonable attorneys' fees and expenses) incurred by FSW in the enforcement of any rights granted FSW hereunder. All such sums will be paid by the undersigned to FSW on demand.

The undersigned waives all rights and defenses arising out of an election of remedies by FSW, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the undersigned's rights of subrogation and reimbursement against the principal by operation of Section 580d of the Code of Civil Procedure or otherwise.

Nothing herein contained shall be in any way impaired or affected by any change in or amendment of any of the Agreements. This agreement shall be binding upon the undersigned, and the undersigned's personal representative, successors, and assigns.

Very Truly Yours,

_____

Name: _____Yarron Bendor_____

Home Address: _23195 N. 77th Way_

_____Scottsdale, Az 85255_____

Phone: __602-432-2550__

SS #: _____